UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                                                   Case No. 10-20075

              Plaintiff,              Hon. A. Tarnow

      vs.

ALISTAIR RUFUS McGEE,
also known as Stir,

              Defendant.
_____/


VOLUME 1
TRANSCRIPT OF JURY TRIAL


BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Tuesday, October 5, 2010


APPEARANCES:

FOR GOVERNMENT:       LEONID FELLER, ESQ.
                      U.S. Attorney's Office
                      211 W. Fort Street, Ste 2001
                      Detroit, Michigan 48226

FOR DEFENDANT:        DAVID M. BURGESS, ESQ.
                      Burgess & Burgess
                      535 Griswold, Ste 2500
                      Detroit, Michigan 48226


*    *    *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
www.transcriptorders.com

<u>**I   N   D   E   X**</u>

<u>**WITNESS:**</u>                                              <u>**PAGE**</u>

**JURY SELECTION**
     (Not transcribed.)                             16

**PRELIMINARY JURY INSTRUCTIONS**                      17

**OPENING STATEMENT BY MR. FELLER**                    22

**OPENING STATEMENT BY MR. BURGESS**                   27

**JOSEPH NETHER**
     Direct-Examination by Mr. Feller          33
     Cross-Examination by Mr. Burgess          61
     Redirect-Examination by Mr. Feller        84
     Recross-Examination by Mr. Burgess        84

# E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| **Government** | | |
| 1 | 1/19/10 recording | 40 |
| 2 | 1/28/10 recording | 40 |
| 3 | 1/28/10 recording | 40 |
| 4 | 2/1/10 recorded phone call | 40 |
| 5 | 2/2/10 recording | 40 |

US v McGee #10-20075

```
 1                               Detroit, Michigan

 2                               Tuesday, October 5, 2010

 3                               8:30 a.m.

 4                       -      -      -

 5              MR. FELLER:  Good morning, Your Honor.  Leonid

 6    Feller, for the United States.

 7              MR. BURGESS:  Good morning, Your Honor.  May it

 8    please this Honorable Court, David Burgess, on behalf of

 9    Alistair McGee.

10              THE COURT:  Good morning.

11              Good morning, Mr. McGee.

12              MR. McGEE:  Good morning.

13              THE COURT:  Now, I understand there are some

14    preliminary matters.  One of the things we always do before

15    trial starts is to make sure if there were any Rule 11 offers.

16              Have there been, counsel?

17              MR. FELLER:  Your Honor, I don't know that I

18    ever provided Mr. Burgess with a written Rule 11 Plea

19    Agreement.

20              We discussed the mandatory minimum in this case

21    of ten years imprisonment.  We discussed the guideline range

22    which we thought was around ten years with a guilty plea.  And

23    Mr. Burgess told me that his client wasn't interested in

24    pleaing under the circumstances.

25              THE COURT:  Is that accurate, Mr. McGee; you are
```

US v McGee #10-20075

```
 1    not interested?

 2                 MR. McGEE:  I thought that that's all that it

 3    carried, was ten years if I was found guilty.

 4                 THE COURT:  WELL, actually what does it carry,

 5    Mr. Burgess?

 6                 MR. BURGESS:  It carries ten years mandatory

 7    minimum up to life, Your Honor.

 8                 THE COURT:  Do you understand that?

 9                 MR. McGEE:  Yes.

10                 THE COURT:  That you could get under the statute

11    up to life?

12                 MR. McGEE:  Yes.

13                 THE COURT:  But you cannot get less than ten

14    years.

15                 MR. McGEE:  Okay.

16                 THE COURT:  Okay.  And it's your choice to go to

17    trial?

18                 MR. McGEE:  Yes.

19                 THE COURT:  Okay.  And I respect that choice,

20    and you have that constitutional right.

21                 Now, let's get to the trial.

22                 MR. FELLER:  Your Honor, Mr. Burgess has a

23    motion.

24                 THE COURT:  And I believe Mr. Burgess can talk

25    on his own behalf.
```

```
 1              MR. FELLER:  I apologize, Your Honor.

 2              MR. BURGESS:  I appreciate the intro though.

 3              Your Honor, Mr. Feller gave me notice, a 404(b)

 4   notice.  After reviewing the discovery in this case, I don't

 5   understand how it would apply under any of the exceptions

 6   under 404(b).

 7              I know Mr. Feller has somewhat indicated -- he

 8   didn't actually file a formal notice.  He just indicated in an

 9   e-mail to me that it would be something to do with pattern.

10              I don't believe there is an offer of proof for

11   purposes of 404(b).  It is an issue that I wanted to bring up

12   to the Court.  While it is not an issue before jury selection,

13   it is an issue for trial.  So . . .

14              THE COURT:  Well, you may as well get it settled

15   so you can do voir dire and know what's coming.

16              MR. BURGESS:  Sure.

17              THE COURT:  So, what's the story?

18              MR. FELLER:  Your Honor, as a courtesy I

19   really -- out of an abundance of caution, I sent Mr. Burgess

20   a, quote, 404(b) notice.  I don't think the evidence is

21   actually 404(b).

22              This case involves --

23              THE COURT:  Well, you just labeled it 404(b).

24              MR. FELLER:  Well, if --

25              THE COURT:  But go on.
```

1          MR. FELLER:  In the event there was a motion and

2     the Court determined it was 404(b), I wanted there to be a

3     notice of it.

4              Your Honor, this case involves an armed robbery

5     in which this Defendant and others, including Dennis Porter

6     and Howard Barkley, intended to rob a stash house of

7     approximately 30 kilograms of cocaine.

8              Literally one or two days prior, this same group

9     of individuals -- this Defendant, Mr. McGee, and Mr. Porter --

10    participated in a robbery of Mr. McGee's neighbor, from which

11    they stole approximately a half dozen firearms and

12    approximately $5,000 in cash.

13             That robbery literally a day or two before is

14    how Mr. Barkley became involved in these events.  He was at

15    Mr. McGee's house leading up to that robbery during the

16    planning of that robbery.  It is how Mr. McGee was recruited

17    to participate in the events in this case.  And one of the

18    recordings we have of Mr. Porter goes, quote:

19             "Yeah, yeah, I ain't even gonna to use Dale.

20    I'm going to use Stir" -- that's this Defendant -- "and Lil

21    Dawg.  So we just, we just, we just hit, one man.  And a whole

22    bunch of ammo, you hear me, AR, an M14, an M16, a chopper, a

23    Heckler and Koch 9, a .45 Smith & Wesson."

24             So, Your Honor, this robbery that takes place a

25    day or two before is part and parcel of the same group of

```
1    individuals, the same conspiracy, the same events leading up

2    to this case.  If it is 404(b), it is certainly a pattern,

3    plan, motive, intent, literally every 404(b) category --

4                THE COURT:  I think I would like to hear from

5    Mr. Burgess, who is not real happy with what you are saying.

6                MR. BURGESS:  Your Honor, the charge in this

7    case is conspiracy to possess with intent to distribute

8    cocaine.

9                That other robbery that took place two days

10   before an uncharged act in this case had nothing to do with

11   any drugs, had nothing to do with the stealing any drugs.  And

12   the prosecutor is trying to bootstrap that case just to show

13   that Mr. McGee is a bad person.

14               And basically that's the whole point, is to

15   prevent this evidence from coming in under 404(b).  That is

16   the whole point of 404(b), is to not show a propensity to

17   commit a crime that fall under one of these limited

18   exceptions.

19               I just would point out to the Court also that

20   404(b) is not a rule of inclusion, but a rule of exclusion.

21   And I would ask that any information relating to any evidence

22   of a prior uncharged act two days before not be admitted

23   during this particular trial, which my client is on trial for,

24   which is just possession with intent to distribute -- excuse

25   me -- conspiracy to possess with intent to distribute cocaine.
```

US v McGee #10-20075

```
 1                    THE COURT:  I'm not going to allow it,
 2   Mr. Feller.
 3                    MR. FELLER:  Your Honor, I --
 4                    THE COURT:  I think you either make your case or
 5   you don't make your case focusing on the actual conspiracy
 6   that is in the charging document.
 7                    MR. FELLER:  Your Honor, I understand the
 8   Court's ruling.  There's a couple practical issues.
 9                    THE COURT:  Okay.
10                    MR. FELLER:  First of all, Mr. Barkley, who is
11   going to be testifying, following his arrest there is a
12   firearm found in his house.  That firearm is from this robbery
13   that took place the day before.
14                    So, either --
15                    THE COURT:  That --
16                    MR. FELLER:  -- either that doesn't come in or I
17   need to be able to explain it.  That's number one.
18                    Number two, is it's the same group of
19   individuals acting a day or two later.
20                    THE COURT:  I understand --
21                    MR. FELLER:  Your Honor, if I -- I don't want to
22   interrupt.  I'm sorry.
23                    THE COURT:  Sure.
24                    MR. FELLER:  I have recordings of everything
25   that's going on, and there's literally throughout the
```

1    recordings mention after mention of this robbery they just

2    completed.

3              So, Mr. Burgess had these recordings and

4    transcripts for months.  I'm hearing about this today.  I'm

5    getting a ruling from the Court today.  I'm not sure how --

6              THE COURT:  Well, I'm not sure who came last,

7    and whether your 404(b) courtesy e-mail triggered Mr. Burgess'

8    response.

9              MR. FELLER:  Your Honor, I just have a practical

10   situation where I have recordings and transcripts to provide

11   to the jury where these Defendants are talking about this

12   prior act as part of these same events.  So, I need some --

13             THE COURT:  What's your response, Mr. Burgess?

14             MR. BURGESS:  Your Honor, my response would

15   be -- I mean I'm not -- I don't believe I am obligated to put

16   the Government's case on for them.  I mean, if the Government

17   is going to have evidentiary issues with their case and they

18   see practical problems with the recordings, they should

19   address it to the Court well in advance so that steps can be

20   taken to redact certain information --

21             THE COURT:  Well, but you had this information.

22             MR. BURGESS:  I had no notice that the

23   Government was going to try to introduce evidence that, in my

24   mind, is not admissible and evidence that they never got a

25   ruling on from the Court.

1          THE COURT:  Did we ever have a final pretrial

2    statement in this case in terms of exhibits and so on?

3          MR. FELLER:  Your Honor, we did not.  We had --

4    well, we did.  We met in-chambers last week.

5          THE COURT:  No.  In terms of having a list of

6    exhibits.

7          Do you have a list of exhibits now?

8          MR. FELLER:  Of course, Your Honor.  And

9    Mr. Burgess has had that since last week.

10          MR. BURGESS:  Mm-hmm.

11          THE COURT:  Okay.  Mr. Burgess, did those

12    exhibits include these tape recordings?

13          MR. BURGESS:  Yes, that's correct, Your Honor,

14    they do.

15          THE COURT:  And you are just objecting to it

16    now?

17          MR. BURGESS:  I am objecting to it now, that's

18    correct, Your Honor.

19          THE COURT:  But you didn't object to it then?

20          MR. BURGESS:  I got the exhibit list I believe

21    it was late last week -- I can check my e-mail, but I believe

22    it was on Thursday or Friday of last week.

23          MR. FELLER:  Your Honor, I mean it's just a

24    little bit silly.  I mean, we have the tape recordings of the

25    events that constitute the crime.  And for Mr. Burgess to say,

```
 1    oh, gee, I didn't think you were going to use the events
 2    constituting the crime, I mean it's just silly.  The fact of
 3    the matter is he has had notice.
 4              I understand the Court's ruling, and I am
 5    perfectly satisfied not to introduce independent evidence of
 6    this other offense.  And that's fine if that's the compromise.
 7    But I don't have -- I don't have the practical ability on the
 8    fly to somehow try and redact these recordings that are, after
 9    all, this Defendant's own statements in the course of the
10    conspiracy that constitutes this event.
11              THE COURT:  Let me see the charging document.
12    Is it the usual one-line conspiracy thing?
13              MR. FELLER:  The crime charged -- yes.  It is
14    possession with intent to distribute more than five kilograms
15    of cocaine.  The possession was to be accomplished by means of
16    an armed robbery.
17              I mean, that's what this case is and has always
18    been.
19              MR. BURGESS:  The indictment doesn't specify.
20    It's very general, Your Honor.
21              MR. FELLER:  There's also a complaint that does
22    specify.
23              THE COURT:  May I see it, please?
24              MR. FELLER:  Your Honor, I am handing up a copy
25    of the Complaint against Alistair McGee which describes in
```

US v McGee #10-20075

1    detail the events that constitute the charge, as well as the

2    Superseding Indictment, which is more general.

3                    THE COURT:  Now, when you're saying the

4    Complaint is more descriptive, you are really referring to the

5    affidavit in support of --

6                    MR. FELLER:  Correct.

7                    THE COURT:  -- the Complaint?

8                    What is your response to this, Mr. Burgess?

9                    MR. BURGESS:  As far as the affidavit, Your

10   Honor?

11                   THE COURT:  Mm-hmm.

12                   MR. BURGESS:  I mean, Your Honor, the response I

13   have is in general.  And that I'm not obligated -- I don't

14   believe I am obligated to inform the Government of its

15   evidentiary pitfalls and issues involved.  If the Government

16   has issues --

17                   I mean, Mr. Feller is an attorney that has been

18   practicing for many years.  I'm sure he knows how the rules of

19   evidence work.  I'm sure he knows the potential problems that

20   his evidence might show, might indicate as far as mentioning

21   other criminal acts.  I mean, I'm sure he would know that, and

22   he should have probably addressed it to the Court.

23                   I don't believe it is my obligation to do any of

24   that, especially Mr. Feller knowing the forum that he is in

25   and knowing how these rules work.  I think it is pretty

| | |
|---|---|
| 1 | apparent that that's his obligation, Your Honor; not mine.  I |
| 2 | don't believe, that from a defense perspective, I'm required |
| 3 | to put him on notice that he has to do certain things.  It's |
| 4 | his burden. |
| 5 | MR. FELLER:  Your Honor, I . . . |
| 6 | THE COURT:  Hang on a minute, please.  I'm |
| 7 | almost done. |
| 8 | MR. FELLER:  I'm sorry. |
| 9 | *(Brief pause.)* |
| 10 | THE COURT:  I'm going to change my ruling.  I |
| 11 | don't think it's 404(b) evidence.  I think it's within the |
| 12 | conspiracy that's charged. |
| 13 | MR. FELLER:  Thank you, Your Honor. |
| 14 | THE COURT:  And therefore we are ready to |
| 15 | proceed I believe. |
| 16 | I have not read the jury instructions in toto, |
| 17 | but -- |
| 18 | Have you had a chance to read them, Mr. Burgess? |
| 19 | MR. BURGESS:  Yes, Your Honor. |
| 20 | THE COURT:  I will read them -- I will use them |
| 21 | in the preliminary instructions, but -- |
| 22 | As you know, I give the instructions to the |
| 23 | jurors as I read them.  So, they will have them as I read |
| 24 | them.  So, we will have to take out the legal citations and |
| 25 | the cover sheet.  But we can do that -- |

1        MR. FELLER:  Would you like me to do that and

2  resubmit them to you, Your Honor?

3        THE COURT:  Yes.

4        And we'll need 12 copies for the jurors, an

5  original for me.  Ms. Mosby gets one.  Each of you get one,

6  whatever that total is.

7        MR. FELLER:  Okay.  Your Honor, the one hang-up

8  I guess is there's alternate instructions depending on whether

9  or not the Defendant testifies.

10        THE COURT:  Okay.  Well, we can wait until that

11  is determined.

12        All right.  Do you want to call and ask the

13  jurors to be sent down.

14        We all understand how many peremptories and how

15  that works?  We talked about that last week.

16        MR. BURGESS:  Yes.

17        MR. FELLER:  Your Honor, you had said six and

18  ten.

19        I think with two alternates it's actually 7 and

20  11?

21        THE COURT:  It has been here.

22        MR. FELLER:  Okay.

23        THE COURT:  And my experience is that it's very

24  rarely are they all used anyway.

25        MR. FELLER:  That's fine with me, Your Honor.

```
 1                    THE COURT:  Off the record.
 2              (Off the record.)
 3                    THE COURT:  We are in recess.
 4              (Recess held at 8:47 a.m.)
 5              (Petit Jury Panel Members enter the courtroom at
 6              9:02 a.m.)
 7                         *     *     *
 8              (Jury Selection was not transcribed.)
 9                         *     *     *
10              (Jury leaves the courtroom at 10:32 a.m.)
11                    THE COURT:  Anything anyone wants to put on the
12     record?
13                    MR. FELLER:  Not for the Government, Your Honor.
14                    THE COURT:  Not for the Defense.
15                    MR. BURGESS:  Not for the Defense, Your Honor.
16                    THE COURT:  Are you going to be ready for your
17     opening statement?
18                    MR. FELLER:  Yes, Your Honor, as soon as my
19     legal assistant gets here.
20                    THE COURT:  Mr. Burgess, are you going to have
21     an opening statement or are you going to preserve it?
22                    MR. BURGESS:  I will have an opening statement.
23     I am prepared to proceed.
24                    THE COURT:  And you will have your witness.
25                    MR. FELLER:  Absolutely.
```

US v McGee #10-20075

1           How long do we have on this break?

2           THE COURT:  It is 25 to 11.  Let's come back and

3   ready to go at five minutes to 11.  A 20-minute break.

4           MR. FELLER:  Thank you, Your Honor.

5           MR. BURGESS:  Thank you, Your Honor.

6           *(Recess taken.)*

7           *(Jury enters the courtroom at 11:01 a.m.)*

8           THE COURT:  You may be seated.

9           I get a turn.

10          MR. FELLER:  Oh, I'm sorry.

11          THE COURT:  You can see how improvised trials

12  are.  But actually my part of the trial is pretty well

13  scripted, which means that the law doesn't change.  Your

14  function doesn't change.

15          In fact, at the end of the trial, before you

16  begin deliberations, you will get a copy of the final

17  instructions so that you will have them, one, to use when I

18  give them to you and, two, to use in the jury room.

19          You all have notebooks.  So that means you can

20  take notes.  You can also ask questions.  If you don't hear

21  something, there's nothing wrong with asking the same

22  question.

23          Mechanically the way that will work is at the

24  end of each witness, I will ask you if you have any questions,

25  and if you do, you will have them written down.  I will take

1    them to what we call sidebar and discuss them with the

2    attorneys, and I will decide whether they are appropriate or

3    not.

4             My experience has been probably between 80 and

5    90 percent are appropriate, maybe even a higher percent.

6             And I do that -- and more and more judges are

7    doing it -- because we are all human.  And the attorneys may

8    not ask the same questions that you would want to know.  If

9    they are relevant, then you should know the answers or, as I

10   say, if you didn't hear something and you just want it

11   repeated.

12            Your role is that of fact-finder, which means

13   you have to pay attention to the witnesses who will be

14   testifying there and to the exhibits if there are any exhibits

15   entered.  And if there are exhibits, you will be able to take

16   those into the jury room.

17            But the difficult part of your job is to

18   determine who is telling the truth and what the facts are.

19            I will give you what the law is and how they

20   come together and so on.

21            You have to also realize that the attorneys are

22   not witnesses.  Their questions are not testimony unless a

23   witness agrees with it.

24            And there will be times perhaps where an

25   attorney objects to the other's question, and I'll have to

US v McGee #10-20075

| | |
|---|---|
| 1 | rule on that.  If I rule that it is not a proper question, do |
| 2 | your best to ignore both the question and what you think the |
| 3 | answer might have been. |
| 4 | There are two kinds of evidence.  There's the |
| 5 | direct evidence where a witness comes in and says I saw that |
| 6 | it was raining outside, and there's circumstantial evidence |
| 7 | where somebody walks in the courtroom wearing a raincoat and |
| 8 | carrying an umbrella, both of which are dripping water.  The |
| 9 | circumstantial evidence would be that it's raining outside. |
| 10 | And both kinds of evidence are admissible and should be |
| 11 | considered. |
| 12 | In terms of determining credibility, you have to |
| 13 | use your past experience and how believable a witness appears. |
| 14 | If there's conflicting testimony, it's your job to decide |
| 15 | which is the real story, which is true. |
| 16 | Again, you have to apply the law that I give to |
| 17 | you to determine whether or not the prosecutor has proved |
| 18 | their case beyond a reasonable doubt. |
| 19 | The reasonable doubt standard is because there's |
| 20 | a presumption of innocence.  In other words, to overcome that |
| 21 | presumption of innocence, you have to have so much evidence, |
| 22 | that you believe the Government has proved it beyond a |
| 23 | reasonable doubt.  It doesn't mean all doubt, but it does mean |
| 24 | a reasonable doubt, something that is a standard you would use |
| 25 | in making decisions on important matters in your everyday |

    1     life.

    2            As I've indicated to you and as Mr. Burgess has

    3     now told us, he doesn't have to call any witnesses.  He's

    4     going to rely on his cross-examination of the Government

    5     witnesses.

    6            He hasn't told me nor have I asked as to whether

    7     Mr. McGee is going to testify.  That decision doesn't have to

    8     be made until after he hears all of the testimony.  And that

    9     he may have made a decision now.  In any event, if he chooses

   10     not to testify, that is not to be held against him, because he

   11     has a constitutional right to remain silent throughout the

   12     trial.

   13            Now, the lawyers' objections are also not

   14     evidence.  Again, the only evidence you're going to hear will

   15     come from the witness stand under oath or exhibits, or there

   16     might be a couple stipulations where whatever the fact is is

   17     agreed to.

   18            This is a count that charges between January

   19     19th, 2010 and on or about February 2nd, 2010, in the Eastern

   20     District of Michigan, Mr. McGee did knowingly and

   21     intentionally combine, conspire, confederate and agree with

   22     other individuals to commit a crime, which was to distribute

   23     controlled substances, in violation of the law.  And the

   24     Government goes on to charge that it involved five kilograms

   25     or more of a mixture or a substance containing cocaine.  And

1   all of those things have to be proved beyond a reasonable
2   doubt.

3                I'll talk to you in much more detail at the end
4   of the trial in defining the elements, but the important thing
5   is to listen to the attorneys when they give you their opening
6   statement, which is going to be like a table of contents, as
7   compared to their closing argument, which is an argument which
8   will be focusing on their view of what the evidence shows.

9                In terms of an outline of how the trial works,
10  after I'm done with these preliminary instructions, the
11  prosecution will give an opening statement.  The defense will
12  have an opportunity to give an opening statement.  And the
13  prosecutor will call their witnesses.  Each witness they call
14  will be subject to cross-examination by the defense.  And,
15  again, the defense doesn't even have to cross-examine.  They
16  can just sit there.  But that's their decision.

17               The only person you are focusing on is
18  Mr. McGee, because that's the person who is the Defendant in
19  this case.  When you begin deliberating, you will be told that
20  your verdict has to be unanimous.

21               After the prosecutor's case, the defense may, if
22  they choose to, testify.  Whether they do or not, the next
23  step is closing arguments, although the prosecutor does have
24  the right to rebuttal if there's anything said by the defense.
25               After all of the evidence is in, then you will

1    hear the closing arguments, and then you will get the final

2    instructions.

3              I think that's where we are -- what we're going

4    to hear.

5              I should mention, as the counsel have mentioned

6    in their voir dire, that this case involves the testimony of a

7    co-conspirator or a Co-Defendant.  And the evidence should be

8    viewed very carefully and cautiously for the reasons that they

9    may be getting something for their testimony.

10             Ready for your opening argument?

11             MR. FELLER:  I am, Your Honor.  Before I --

12             THE COURT:  Excuse me.  Opening statement.

13             MR. FELLER:  Opening statement, Your Honor.

14             Before I do that, I did want to introduce

15   Ms. Carol Oliver, a paralegal with the U.S. Attorney's in my

16   office.

17             *(Off the record.)*

18             *(Jury affirmed and sworn.)*

19             THE COURT:  You may begin.

20             MR. FELLER:  Ladies and gentlemen, good morning

21   again.

22             As I said earlier, this is a case about an armed

23   home invasion crew of which this Defendant Alistair McGee,

24   better known as Stir, was a member.  Their specialty was

25   breaking into homes that they believed contained either large

1    amounts of drugs or guns.  They would then sell, the evidence

2    will show, the guns or drugs and split up the proceeds.

3              This crew came to the attention of law

4    enforcement in January 2010.  An undercover ATF agent met with

5    another member of the crew, a gentleman by the name of Dennis

6    Porter.  The undercover agent said he was working for a

7    Mexican Drug Cartel, that he wasn't satisfied with the cut

8    that he was receiving, and that he wanted Mr. Porter and his

9    crew to rob the Mexican Drug Cartel and split up the proceeds.

10   There was a stash house or there was to be a stash house that

11   contained at least 30 kilograms of cocaine.

12             And all of this and almost everything that

13   happened in the case was caught on video tape.

14             Ms. Oliver, if we could have Exhibit 1, Clip 3.

15             THE COURT:  Do you want the lights dimmed?

16             MR. FELLER:  These are all short.  I think

17   that's fine.

18             THE COURT:  Okay.  I've studied audiovisual at

19   judges school.

20             *(Exhibit 1, Clip 3, played in open court.)*

21             MR. FELLER:  The undercover agent asked Porter

22   if he and his crew would be willing to rob the Mexican Cartel.

23   Mr. Porter said he would and that he had a crew to do it.

24             Exhibit 1, Clip 1, please.

25             *(Exhibit 1, Clip 1, played in open court.)*

1      MR. FELLER:  Once the drugs were in hand,

2  Mr. Porter's brother would be the one responsible for selling

3  them.

4      Exhibit 1 Clip 2, please.

5      *(Exhibit 1, Clip 2, played in open court.)*

6      MR. FELLER:  A few days later a confidential

7  informant called Mr. Porter and asked him whether he was ready

8  to do the job, whether the crew was assembled.  Porter said

9  that he did, that he was ready to go, and that one of the

10  individuals he would be using was a man named Stir.  And he

11  talked about a robbery they had just finished a day or two

12  earlier, including stealing some firearms.

13      If we could have Exhibit 4 Clip 1, please.

14      *(Exhibit 4, Clip 1, played in open court.)*

15      MR. FELLER:  You will hear the word "chopper" a

16  lot.  That's how these individuals refer to firearms.

17      If we could have Exhibit 4 Clip 2, which is a

18  continuation of the call.

19      *(Exhibit 4, Clip 2, played in open court.)*

20      MR. FELLER:  On February 2nd, 2010, the

21  undercover agent -- he will be the first witness you will hear

22  from -- he met with Mr. Porter, who you have heard from so

23  far, at a coney island to finalize plans for the robbery that

24  was going to take place that night.  Mr. Porter brought with

25  him this Defendant, Stir, Mr. McGee, who by his own words was

1    ready to go.

2              Exhibit 5, Clip 1.  And in this one you will see

3    Mr. McGee on the right-hand side of the table.

4              *(Exhibit 5, Clip 1, played in open court.)*

5              MR. FELLER:  The undercover agent again told

6    Mr. Porter, Mr. McGee, the assembled crew how much cocaine

7    they could expect to get from the robbery, 30 kilograms.

8              Exhibit 5 Clip 2.

9              *(Exhibit 5, Clip 2, played in open court.)*

10             MR. FELLER:  Again, in that clip you could see

11   Mr. McGee standing on the left-hand side.  You will see him

12   again in this clip where he talks about being ready to do the

13   job.

14             He thought it would be easy.  He thought it

15   would be smooth.  That once the house they were invading, once

16   the people inside saw the choppers, they would just turn the

17   drugs over without any shots even being fired.

18             If we could have Exhibit 5 clip 2.

19             *(Exhibit 5, Clip 2, played in open court.)*

20             MR. FELLER:  Also at the coney island that

21   evening was Howard Barkley, who, in fact, Stir or Mr. McGee

22   recruited to participate in the robbery with him.

23             As I mentioned, Mr. Barkley has pled guilty, and

24   you will be hearing his testimony from the witness stand

25   likely tomorrow.

1          The undercover agent, the crew, everyone leaves

2    the coney island to go get the guns they will be using for the

3    robbery in a little bit, and they end up meeting back at a

4    storage facility from which they are supposed to head to the

5    robbery.  That's where the arrest takes place.

6          Now, candidly, the arrest doesn't go as smoothly

7    as it should.  In fact, Mr. McGee is able to flee on foot.  It

8    takes ATF and the U.S. Marshals a couple weeks to track him

9    down.  When they do, they find him living in the basement of

10   another man's home, and in the basement they find this firearm

11   hidden behind a couch.

12          If we could see Exhibit 6.

13          Now, Mr. McGee is charged here in federal court

14   with a single count, conspiracy to possess with intent to

15   distribute more than five grams of crack cocaine -- I'm

16   sorry -- five kilograms of cocaine; not crack cocaine.

17          You heard the word "elements."  The charge at

18   issue in this case has two elements; first, that there was an

19   agreement to obtain and then distribute drugs.  In most cases,

20   Defendants plan to either manufacture or buy drugs.  Here, the

21   plan was to steal the drugs.  And, second, that Mr. McGee

22   voluntarily joined that agreement, that conspiracy.

23          I expect the evidence to be straightforward.  I

24   expect it to be largely undisputed.

25          At the conclusion of this trial, I will ask you

```
 1          to return a verdict of guilty.

 2                          Thank you.

 3                          THE COURT:  Thank you.

 4                          Mr. Burgess?

 5                          MR. BURGESS:  Thank you, Your Honor.

 6                          Good morning again.

 7                          Opening statement, obviously, it's not evidence.

 8          What the Government just said to you, Mr. Feller, is not

 9          evidence.  What I'm saying right now is not evidence.  It's

10          just kind of a road map.  Well, in the Government's case, it's

11          a road map.

12                          What I'm trying to say to you is basically the

13          things I want you to consider when you are listening to the

14          evidence in this case, because in this case you get a somewhat

15          unique opportunity to see how the Government creates a case.

16          And I say "create" because you are not talking about Sherlock

17          Holmes here that actually uses deductive reasoning and sorts

18          out clues and stuff.

19                          Basically how the Government works in this case

20          is it's almost like creating a crime.  And when I say that,

21          you saw clips.  You didn't see a run-through or anything like

22          that.  And that's kind of similar with the Government, because

23          the Government has control over when these video cameras are

24          on, when they are off.

25                          And the Government also is going to try to put
```

| | |
|---|---|
| 1 | in -- well, they are probably going to put in some evidence in |
| 2 | this case that has nothing to do with this case.  And they are |
| 3 | going to do it honestly to, even though it has nothing to do |
| 4 | with the elements in this case, to elicit a desired response |
| 5 | from you.  They figure if they throw enough stuff at the wall |
| 6 | in this case, that has nothing to do with the case, you will |
| 7 | just figure Mr. McGee is a bad guy because of all this stuff |
| 8 | that's around him and you will convict him.  That's their |
| 9 | desire in this case, and that's how the Government has created |
| 10 | this case, and that's how they would like to prove it, because |
| 11 | they set it up in some certain way. |
| 12 | The evidence they show here has been carefully |
| 13 | orchestrated and carefully arranged in a certain way.  And |
| 14 | it's done that way, again, to elicit a desired response by the |
| 15 | Government. |
| 16 | Now, you are also going to hear from a snitch |
| 17 | witness.  And you've heard about this before.  They refer to |
| 18 | him as a cooperating witness.  And you all answered some |
| 19 | questions about how a snitch witness operates or what a snitch |
| 20 | witness would likely say. |
| 21 | And you are going to hear a word mostly from me, |
| 22 | but I want to you consider it and I'm going to kind of give |
| 23 | you a definition of it.  It's called conflabulation. |
| 24 | Now, what that word means is basically when a |
| 25 | snitch witness is interviewed over and over and over again by |

1    the Government, the agents in this case interview him, and

2    either intentionally or unintentionally the agents, who

3    already have the information in their heads, who already have

4    what they desire as an outcome in this case, talk to these

5    snitch witnesses and either intentionally or unintentionally

6    feed information to these snitch witnesses.  And these snitch

7    witnesses pick up on this information and in their minds turn

8    it into their own story.

9              And that's pretty common in how the Government

10   proceeds in these types of cases as relates to snitch

11   witnesses.

12             So, I want you to keep that in mind when you are

13   listening to the testimony and whether or not the snitch

14   witness's testimony not so much in a vacuum makes sense, but

15   whether it makes sense in conjunction with all the rest of the

16   evidence or the lack of evidence, which I will get into more

17   in my closing argument.

18             Because as the Judge will instruct you in this

19   case, proof beyond a reasonable doubt is a -- excuse me.  A

20   reasonable doubt is a doubt based on reason and common sense

21   growing out of the evidence or lack of evidence.

22             So, when you are listening to evidence in this

23   case, I would ask you to consider not only what has been

24   presented to you, but what has not been presented to you as

25   well and what could have possibly been presented to you.  And

1    please use your common sense and everyday experiences when you

2    are assessing that.

3                I would also ask you to consider again when you

4    are listening to the evidence, focus on what I asked you about

5    earlier, the elements in this case.  Because when it comes

6    down to it, you are going to see that the evidence that I

7    believe the evidence will show in this case, basically in a

8    nutshell, on the date in question here, Mr. McGee is present

9    at this coney island.  Mr. McGee gets in a vehicle, and

10   Mr. McGee drives away from the scene before anything happens

11   and has nothing more to do with this matter.  That's the

12   evidence in a nutshell in this case.

13                And I'm asking you all to keep your eyes on the

14   prize.  Please stay focused.  Keep an open mind in this case.

15   Consider the quality of the evidence as well as the source of

16   the evidence and also what is not introduced, again, by the

17   way, because the Government in this case is really trying to

18   bootstrap their case by offering all kinds of extraneous

19   information, all kinds of extraneous evidence.

20                As they create this -- as they have created this

21   case and as they present it to you in its created finished

22   form, much like a movie producer, director, I would ask you to

23   consider all that.  Consider how it has been offered.  Has it

24   been offered in its raw form for you to consider.  Has it been

25   offered by the Government in some pre-prescribed way again in

```
 1    order to elicit a response from all of you.

 2                    I'm asking you to consider all of that before

 3    you have heard any evidence.  I'm asking you to consider it

 4    when you are listening to the evidence as well.  Because I

 5    think after you hear all of the evidence in this case -- not

 6    looked at it in a vacuum, not looked at in just clips, but

 7    looking at all of the evidence and keeping it in mind, at the

 8    end of the case you will have a reasonable doubt and you will

 9    find my client not guilty.

10                    Thank you.

11                    THE COURT:  Thank you.

12                    Are you ready to call your first witness,

13    please?

14                    MR. FELLER:  Yes, Your Honor.  The United States

15    calls ATF Special Agent Joseph Nether.

16                    THE COURT:  Yes?

17                    JUROR NO. 8:  Your Honor, does the podium move

18    at all?

19                    THE COURT:  No.  Would you like to --

20                    JUROR NO. 8:  No.  I just would like to see the

21    Defendant.

22                    THE COURT:  Oh, oh, that's interesting.

23                    Would you raise your right hand.

24              JOSEPH NETHER, GOVERNMENT'S WITNESS, SWORN.

25                    THE COURT:  The podium is new in configuration.
```

```
 1              MR. FELLER:  Your Honor, is it all right if I

 2   stand back a little bit.

 3              THE COURT:  Yeah.  You can stand back.

 4              Does that make it easier for all of you to see?

 5              JUROR NO. 8:  Yes.

 6              THE COURT:  Do all of you see the people at the

 7   tables?

 8              JURORS:  No.

 9              THE COURT:  Who can you not see?

10              JURORS:  The Defendant.

11              THE COURT:  You know what.  At the break we are

12   going to switch sides.  We can't do it now because they have

13   got their computer set up there.  But I missed that when we

14   were designing this.  I'm thinking how to solve it for the

15   future.  Maybe put a mirror on the far side.

16              All right.  Why don't you introduce your witness

17   now that I have distracted everybody.

18              Hang on one second.

19              How many jurors cannot see the Defendant now?

20   Raise your hand.

21              (Two of the jurors raise their hands.)

22              THE COURT:  Why don't you two just go sit down

23   at the other end of the jury box.

24              You just saved the Government a lot of money.

25              JUROR NO. 1:  Do you want me to take the bell?
```

```
 1              THE COURT:  No.  Give it to Juror No. 3.
 2              It might be a lot easier to come out front and
 3    walk around.
 4              Boy, I hope they give credit for solving
 5    problems.  I just solved the problem.
 6              MR. FELLER:  Thank you.
 7              THE COURT:  All right.  You may begin.
 8              MR. FELLER:  Have we sworn the witness, Your
 9    Honor?
10              THE COURT:  I'm sorry.  Yes, we did -- "we"
11    didn't.  I did.
12              MR. FELLER:  Thank you.  I apologize.
13        JOSEPH NETHER , GOVERNMENT'S WITNESS, SWORN.
14                    DIRECT-EXAMINATION
15    BY MR. FELLER:
16    Q.  Sir, would you state and spell your last name for the
17    jury, please?
18    A.  Joseph Nether, N E T H E R.
19    Q.  And what do you do for a living?
20    A.  I'm a Special Agent with the Bureau of Alcohol, Tobacco &
21    Firearms and Explosives.
22    Q.  Is that commonly known as ATF?
23    A.  Yes.
24    Q.  How long have you been with ATF?
25    A.  Since 2001.
```

Q.   Could you describe a little bit for the jury the training you go through to become an ATF agent?

A.   We have six months of training at the Federal Law Enforcement Training Center in Glenco, Georgia.   Three months of that is a general training, and then the last three months is the ATF National Academy where we learn the law specific to ATF that we investigate.

Q.   Have you been assigned to Detroit throughout your career?

A.   Yes, I have.

Q.   And are you assigned to any specific squads or task forces?

A.   Right now I am assigned to a task force that works out of Redford.   We go after violent felons in possession of firearms and armed drug dealers.

Q.   What do you specifically do most of your time as an ATF agent?

A.   The majority of my investigations involve undercover work. So, I actually interact with the individuals I'm investigating.

Q.   What does that mean, undercover; what do you do?

A.   I pose as another person to actually conduct my investigations.   I actually pretend to be somebody that I'm not.   I do not tell anybody I am an ATF agent.

Q.   Is it fair to say you generally pretend to be a criminal?

A.   Yes.

```
 1    Q.  Why do you do that; because you have nothing better to do?
 2    A.  No.  Because it's a way to conduct investigations, to
 3    where you get great evidence, audio and video evidence.  So, I
 4    find that for me it's the best way to conduct my
 5    investigations.
 6    Q.  How are targets for your investigations generally
 7    selected?
 8    A.  We typically get targets from either citizens that call in
 9    on a tip or an informant, someone who tells us about another
10    criminal.  They allege what they are doing, and we investigate
11    those allegations.
12    Q.  And is there anything about the individuals and targets
13    that you focus on?
14    A.  For us as ATF agents we typically focus on either felons
15    in possession of the firearms, armed drug dealers, robbery
16    cases, anything typically dealing with violence, that's what I
17    typically investigate.
18    Q.  Now, specific to this case, and without telling us
19    anything that anyone said to you or that you said to anyone,
20    was there an armed home invasion crew that came to your
21    attention in, say, January of 2010?
22    A.  Yes.
23    Q.  And how did that generally come to your attention, again,
24    without telling us anything anyone specifically said to you?
25    A.  Through a cooperating witness.
```

1   Q.   And did you in fact, to investigate this particular crew,

2   develop an undercover persona?

3   A.   Yes.

4   Q.   And can you tell the jury what that persona was?

5   A.   For this particular case I pretended to be a courier for a

6   large drug organization that operated mainly in the city of

7   Detroit.

8   Q.   All right.   And what was the opportunity that was going to

9   be offered to this crew?

10   A.   I was going to give the crew and I did give the crew an

11   opportunity to rob my employer of their narcotics.

12   Q.   And why would they do that?   What reason did you give them

13   for wanting to rob the employer?

14   A.   I told members of the crew that I wasn't being paid what I

15   felt that I should have been paid, and when I asked for a

16   raise, they wouldn't give me a raise.   So based on that, I

17   wanted to get the main drug dealer robbed.

18   Q.   Did you describe the quantity that this crew could expect

19   to find inside this Mexican Cartel's drug house?

20   A.   Yes.   I advised that this cartel typically once to twice a

21   month deals in 30-plus kilograms of cocaine and that I

22   typically couriered approximately six kilograms.

23   Q.   How was the robbery to take place?   What was going to

24   happen?

25   A.   I was going to go inside the house, see how much cocaine

1   was inside the house, then go into the bathroom, make a phone

2   call to one of the members of this drug crew -- of this

3   robbery crew, tell them how much cocaine would be inside the

4   house, let them know how many guys were in the house, whether

5   or not they had the guns and where they were located.

6               Once I gave them that information, that's when

7   the robbery crew would come in the house and rob the

8   individuals inside.

9   Q.  Now, are you familiar with the terms "distribution

10  quantity" versus "user amount?

11  A.  Yes.

12  Q.  What is a "user amount"?

13  A.  A "user amount" would be typically an amount like a 16th

14  of a gram of cocaine, which somebody typically would use one

15  time.

16  Q.  If they wanted to get high?

17  A.  If they wanted to get high, correct.

18  Q.  All right.  What does the term "distribution quantity"

19  mean?

20  A.  That would be more used for somebody who is a seller of

21  narcotics.  So, they would have larger quantities.

22  Q.  Okay.  Based on your training and experience as an ATF

23  agent, would a kilogram of cocaine be a distribution quantity?

24  A.  Yes.

25  Q.  6 kilograms?

1    A.  Yes.

2    Q.  30 kilograms?

3    A.  Yes.

4    Q.  You have a book in front of you.  It is a book of

5    exhibits, and we are going to be displaying that to the jury

6    up on the screen.

7              During the course of your investigation were a

8    number of recordings made?

9    A.  Yes.

10   Q.  All right.  Did an individual known as Dennis Porter

11   appear on those recordings?

12   A.  Yes, he did.

13   Q.  Is there an alias he is known by?

14   A.  Yes.  He went on the street as Denny Mo.

15   Q.  Is an individual known as Howard Barkley, does he appear

16   on some of those recordings?

17   A.  Yes, he does.

18   Q.  Does Mr. McGee or Stir, does he appear on those

19   recordings?

20   A.  Yes, he does.

21   Q.  Does the Government ATF confidential informant appear on

22   some of those recordings?

23   A.  Yes, he does.

24   Q.  What name does he go by on those recordings?

25   A.  That is Nop.

Q.  That is N-O-P?

A.  N-O-P.

Q.  All right.  Let me ask you to take a look at Exhibits 1 through 5 in that book and ask if you can identify those.

A.  Exhibit 1 is a recording I made on January 19th of this year, which was the first meeting I had with Dennis Porter.

Exhibit 2 is a second meeting I had on January 28th of this year, a meeting I had with Dennis Porter.

Exhibit 3 is another recording from that same meeting on January 28th, 2010.

Exhibit 4 is a phone call placed from the cooperating witness to Dennis Porter on February 1st, 2010.

Exhibit 5 was recorded February 2nd, 2010, and that is the final meeting and arrest of Dennis Porter, Howard Barkley, and Alistair McGee regarding the robbery.

Q.  And that last one, Agent -- I think you misspoke -- it's the final meeting with all of those individuals.  Not everyone was arrested on that date.  Correct?

A.  Correct.

Q.  And those discs, Exhibits 1 through 5, you have had an opportunity to review each of those?

A.  Yes.

Q.  Are they all fair and accurate representations of the events as they took place, either video and audio recordings?

A.  Yes.

1    MR. FELLER:  Your Honor, I would offer Exhibits

2  1 through 5 into evidence at this time.

3    THE COURT:  Any objection?

4    MR. BURGESS:  No voir dire.  No objection, Your

5  Honor.

6    THE COURT:  They are received.

7    *(Government Exhibits 1 through 5 were admitted*

8    *into evidence.)*

9    MR. FELLER:  Thank you, Your Honor.

10    And I should just say, for the record, as a

11  practical matter what we've done is taken the discs,

12  downloaded them into the computer, synched them with the

13  transcripts as we've seen, and those are the images we are

14  playing for the jury.

15    THE COURT:  Any objection?

16    MR. BURGESS:  No, Your Honor.

17    THE COURT:  They are received.

18    And I assume you will make a lap top available

19  to the jurors for deliberations.

20    MR. FELLER:  Of course, Your Honor.  And even

21  someone to operate the lap top if they like.

22    THE COURT:  No.  I think one of the jurors or

23  more will be able to -- we will label the switch O for on and

24  O for off, and they will figure it out.

25    MR. FELLER:  Your Honor, I will say I can't

```
 1    operate it.  So . . .

 2                   THE COURT:  That's why you are not on the jury.

 3    BY MR. FELLER:

 4    Q.  Agent Nether, you referenced a first meeting.  Again, who

 5    was that with?

 6    A.  Dennis Porter.

 7    Q.  Okay.  And where did that meeting take place?

 8    A.  Uhm . . .

 9    Q.  Was it in a home, in a store . . .

10    A.  It was in my vehicle in a parking lot off of Grand River

11    in northwest Detroit.

12    Q.  And that was recorded?

13    A.  Yes, it was.

14                   MR. FELLER:  I will ask if you can cull up

15    Exhibit 1.

16                        (Exhibit 1 played in open court.)

17                   If you could just pause it.

18    BY MR. FELLER:

19    Q.  Could you just describe for the jury what this is, what

20    they're seeing?

21    A.  This is actually the vehicle that I was driving when I met

22    with Dennis Porter.  And you are seeing four different angles

23    of cameras that were throughout the vehicle.

24    Q.  Okay.  And what is each angle, which part of the vehicle?

25    Going clockwise to --
```

1    A.   The top left corner is -- I am the closest one to the

2    steering wheel.  Dennis Porter will be in the passenger seat.

3    The top right corner is going to be, I believe, a head-on shot

4    of Dennis Porter.  The bottom left corner is just going to be

5    a side view of both of our heads, and the bottom left corner I

6    can't really remember what angle that is until it plays a

7    little further.

8    Q.   We'll take a look.

9              MR. FELLER:  Let's see Exhibit 1.

10             *(Exhibit 1 continued playing in open court.)*

11             MR. FELLER:  If you could pause it for a second.

12   BY MR. FELLER:

13   Q.   I'm going to have to interrupt every now and again

14   unfortunately.

15             Is it fair to say there is a decent amount of

16   slang that is used throughout these recordings?

17   A.   Yes.

18   Q.   Is it fair to say that is something you are familiar with

19   as part of your undercover work for, I believe, eight years?

20   A.   Yes.

21   Q.   When you say "brick," what is a brick?

22   A.   A "brick" is a slang term for a kilogram.

23   Q.   Okay.  So when you say "30 bricks," you are referring to

24   what?

25   A.   30 kilograms of cocaine.

1          MR. FELLER:  If we can continue.

2          (Exhibit 1 continued playing in open court.)

3          MR. FELLER:  Pause for one second.

4    BY MR. FELLER:

5    Q.  Maybe we should just run through them.

6          Are there various slang terms for guns?

7    A.  Yes.

8    Q.  All right.  Can you tell the jury what some of those are

9    that may be used in the course of the investigation?

10   A.  Typically "heaters" will be used for guns.  Sometimes you

11   will hear "blowies," which means firearms also.  You may hear

12   a "chopper," which means an AK-47 style assault rifle.

13   "Tools" is another word for gun.  "Whistle" is another word

14   for gun.

15         MR. FELLER:  All right.  Let's continue.

16         (Exhibit 1 continued playing in open court.)

17   BY MR. FELLER:

18   Q.  I probably should have asked you earlier.  As past your

19   training to be an ATF agent, do you receive any specific

20   training for undercover work like this?

21   A.  There is training that I have been to, put on by ATF, to

22   practice undercover work.  But to start doing undercover work

23   with ATF, there isn't any specific training you have to go to.

24   Q.  How is it you are able to do this?

25         You give incredible detail about this plan that

1    is supposed to come together.  You are talking about

2    foreclosures in the neighborhood.

3                    How is it that you are able to do it?

4    A.  They cases have been done before by ATF, and there's a

5    specific I guess set of rules that we have to follow in order

6    to do this type of investigation.  So, I've just reviewed

7    that.  I have listened to other undercovers that have done

8    this before me, that have done the same type of investigation,

9    and then kind of put my own spin on it.

10   Q.  Is undercover like this dangerous?

11   A.  Yes.

12   Q.  What, if anything, can you do to protect yourself?

13   A.  Nothing really.  I mean we have a crew on standby; that if

14   anything goes wrong, you know, hopefully they can get there in

15   time.

16   Q.  Odds are, can they get there on time if something goes

17   wrong?

18   A.  Sometimes they do; sometimes they don't.

19   Q.  Why do you do this kind of work?

20                    MR. BURGESS:  Objection, Your Honor.  Relevance.

21                    THE COURT:  Sustained.

22   BY MR. FELLER:

23   Q.  Subsequent to this -- this first meeting occurs on January

24   19th, correct?

25   A.  Yes.

1    Q.  Is there subsequently a meeting with Mr. Porter at a coney

2    island?

3    A.  Yes.

4    Q.  Okay.  And also at that meeting is the confidential

5    informant Nop, correct?

6    A.  Yes.  He's also there.

7    Q.  Without telling us anything you said to anyone or anything

8    anyone said to you, how is it that Nop is able to introduce to

9    you Mr. Porter?  Do they have some kind of past relationship,

10   if you know?

11   A.  The informant did advise us that he was a member of a

12   robbery crew and robbed --

13                   THE COURT:  Hang on a second.  That was a yes or

14   no question.

15   BY MR. FELLER:

16   Q.  Did Mr. Porter and the confidential informant Nop have

17   some sort of preexisting relationship so that Nop was able to

18   introduce you to Porter?

19   A.  Yes.

20   Q.  Okay.  Do you know -- again, without telling us anything

21   anyone said to you or you said to anyone, do you generally

22   know the nature of their prior relationship?

23   A.  Yes.

24   Q.  And can you describe that for the jury?

25   A.  The informant had actually conducted robberies with Dennis

1    Porter before, the same type of robbery that we were

2    discussing.

3    Q.  All right.  And so that's how Nop was able to introduce

4    you to Porter?

5    A.  Yes.

6    Q.  Because they had worked together before as well?

7    A.  Yes.

8    Q.  So, there's a meeting with Nop and Porter at a coney

9    island, correct?

10   A.  Yes.

11   Q.  Do you know the approximate date of that meeting?

12   A.  I believe it's January 28th --

13   Q.  Okay.

14   A.  -- 2010.

15   Q.  And there's a portion of that meeting that you participate

16   in.  That's Exhibit 3.  Correct?

17   A.  Correct.

18   Q.  And is there a portion of the meeting that's just Nop and

19   Porter?

20   A.  Yes.

21   Q.  Okay.  And that's Exhibit 2.  Is that right?

22            You can check.

23   A.  Yes, it is Exhibit 2.

24   Q.  All right.  Now, at this January 28th meeting, if we have

25   the date right -- yep -- Mr. McGee is not there.  Correct?

1    A.   No, he is not.

2    Q.   On January 28th?

3    A.   No, he is not.

4    Q.   And no mention of Stir, correct?

5    A.   No.

6    Q.   What is the general nature of this meeting on January 28th

7    that takes place between you and Nop and Mr. Porter?

8    A.   It's to go over the plans again.  We are talking about

9    doing a robbery.  So, we need to finalize certain things,

10   actually go over how the robbery is going to take place, how

11   many individuals he's going to use, things of that nature.

12   So, a lot of things that were discussed in the first meeting

13   are discussed again in the subsequent meeting.

14   Q.   Okay.  And we have Exhibits 2 and 3 in evidence.

15            Skipping ahead, subsequent to the coney island

16   meeting, did you ask Nop, your confidential informant, to make

17   a call to Mr. Porter?

18   A.   Yes.

19   Q.   And what was the purpose of having Nop make that call?

20   A.   The purpose of the informant making that phone call was to

21   let Dennis Porter know that the robbery was going to take

22   place the next day.  That I received a phone call to be ready

23   for that next day to go actually pick up the shipment.  So, we

24   were informing Porter that the crew needed to be ready by the

25   next day.

1    Q.  And were you attempting to determine whether Mr. Porter

2    was ready and his crew as well?

3    A.  Yes.

4    Q.  And did you record the call between Nop and Mr. Porter?

5    A.  Yes.

6    Q.  And that's Exhibit 4, correct?

7    A.  Yes.

8                    MR. FELLER:  Okay.  If you could play Exhibit 4.

9                    (Exhibit 4 played in open court.)

10   BY MR. FELLER:

11   Q.  It's fair to say, obviously a lengthy discussion there of

12   a robbery that had taken place where some firearms were

13   stolen.

14                    Do you know whether law enforcement determined

15   whether, in fact, a robbery such as the one described had

16   taken place?

17                    MR. BURGESS:  Objection.  Foundation.

18                    THE COURT:  The question is does he know.  And

19   that will -- if he knows, fine.  If he doesn't know, fine.

20                    MR. BURGESS:  Okay.

21                    THE COURT:  Overruled.

22   A.  Yes.  The Detroit police did determine that a robbery did

23   take place.

24   BY MR. FELLER:

25   Q.  Now, in this call a meeting was arranged for again the

1    coney island the next day.

2              Any particular reason you were using the coney

3    island?

4    A.   It was just a meeting place that we met at before.  So, I

5    figured that Dennis Porter would be comfortable meeting there

6    the day we were supposed to do the robbery.

7    Q.   And it preempted my next question a little bit.  But what

8    was supposed to happen after the coney island meeting?

9    A.   After the coney island meeting, I was supposed to get them

10   to a secure location away from citizens to effect the

11   arrest -- or, to have other ATF members effect the arrest.

12   Q.   All right.  And how did you plan to go about doing that?

13   A.   Once we got to the coney island, I was supposed to go over

14   the robbery plan again with all the members of the crew.  If

15   there were any new members to show up, I would again go over

16   how many kilograms of cocaine would be there, get them into

17   discussions of the robbery, to make sure they were willing and

18   able to do the robbery.

19             Once I felt I had enough conversation, I would

20   then say we need to go to another place to actually wait for

21   the phone call to get the address.

22             That ruse to get them to go to another location

23   was just to get them to an area to actually have our ATF team

24   effect the arrest.

25   Q.   And other than waiting for a call at the secure location,

| | |
|---|---|
| 1 | was there anything else that you and the group were going to |
| 2 | do there? |
| 3 | A.   There was a rental vehicle that they wanted to use that I |
| 4 | was going to get for them.  So, I said that there would be a |
| 5 | vehicle at this other location, and we were going to just sit |
| 6 | there and wait there for the actual call to come in. |
| 7 | Q.   Okay.  And the rental vehicle would be taken to the |
| 8 | robbery? |
| 9 | A.   Yes. |
| 10 | Q.   And, again, this meeting at the coney island is recorded |
| 11 | on Exhibit 5? |
| 12 | A.   Yes, it is. |
| 13 | Q.   Is there also recorded on Exhibit 5 some periods of |
| 14 | subsequent discussion that ultimately the arrest occurred? |
| 15 | A.   Yes. |
| 16 | Q.   And we will go into those in a little bit more detail? |
| 17 | MR. FELLER:  Can we start Exhibit 5. |
| 18 | *(Exhibit 5 played in open court.)* |
| 19 | MR. FELLER:  Pause for just a second. |
| 20 | BY MR. FELLER: |
| 21 | Q.   We may not have paused it at the best spot.  But is that |
| 22 | you walking into the coney island? |
| 23 | A.   Yes, it is. |
| 24 | Q.   By the way, I assume Exhibit 1 you were able to record |
| 25 | because the cameras were set up in your vehicle, correct? |

1    A.   Correct.

2    Q.   How is it that you were able to record these?

3    A.   I have a camera attached to my person.

4    Q.   Can you describe to the jury as best you can recall who

5    was present and where they were in relation to you at the

6    coney island?

7    A.   When I arrived at the coney island, Dennis Porter was

8    already there, Alistair McGee was already there, and I believe

9    the cooperating witness was already there.

10   Q.   Now?

11   A.   Yes, now.

12   Q.   Okay.  And can you recall where everyone was relative to

13   where you were standing at the start?

14   A.   They were in the corner of the restaurant, I believe the

15   northeast corner of the coney island, sitting there at the

16   table.

17   Q.   Let's play it and maybe we'll pause and you can identify

18   it.

19                    *(Exhibit 5 continued playing.)*

20             MR. FELLER:  Pause right there.

21   BY MR. FELLER:

22   Q.   Who is that individual at that table on the left?

23   A.   That's the cooperating witness.

24   Q.   Okay.  So, that's Nop.

25             MR. FELLER:  Go ahead and play it.

1          *(Exhibit 5 continued playing.)*

2                    MR. FELLER:  Pause right there.

3     BY MR. FELLER:

4     Q.   Well, he's still sort of in there.

5                    Who is that directly in front of you?

6     A.   That's Denny Porter, a/k/a Denny Moe.

7     Q.   What was the discussion at this time?  It sounds like you

8     are still waiting on somebody.

9     A.   Dennis Porter advised me that another man was coming to

10    help with the robbery.  So, he advised that we were waiting on

11    that.

12                   I'm also letting him know that I have the rental

13    vehicle, and the guy that's going to go with me, my backup, is

14    going to be at this other location with the rental vehicle.

15    Q.   All right.  So, Nop to your left and Dennis Porter

16    directly in front of you.

17                   MR. FELLER:  Let's go ahead.

18                   *(Exhibit 5 continued playing.)*

19    BY MR. FELLER:

20    Q.   Now, we haven't been able to see the other person in the

21    image yet.  But is there someone else involved, still there as

22    well?

23    A.   Yes.  Right next to Dennis Porter, to the right of him, is

24    Alistair McGee a/k/a Stir.

25    Q.   Do you see that individual in the courtroom today?

1    A.  Yes, I can.

2    Q.  Can you identify him?

3    A.  He is the individual wearing the red plaid shirt seated

4    next to Defense counsel.

5                   MR. FELLER:  All right.  Continue.

6                   *(Exhibit 5 continued playing.)*

7                   MR. FELLER:  Let's pause.

8    BY MR. FELLER:

9    Q.  We saw Mr. McGee in the image for a second there on the

10   right.

11                   Was he on the telephone at that point?

12   A.  Yes, he was.

13   Q.  All right.  At that time or subsequently did you determine

14   who he was speaking with?

15   A.  Yes.  He was speaking with Howard Barkley.

16   Q.  All right.  Let's continue.

17                   *(Exhibit 5 continued playing.)*

18                   MR. FELLER:  Pause it.

19   BY MR. FELLER:

20   Q.  All right.  Is that Mr. McGee there on the right?

21   A.  Yes, it is.

22   Q.  All right.  Let's continue.

23                   *( Exhibit 5 continued playing.)*

24                   MR. FELLER:  Pause it for one second.

25

1  BY MR. FELLER:

2  Q.  And again just to be clear, at this point, what are you

3  all doing?

4  A.  We're just sitting around waiting on Howard Barkley to

5  show up.

6  Q.  As the fourth member?

7  A.  As the fourth member of the robbery crew.

8           MR. FELLER:  Let's continue.

9           *(Exhibit 5 continued playing.)*

10           MR. FELLER:  Let's pause for one second.

11  BY MR. FELLER:

12  Q.  Is that Mr. McGee?  Has he now moved?  Is he standing on

13  your left right there?

14  A.  Yes, he is.

15           MR. FELLER:  Please continue.

16           *(Exhibit 5 continued playing.)*

17           MR. FELLER:  Pause.

18  BY MR. FELLER:

19  Q.  Who is that that has just come into the coney island?

20  A.  That he is Howard Barkley a/k/a Bear.

21           *(Exhibit 5 continued playing.)*

22           MR. FELLER:  Let's pause it for a second right

23  here.

24  BY MR. FELLER:

25  Q.  All right.  So, explain to the jury where we are and what

1   we are waiting on right here?

2   A.  We are outside of the coney island right now.  The other

3   individuals are having a discussion that, you know, I'm not

4   at.  But right now they are going to go -- after further

5   conversation, they are going to go get the firearms, and then

6   they are supposed to come back to the coney island so that we

7   can go over to the secondary meet location where the arrest

8   would take place.

9   Q.  All right.  Who are you on the phone with?

10  A.  I'm on a phone with a member of the surveillance crew

11  letting them know what's going on.

12              MR. FELLER:  All right.  Continue.

13              *(Exhibit 5 continued playing.)*

14              MR. FELLER:  Let's pause right there for a

15  second.

16  BY MR. FELLER:

17  Q.  All right.  The plan was they were going to go get the

18  heaters and come to the coney island, but what?

19  A.  Well, actually, when I told them to get the heaters and

20  come back to the coney island, Dennis Porter said they were

21  going to get the heaters and meet me on Schaefer.  That's not

22  what actually happened.

23              Then when I had a conversation with Denny Porter

24  and asked him if he was coming back over to the coney island,

25  he said no, already your way; we're over at Schaefer and

1    Lyndon.

2    Q.  All right.  At a liquor store?

3    A.  At a liquor store.

4    Q.  All right.  And so then you go to . . .

5    A.  So, then I drive over to that liquor store at Schaefer and

6    Lyndon.

7                    MR. FELLER:  All right.  Continue.

8                    *(Exhibit 5 continued playing in open court.)*

9                    MR. FELLER:  Let's pause right here.

10   BY MR. FELLER:

11   Q.  All right.  The image we just saw where you were talking

12   to Mr. Barkley, where was that?

13   A.  That was inside the vehicle that was driven by Dennis

14   Porter.

15                    Dennis Porter was out of the vehicle inside the

16   liquor store.  And I went over to Dennis Porter's vehicle and

17   spoke to Howard Barkley, who was in the passenger seat.

18   Q.  All right.  At the liquor store was Mr. Porter and

19   Mr. Barkley.  They came together?

20   A.  Yes.

21   Q.  All right.  Who were you still waiting on at that point?

22   A.  We were waiting on Alistair McGee at that point.

23   Q.  All right.  And who is Junior?

24   A.  Junior who is a Detroit police officer that I was working

25   with.  He was with me when I did the first two undercover

1    meetings with Dennis Porter.

2    Q.  All right.  And then does Mr. McGee eventually arrive at

3    the liquor store or somewhere else?

4    A.  He arrives at the liquor store.

5    Q.  Is that where we are right now?

6    A.  Yes.  He is standing outside of Dennis Porter's vehicle.

7    Dennis Porter is inside his vehicle, and I'm speaking with him

8    at the window.

9    Q.  Okay.  Is there anyone else there?

10   A.  There is another person in the vehicle that Alistair McGee

11   arrived in, and I didn't see him at that point.

12   Q.  Okay.  He remained in the vehicle?

13   A.  Yes.

14   Q.  And what kind of vehicle was Mr. McGee in?

15   A.  It was a red type of SUV.  I can't really remember exactly

16   what type.

17   Q.  Okay.  So, just to set the stage a little bit, it sounds

18   like we've got three vehicles.  We've got your vehicle with

19   you and Nop?

20   A.  Yes.

21   Q.  Okay.  We've got a vehicle with Mr. Porter and

22   Mr. Barkley?

23   A.  Yes.

24   Q.  And then we've got a third vehicle, a red SUV of some

25   sort, with Mr. McGee and another unknown individual?

1    A.   Yes.

2    Q.   Okay.  And right now we are still at the liquor store

3    across the street from the storage facility?

4    A.   Yes.

5                MR. FELLER:  All right.  Let's continue.

6                *(Exhibit 5 continued playing in open court.)*

7                MR. FELLER:  Let's pause right here.

8    BY MR. FELLER:

9    Q.   All right.  So, where are we now?

10   A.   We are inside the storage facility.

11   Q.   All right.  So, that first vehicle -- hopefully we will be

12   able to see it again when we play it a little bit -- is who's?

13   A.   That first vehicle is an ATF vehicle that we just dropped

14   there to pretend to use that as the rental vehicle.

15   Q.   Okay.  So, at this point in the video, who is at the

16   storage facility?

17   A.   I'm there with the cooperating witness Nop.  Dennis Porter

18   is there with Howard Barkley.

19   Q.   All right.  Where is Mr. McGee?

20   A.   Mr. McGee did not pull into the gate.  So, I ended up

21   having to have a phone conversation with him.

22   Q.   All right.  Why did he say he didn't pull into the gate?

23   A.   He said he didn't pull into the gate, when I spoke to him

24   on -- Dennis Porter told me that he did not pull in because

25   the gate closed too quick.  So, that is when I got on the

1   phone with Alistair McGee and provided him with the code to

2   get into the location.

3   Q.  All right.  Let's continue.

4              *(Exhibit 5 continued playing in open court.)*

5              MR. FELLER:  Let's pause it.

6   BY MR. FELLER:

7   Q.  So, who are you on the phone with at this point?

8   A.  Now I'm on the phone with Alistair McGee.

9              MR. FELLER:  All right.  Let's continue.

10             *(Exhibit 5 continued playing in open court.)*

11             MR. FELLER:  Let's pause it.

12  BY MR. FELLER:

13  Q.  What does K out of one ten mean?  What's that all about?

14  A.  I advised the cooperating witness that I had an AK-47 -- I

15  called it a K -- that he could utilize during the robbery.

16  And the number was just the storage unit number that I was

17  telling him the K was at, the AKA-47.

18  Q.  And who, if you know, is Mr. Porter still on the phone

19  with at this point trying to get into the facility?

20  A.  Alistair McGee.

21             MR. FELLER:  All right.  Let's continue.

22             *(Exhibit 5 continued playing in open court.)*

23  BY MR. FELLER:

24  Q.  Okay.  And after that there has been some flashback.  But

25  does the arrest take place after that?

1   A.   Yes, it does.

2   Q.   Okay.  And who is arrested at that point?

3   A.   At that point, Dennis Porter and Howard Barkley are

4   arrested inside the storage facility.

5   Q.   Because that's where their vehicle is right there?

6   A.   Yes.

7   Q.   What happened with respect to Mr. McGee and the unknown

8   individual in the red SUV?

9   A.   The surveillance on the outside, that was supposed to come

10   in and make a perimeter once all the vehicles were inside,

11   ended up trying to arrest Alistair McGee outside --

12              MR. BURGESS:  Objection.  Lack of personal

13   knowledge.

14              THE COURT:  You want to lay a foundation or

15   rephrase the question.

16              MR. FELLER:  Absolutely, Your Honor.

17   BY MR. FELLER:

18   Q.   Where are you at this point?

19   A.   I'm standing outside in the stored unit.

20   Q.   Okay.  Do you have -- at that point, do you personally

21   have a view of Mr. McGee in his vehicle?

22   A.   No, I do not.

23   Q.   Okay.  Are there other agents who are responsible for

24   trying to apprehend and arrest Mr. McGee?

25   A.   Yes.

1   Q.  All right.  And is Task Force Agent Pacholski one of the

2   individuals who eventually gets involved with that effort?

3   A.  Yes.

4                MR. FELLER:  All right.  Your Honor, that's all

5   of the questions I have for Agent Nether at this time.

6                THE COURT:  Mr. Burgess.

7                MR. BURGESS:  Thank you, Your Honor.

8                THE COURT:  It's five minutes to one.  Normally

9   we break at one, but if you have -- do you have an estimate as

10  to how many minutes you need?

11               MR. BURGESS:  I would say approximately half an

12  hour, maybe 40 minutes at the most, Your Honor.

13               THE COURT:  Do you guys have time or do you need

14  a break?

15               Nobody in the -- let's see how close to 30 to 40

16  minutes you can do it.

17               MR. BURGESS:  Okay.  It might be a little short.

18                         CROSS-EXAMINATION

19  BY MR. BURGESS:

20  Q.  Agent Nether, you said you have been an ATF agent for how

21  long?

22  A.  Since 2001.

23  Q.  So, nine years approximately?

24  A.  Approximately.

25  Q.  Now, the Government, Mr. Feller, asked you some questions

1    about you learned of a home invasion crew through a

2    cooperating witness, correct?

3    A.   That's correct.

4    Q.   And that witness was Nop?

5    A.   Yes.

6    Q.   Okay.  And obviously Nop was -- he didn't come to you out

7    of the goodness of his heart, did he?

8    A.   I don't believe so.

9    Q.   Okay.  I mean at some point --

10   A.   I wasn't handling that part of the investigation.  I just

11   came in to actually speak with him about this investigation.

12   Q.   Okay.  Do you have any personal knowledge as to whether

13   Nop was arrested at some prior time?

14   A.   Yes.

15   Q.   Was he?

16   A.   Yes, he was.

17   Q.   Okay.  In conjunction with being in some home invasion

18   robbery crew?

19   A.   That's correct.

20   Q.   Okay.  So, Nop was actually caught prior to being a

21   witness for the Government.  Is that correct?

22   A.   Yes.

23   Q.   Does Nop have a name or is that how you know him by, Nop?

24              MR. FELLER:  Your Honor, if there's some reason

25   that we need it at this point --

1          MR. BURGESS:  No, I don't.  It's just for

2     clarification, but I don't if it's sensitive.

3     BY MR. BURGESS:

4     Q.  Now, had you ever talked to Nop?  Have you briefed Nop or

5     spoken with him?

6     A.  Yes, I have.

7     Q.  Okay.  And Nop is the person that brought you to Mr.

8     Porter; is that correct?

9     A.  Yes.

10    Q.  Now, Nop did not bring you to Mr. McGee; is that correct?

11    A.  No, he did not.

12    Q.  Okay.  That was something you learned through Mr. Porter.

13    Is that also correct?

14    A.  Correct.

15    Q.  Now, Nop -- the information you received from Nop was that

16    Nop did these home invasion crews with Mr. Porter and Nop's

17    cousin.  Is that correct?

18    A.  He -- he -- Nop had done home invasions with Mr. Porter,

19    and I believe Porter said that they have used Nop's cousin to

20    do a couple of home invasions.

21    Q.  Okay.  Thank you.

22          Did you ever verify about who Nop's cousin was

23    or whether that was correct information?

24    A.  I did not.

25    Q.  Did you ever identify who Nop's cousin was?

1    A.   I did not.

2    Q.   Do you know if anyone did, personal knowledge?

3    A.   I have no personal knowledge of that.

4    Q.   Now, undercover work, is that pretty much what you

5    predominantly do?

6    A.   Yes.

7    Q.   Okay.  And so you pretend to be a criminal, obviously,

8    involved in these type of situations; is that correct?

9    A.   Yes.

10   Q.   I mean, most of the time throughout the recordings that

11   we've seen, the video recordings that we've seen and the audio

12   we've heard, I mean this is all you pretending to be someone

13   else, correct?

14   A.   Correct.

15   Q.   Okay.  I mean, none of this is actually true, right?  None

16   of this information is actually true?

17   A.   I'm not a criminal, no, that's not true.

18   Q.   And none of this stuff about you working for a drug cartel

19   is true, correct?

20   A.   That's correct.

21   Q.   I mean, all this information, do you come up with it

22   yourself or does someone tell you to say certain things and

23   then you relay it to somebody else?

24   A.   There are certain guidelines that we have to follow within

25   ATF as far as doing this type of investigation.  So, there is

1    a specific script that we are supposed to stay as close to as

2    possible.

3    Q.   Okay.  And you did your best to stay to the script; is

4    that correct?

5    A.   Yes.

6    Q.   Do you know who makes the script, who like wrote the

7    script?

8    A.   I believe so, yes.  Another ATF agent.

9    Q.   Is that like a script used specifically in Detroit or in

10   this instance or is that a script that's used generally

11   throughout the ATF?

12   A.   It's a script used throughout the ATF.

13   Q.   Like countrywide or is it regional?

14   A.   Countrywide.

15   Q.   So, mentioning that you are part of the cartel, is that

16   part of the script?

17   A.   Yes.

18   Q.   And the 30 kilos, the amount in question that you allege

19   to be -- that you claim to have at the stash house, is that

20   part of the script?

21   A.   No, it is not.

22              The amount that we use is based on the region

23   that you are from.  In speaking with cooperating witnesses,

24   you figure out what a typical stash house in the city would

25   have, and then you try to stick as close to that amount as

1    possible.

2    Q.   So, 30 kilos is supposed to be a typical stash house in

3    this area, that's the amount?

4    A.   In speaking with other people, a large-scale drug

5    operation would usually be more than 30 kilograms.  But I mean

6    it could be upwards of 200 kilograms.  But 30, based on my

7    experience and knowing how other law enforcement officers have

8    raided certain people, I thought 30 was a good number to be

9    real.

10   Q.   And 30 was a number obviously that was -- it was based on

11   something, but it was made up by you or somebody else in the

12   ATF?

13   A.   That's correct.

14   Q.   Now, you were introduced to Porter by Nop?

15   A.   Yes.

16   Q.   And was that like a face-to-face introduction; like you

17   went with Nop to meet Porter?

18   A.   Yes, it was.

19   Q.   Was that on the 19th of January?

20   A.   Yes, it was.

21   Q.   And that was Exhibit 1 that was shown on the screen?

22   A.   Yes.

23   Q.   That's the first time you are meeting Mr. Porter?

24   A.   Yes, it is.

25   Q.   Okay.  Could you describe -- I mean they have seen it in

 1    the video.  Could you describe Mr. Porter?

 2              It is kind of hard to see on the screen.  Could

 3    you describe physically Mr. Porter?

 4    A.  I would say he was approximately 280 pounds, at least six

 5    feet tall, a scruffy beard, a darker complexion,

 6    salt-and-paper hair.  He was wearing I believe a military type

 7    jacket or coat that day.

 8    Q.  Okay.  Did -- just from a personal perspective, did

 9    Mr. Porter seem like a tough guy to you?

10    A.  From speaking with him?  Yes.  And by his appearance, yes.

11    Q.  Okay.  Not somebody you would want to meet in an alley,

12    right?

13    A.  No.

14    Q.  Okay.  Now, the first time you spoke with Mr. Porter was

15    on January 19th.  And that was in whose vehicle?

16    A.  That was in my vehicle.

17    Q.  Okay.  Now, on January 19th -- that's this year, 2010?

18    A.  Yes.

19    Q.  On that date when you are speaking to Mr. Porter,

20    Mr. McGee's name is not mentioned ever, correct?

21    A.  On that date, no.

22    Q.  That's all I'm talking about is the 9th of January right

23    now.

24    A.  Okay.

25    Q.  And in fact actually the crew that was mentioned by

1    Mr. Porter that day was actually Nop and his cousin and

2    Mr. Porter, right; that was the crew he alluded to?

3    A.  He alluded that he had done home invasions with Nop and

4    the cousin.

5    Q.  Okay.  In response to my question, that's the only crew

6    that was mentioned on January 19th.  Is that correct?

7    A.  On that date, yes.

8    Q.  Now, the Government referenced Exhibits 2 and 3.  Do you

9    remember him asking you questions about 2 and 3?

10   A.  Yes.

11   Q.  Okay.  Those weren't shown on the screen; is that correct?

12   A.  No, they were not.

13   Q.  And what were those, just for the jury, so they know what

14   Exhibits 2 and 3 are?

15   A.  That was another meeting with Dennis Porter at the coney

16   island regarding this armed home invasion.

17   Q.  There's two.  Is that Exhibit 2 or Exhibit 3?

18   A.  They are two exhibits, but they are during the same

19   meeting.

20   Q.  Okay.  I'm sorry.  So, they are both on January 28th?

21   A.  Yes.

22   Q.  Okay.  And they both were continuous meetings.  They just

23   happened to be two different recordings?

24   A.  Yes.  I was wearing a recording device as well as the

25   cooperating witness.

1    Q.   There was a video device?

2    A.   Yes.

3    Q.   And you had that on your person?

4    A.   Yes.

5    Q.   And that was working properly?

6    A.   Yes, it was.

7    Q.   Now, let me ask you a question.  Mr. Porter, in your

8    conversations with him, did you have any trouble getting

9    Mr. Porter to talk?

10   A.   No, I did not.

11   Q.   He was pretty -- I mean, he was pretty upfront with

12   talking about anything, correct?

13   A.   Yes.

14   Q.   Okay.  And would you ever describe any of Mr. Porter's

15   demeanor -- in the conversations that you had with him, would

16   you describe him as being a braggart or kind of bragging in

17   any of the stuff he talked about?

18   A.   I would describe him as being very confident about what he

19   did.

20   Q.   Would arrogant be correct as well?

21   A.   Yes.

22   Q.   And he did brag on occasion about things that he had done

23   in the past?

24   A.   He didn't talk about prior robberies.  But I asked him if

25   he had done this before, and I think he was letting me know

```
 1   that he had by describing some of his prior robberies.  I
 2   wouldn't call it bragging.  I think he was letting me know
 3   that he was the individual that I should be going to for this.
 4   Q.  Okay.  So, he was informing you that he is skilled in this
 5   particular area?
 6   A.  That's correct.
 7   Q.  And he also talked -- bragged -- excuse me -- talked about
 8   other things that he had done as far as like stabbing people,
 9   assaulting people?  He did that, correct, during those
10   conversations?
11   A.  During my conversations, I don't remember him talking
12   about stabbing people.  I remember him talking about burning
13   people.  And actually at one time he did talk about cutting
14   fingers off to get information.
15   Q.  Did he ever talk about things he did to people while he
16   was in prison, if you remember?
17   A.  Not during my conversations.
18   Q.  Do you have any knowledge as to whether or not he ever
19   bragged about stabbing anybody in prison?
20            MR. FELLER:  Your Honor, I'm going to object to
21   hearsay at this point.  They --
22            THE COURT:  Well, I'm not sure it's hearsay, but
23   he just said he didn't remember any conversations about
24   prison.
25            So, you could ask him 400 questions about what
```

US v McGee #10-20075

| | |
|---|---|
| 1 | may have happened in prison, but he has already told us that |
| 2 | he didn't hear anything about prison. |
| 3 | MR. BURGESS:  Okay.  I was just getting a |
| 4 | clarification.  I thought he had said he didn't have any |
| 5 | conversations with him. |
| 6 | I was just asking if he had witnessed any |
| 7 | conversations that Mr. Porter had with other people. |
| 8 | That's -- |
| 9 | THE COURT:  Why don't you ask that question -- |
| 10 | MR. BURGESS:  I will. |
| 11 | THE COURT:  -- without going into what those |
| 12 | were. |
| 13 | MR. FELLER:  Well, Your Honor, the objection to |
| 14 | that would be hearsay.  The substance and sum of that |
| 15 | communication would be -- |
| 16 | THE COURT:  He is not going into the substance. |
| 17 | He's just going to say did he hear any conversations. |
| 18 | MR. BURGESS:  A foundation question. |
| 19 | THE COURT:  A foundation question.  But be ready |
| 20 | for your . . . |
| 21 | MR. FELLER:  I will be ready.  Thanks. |
| 22 | BY MR. BURGESS: |
| 23 | Q.  Did you witness any conversations? |
| 24 | A.  I personally did not witness any conversations where he |
| 25 | was talking about stabbing people. |

1    Q.   Okay.  But the other stuff you mentioned about burning,

2    cutting fingers off, those were conversations you had with

3    Mr. Porter?

4    A.   Yes.

5    Q.   Now, the Exhibit 4, that was a phone call that was

6    recorded between Nop and Porter, is that correct -- or,

7    Mr. Porter.  Is that correct?

8    A.   That is correct.

9    Q.   And that was done on February 1st, 2010?

10   A.   Yes, it was.

11   Q.   And that's when he -- Mr. Porter mentioned somebody named

12   Stir; is that correct?

13   A.   That's correct.

14   Q.   On February 1st, 2010, you didn't know who Stir was,

15   right?

16   A.   No, I did not.

17   Q.   Okay.  You had never heard that name before February 1st,

18   2010?

19   A.   No.

20   Q.   And you didn't know the name Alistair McGee at that time?

21   A.   No, we did not.

22   Q.   Now, during that phone conversation, Porter said he had a

23   guy Stir that he was going to bring, right?

24   A.   Yes.

25   Q.   All right.  You don't have any personal knowledge of

1    whether or not Mr. Porter actually spoke with Mr. McGee; is

2    that correct?

3    A.   I have no personal knowledge of that.

4    Q.   You have no idea whether or not that -- Mr. Porter had

5    verified or confirmed that Mr. McGee was doing anything,

6    correct?

7    A.   In that conversation he advised that --

8    Q.   I understand what he advised.  But what I'm asking you is

9    the conversation between Mr. McGee and Mr. Porter, you weren't

10   witness to anything like that; is that correct?

11   A.   I didn't witness any conversations.

12   Q.   Okay.  So, you have no idea whether Mr. Porter had

13   actually spoken to Mr. McGee on February 1st; is that correct?

14   A.   That's correct.  I didn't witness anything.

15   Q.   The first time you actually had seen Mr. McGee is February

16   2nd, 2010 at the coney island, right?

17   A.   Correct.

18   Q.   Okay.  And he arrived up there -- do you know how he

19   arrived up there?

20   A.   He was already there when I got there.  So, I'm not

21   positive how he got there.

22   Q.   Okay.  You would be speculating if you guessed as to how

23   he got up there, correct?

24   A.   Right.

25   Q.   Okay.  The phone call that the Government or Mr. Feller

1    had asked you about, you said that you spoke with someone from

2    DPD to verify that there was a robbery on February 1st.  Is

3    that correct?

4    A.  I didn't actually speak with that individual.  Another

5    agent -- another officer that I was working with actually had

6    conversations and verified that a robbery did take place.

7    Q.  Okay.  You have no information -- you have no personal

8    information that Mr. McGee was ever charged in any robbery, do

9    you?

10   A.  I have no personal information.

11   Q.  That's all I'm asking.  Do you have any personal

12   information that Mr. McGee was ever charged in a robbery on

13   February 1st, 2010?

14   A.  No.

15   Q.  Now, Exhibit 5, at the coney island, you were watching

16   that during your testimony.  Is that correct?

17   A.  Yes.

18   Q.  And you have seen it before, right?  You were actually

19   present when it actually happened?

20   A.  Yes.

21   Q.  And Mr. McGee moves around a lot during that video?

22   A.  Yes.

23   Q.  He paces a lot?

24   A.  Yes.

25   Q.  And he's on the phone quite a bit trying to find out where

```
 1    the . . .
 2    A.  Where the other individual is.
 3    Q.  Some other guy is coming out?
 4    A.  Right.
 5    Q.  And the other guy that comes up, was that guy ever
 6    identified?
 7    A.  Yes.
 8    Q.  Okay.  And that was who?
 9    A.  Howard Barkley a/k/a Bear.
10    Q.  Now, there was another person that was in the red SUV with
11    Mr. McGee.
12                   Was that person ever identified, if you know?
13    A.  No, I don't know.
14    Q.  And the other person in the red SUV, was he driving or was
15    he the passenger?
16    A.  He was the driver.
17    Q.  Now, when everybody left the coney island, you go -- whose
18    car do you go in?
19    A.  I'm driving my car.
20    Q.  You're driving your car.  Okay.
21                   And the vehicle that Mr. McGee is in, do you see
22    where it goes when he left the coney island?
23    A.  I didn't see where it went.
24    Q.  Did you see whether he was driving or passenger?
25    A.  No, I did not.
```

1    Q.   Was the vehicle already gone by the time you had gotten

2    out and got in your car?

3    A.   No.  We all left out of the coney island at the same time.

4    Q.   Okay.  You just weren't really paying attention to

5    Mr. McGee's vehicle or where it went?

6    A.   No, because there was a -- when I came out of the coney

7    island, I went to my vehicle.  I was trying to make a phone

8    call to my surveillance team while they were having a

9    conversation outside of the vehicle.  So, at that time, I

10   wasn't paying attention to what vehicles the individuals got

11   in.

12   Q.   So, Porter tells you at the coney island they didn't bring

13   no heaters.  I think that's how I wrote it down.

14                    That means there was no guns brought to the

15   coney island when you all met up there?

16   A.   Right.

17   Q.   At least that's what Mr. Porter indicated?

18   A.   Mr. Porter advised me that he told the crew not to bring

19   the guns up there, because they all lived right near the coney

20   island, and to just keep them at their house.

21   Q.   And that's just something Mr. Porter said, right?

22   A.   Correct.

23   Q.   That was never verified one way or the other by Mr. McGee

24   to you.  Is that correct?

25   A.   Correct.

1   Q.  Now, you met up with Mr. Porter again at the liquor store,

2   right?

3   A.  Correct.

4   Q.  Okay.  Mr. McGee is not there at the time?

5   A.  When I first met with Dennis Porter, he was not there.

6   Q.  Okay.  Now, when he arrives -- Mr. McGee arrives in an SUV

7   sometime later?

8   A.  Yes.

9   Q.  And when he arrived did you ever look in the SUV?

10  A.  Well, it had tinted windows.  So, I looked, but I couldn't

11  see inside the SUV.

12  Q.  You didn't open the door --

13  A.  No.

14  Q.  -- or try to do anything like that?

15  A.  No.

16  Q.  So, anything that could have been in the SUV, you never

17  verified.  Is that correct?

18  A.  That's correct.

19  Q.  So, you don't know if there was any guns or anything in

20  the SUV.  Is that correct?

21  A.  No, I couldn't see inside.

22  Q.  And the SUV, had you seen that vehicle at the coney

23  island?

24  A.  No.

25  Q.  Now, you at some point leave the liquor store and go to

1   this storage facility; is that correct?

2   A.   Correct.

3   Q.   And that's where the arrest is going to take place?

4   A.   That's where the arrest was supposed to take place.

5   Q.   Well, the arrest did take place at some point?

6   A.   Some individuals were arrested there, yes.

7   Q.   Now, in the SUV Mr. McGee was in, Mr. McGee was the

8   passenger of that SUV; is that correct?

9   A.   That's correct.

10  Q.   Mr. McGee did not go into the storage facility; is that

11  correct?

12  A.   No, he did not enter.

13  Q.   Were you watching -- were you ahead of him or were you

14  behind him?

15  A.   I was the first vehicle followed by the vehicle that

16  Dennis Porter was driving.

17  Q.   Okay.

18  A.   And then the vehicle that Alistair McGee was in was the

19  third vehicle.

20  Q.   When you pulled into the storage facility, did you

21  actually view where the SUV went when you pulled into the

22  storage facility?

23  A.   When I pulled in, I did observe Dennis Porter's vehicle,

24  which was right behind me, pull in.  And at that time I was

25  putting in the code.  I did not observe the third vehicle.

1   Q.  So, you don't know where the SUV actually went?  When you

2   put in the code and drove in, your face was not in that

3   direction.  Is that correct?

4   A.  That's correct.

5   Q.  And after you got in the facility until these arrests were

6   made, you never saw the SUV again, right?

7   A.  No, I did not.

8   Q.  Now, there's a -- there was a recording about a phone

9   conversation that Mr. Porter was supposedly having with

10   Mr. McGee; is that correct?

11   A.  That's correct.

12   Q.  Do you know whose phone that was?

13   A.  No, I don't.

14   Q.  The recording of that conversation is one-sided, correct?

15   A.  (No response.)

16   Q.  You can't hear Mr. -- supposedly Mr. McGee is on the other

17   end of the phone, right?

18   A.  Correct.

19   Q.  You can't hear anything Mr. McGee says, right?

20   A.  Not to Dennis Porter, no.

21   Q.  Right.

22                    And you don't know whose phone that was?

23   A.  That Dennis Porter was using?  No, I do not.  I'm not

24   sure.

25   Q.  And according to Dennis Porter, even though you couldn't

1   verify it by Mr. McGee, Mr. McGee said his reason for not

2   going in there is there was a truck behind him?

3   A.  He said the gate closed on him.

4   Q.  Okay.  And then he said at some point there was a truck

5   behind him though?

6   A.  Later on in the conversation after I had already spoke

7   with McGee, when --

8   Q.  You spoke with McGee?

9   A.  Yes, I did.

10  Q.  On whose phone?

11  A.  On the same phone that Dennis Porter was using.  I was

12  advising McGee of the code to get inside the storage unit.

13  Q.  Okay.  And he told you there was a truck behind him?

14  A.  No, he did not.

15  Q.  All right.  You heard that from Mr. Porter?

16  A.  After I finished my conversation with McGee, I handed the

17  phone back to Dennis Porter.  Dennis Porter then had

18  another -- was speaking with Alistair McGee.

19              After he got off the phone, he told me that

20  there was a truck that was, I guess, blocking or behind

21  McGee's vehicle.  He was waiting for the vehicle to move.

22  Q.  But Mr. McGee obviously never came in the gate; is that

23  correct?

24  A.  That's correct.

25  Q.  Okay.  And you didn't actually see him again ever, or when

| | |
|---|---|
| 1 | was the next time you had seen Mr. McGee, if you know? |
| 2 | A.  This is the first time I've seen McGee since -- |
| 3 | Q.  Since February 2nd, 2010? |
| 4 | A.  Since February 2nd, yes. |
| 5 | Q.  And you said there was outside surveillance. |
| 6 | That would have been people outside the gate? |
| 7 | A.  We had a plan of having agents inside the storage facility |
| 8 | to arrest whoever was inside.  And we also had a contingency |
| 9 | of another arrest team outside the location for any vehicles |
| 10 | that did not come inside the storage unit, for that ATF team |
| 11 | to arrest those individuals. |
| 12 | Q.  To your knowledge, that was actually not accomplished that |
| 13 | evening; is that correct? |
| 14 | A.  It was not. |
| 15 | Q.  Now, you said you've been an agent since 2001. |
| 16 | And approximately how many undercover |
| 17 | assignments do you think you've had, just a guesstimate? |
| 18 | A.  You mean from beginning to end, each assignment?  I don't |
| 19 | know.  Maybe 50. |
| 20 | Q.  All right.  So, you've had a decent amount of interaction |
| 21 | with a variety of people -- I mean, I guess potentially |
| 22 | suspects.  Correct? |
| 23 | A.  I've had hundreds of interactions. |
| 24 | Q.  And during those hundreds of interactions, have you ever |
| 25 | known someone to -- strike that. |

1              Did these people -- are they always truthful to

2    you?

3    A.  (No response.)

4    Q.  In these hundreds of interactions with people, are they

5    always truthful or do they lie?

6    A.  Well, they are criminals; so they lie.

7    Q.  So, all criminals lie; is that what you're -- is that

8    basically what you are saying with that statement?

9    A.  What I believe is being a criminal is a dishonest

10   profession.  So, you are not an honest person.

11   Q.  Technically, as an undercover agent, correct?

12   A.  Correct.  But I get sanctioned by my agency, the

13   techniques, to investigate the allegations.

14   Q.  I understand it's sanctioned by the ATF, but it is

15   essentially lying, correct?

16   A.  Correct.

17   Q.  Now, you've talked about criminals that lie.

18              Do you know criminals that brag, in your

19   experience?

20   A.  Yes.

21   Q.  Say things that -- claim they've done things that they

22   haven't actually done, in your experience?

23   A.  I can't verify whether or not they were saying things they

24   didn't actually do.  Whether they were bragging -- whether or

25   not they were telling the truth or not, I don't know.

1    Typically on these assignments, my job is as an undercover

2    agent; not to investigate the totality of the case.

3    Q.  I understand.  But you have found people to brag, have you

4    not?

5    A.  Yes.

6    Q.  And that's pretty common?

7    A.  Yes.

8    Q.  Do you know what puffing is?

9    A.  Yes.

10   Q.  Like puffing yourself up, do you understand what I'm

11   talking about?

12   A.  Yes.

13   Q.  Have you ever encountered that kind of thing, somebody

14   puffing, overstating, somebody bragging?

15   A.  Again, if they are overstating, I don't have any personal

16   knowledge of that, but they are definitely willing to tell me

17   the things that they do.

18   Q.  Okay.  Or things that they claim to do, is that correct,

19   since you are not verifying them?  Right?

20   A.  Correct.

21   Q.  Now, you said that you hadn't seen Mr. McGee since

22   February 2nd, 2010.

23            You haven't spoken to him either, right?

24   A.  No, I have not.

25   Q.  I mean on the phone or otherwise?

1    A.  No, I have not.

2              MR. BURGESS:  Nothing further.

3              THE COURT:  Redirect.

4              MR. FELLER:  Just one question, Your Honor.

5                    REDIRECT-EXAMINATION

6    BY MR. FELLER:

7    Q.  Agent Nether, based on your training and experience and,

8    in fact, what you did in this case, do you have any indication

9    that either Mr. Porter, Mr. Barkley or Mr. McGee at any point

10   were bragging or puffing?

11   A.  No.  I believe they were telling me exactly what they do.

12             MR. FELLER:  Thank you.

13             THE COURT:  Mr. Burgess?

14                    RECROSS-EXAMINATION

15   BY MR. BURGESS:

16   Q.  That's your opinion, right?

17   A.  Yes.

18   Q.  Not verified.  According to you, not verified as part of

19   your job, right?

20   A.  As part of my job as an undercover, it is not my job to

21   verify what they are doing.  My job is strictly to be an

22   undercover agent.

23   Q.  So, your belief is that they are telling the truth about

24   their bragging, but you don't know for sure because you didn't

25   verify it as per your testimony, correct?

1    A.  I did not verify.  I know other home invasions conducted

2    by Dennis Porter were verified, but I did not personally

3    verify anything.

4    Q.  And as far as him cutting fingers off and burning people

5    and all of that other information that you talked about

6    earlier, that was never verified by you, right?

7    A.  I didn't verify anything.

8                   MR. BURGESS:  Okay.  Thank you.  Nothing

9    further.

10                   THE COURT:  Any questions from the jurors?

11                   All right.  You may step down.  Thank you.

12   A.  Thank you.

13                   THE COURT:  It's now after one o'clock.  We are

14   going to adjourn for the day.

15                   I will repeat:  Don't talk about this with

16   anyone.  When you get home and the person asks how was your

17   day, tell them it was great, it's a beautiful courtroom, but

18   the mean old judge says I can't talk about it.

19                   Don't do any independent research.  Don't

20   speculate about anything.  Don't talk with each other about

21   the case.

22                   It's likely that the testimony part of the case

23   will be done tomorrow, but there will also be closing argument

24   and instructions and deliberations.  So, be prepared to be

25   here all day tomorrow.

 1              Be here at 8 o'clock in the morning upstairs.

 2    And we'll start as close to 8:30 as possible.  There's always

 3    something that comes up at the last minute in preparation, but

 4    we won't forget you.

 5              And have a great afternoon and a good evening.

 6              All rise for the jury, please.

 7              *(Jury leaves the courtroom at 1:23 p.m.)*

 8              THE COURT:  Anything anyone wants to put on the

 9    record?

10              MR. FELLER:  Not for the record, Your Honor.

11              MR. BURGESS:  Not for the Defense, Your Honor.

12              THE COURT:  Okay.  Maybe I should ask if there's

13    anything anyone wants to put on the disc.

14              MR. FELLER:  No, Your Honor.

15              I just want to clarify the schedule for

16    tomorrow.

17              THE COURT:  Okay.

18              MR. FELLER:  I would anticipate that we actually

19    don't have more than probably a couple hours of testimony,

20    depending on how long the cross of Mr. Barkley takes.  So, we

21    will be ready to close if that's convenient for the Court.

22              THE COURT:  That's what I just told the jury.

23              MR. FELLER:  I just wanted to clarify.

24              THE COURT:  And if we can get them instructed

25    before lunch, they will come back after lunch or we will have

```
 1   lunch brought in, and they will deliberate as long as they

 2   want tomorrow afternoon.

 3                   MR. FELLER:  And do you instruct before or after

 4   closing?

 5                   THE COURT:  After closing.

 6                   MR. FELLER:  Okay.

 7                   THE COURT:  Now, I do have -- on the

 8   instructions there's one instruction that you don't have to

 9   give, and it should be eliminated.  Paragraph four on page 42,

10   "If you want any exhibit, they will be provided for you."

11                   We are going to give them the exhibits

12   straightaway.

13                   And if you could get the set with the citations

14   omitted, we will be ready to hand those out tomorrow.

15                   Anything for you, Mr. Burgess?

16                   MR. BURGESS:  No, Your Honor.

17                   THE COURT:  You have agreed to the instructions?

18                   MR. BURGESS:  I'm sorry?

19                   THE COURT:  You have agreed to the instructions?

20                   MR. BURGESS:  I have read through the

21   instructions, Your Honor.  I have nothing to add to them.

22                   THE COURT:  Do you want to tell us whether your

23   client is going to testify or not, so we can straighten that

24   out, or do you want to wait?

25                   MR. BURGESS:  I prefer to wait at this point,
```

```
 1    Your Honor.

 2                    THE COURT:  Okay.

 3                    MR. FELLER:  Your Honor, what I can do is I can

 4    put those together as separate pages and we can literally pull

 5    them out, so we are ready.

 6                    THE COURT:  That would be a good idea.  So

 7    creative.  And you did that without your legal assistant.

 8                    We are off the record now.

 9                    (Off the record.)

10                    (Proceedings adjourned at 1:25 p.m.)

11                            —     —     —

12

13

14

15    STATE OF MICHIGAN )
                        ) ss.
16    COUNTY OF WAYNE   )

17
      I, Denise A. Mosby, Federal Official Court Reporter, do
18    certify that the foregoing is a correct transcript from the
      record of proceedings in the above matter.
19

20                            s/ Denise A. Mosby

21                            _____
                              DENISE A. MOSBY, CSR, RMR, CRR
                              United States Court Reporter
22                            124 Theodore Levin U.S. Courthouse
                              231 W. Lafayette Boulevard
23                            Detroit, MI 48226
                              313.961.6230
24                            Denise_Mosby@mied.uscourts.gov

25    Dated:   MARCH 22, 2011
```