UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

Case No. 10-20075

            Plaintiff,            Hon. A. Tarnow

    vs.

ALISTAIR RUFUS McGEE,
also known as Stir,

            Defendant.
_____/


VOLUME 2
TRANSCRIPT OF JURY TRIAL


BEFORE THE HONORABLE ARTHUR J. TARNOW
UNITED STATES DISTRICT COURT SENIOR JUDGE
Detroit, Michigan
Wednesday, October 6, 2010


APPEARANCES:

FOR GOVERNMENT:        LEONID FELLER, ESQ.
                       U.S. Attorney's Office
                       211 W. Fort Street, Ste 2001
                       Detroit, Michigan 48226

FOR DEFENDANT:         DAVID M. BURGESS, ESQ.
                       Burgess & Burgess
                       535 Griswold, Ste 2500
                       Detroit, Michigan 48226




                    *      *      *

OFFICIAL COURT REPORTER:
Denise A. Mosby, CSR, RMR, CRR
www.transcriptorders.com

# I   N   D   E   X

**WITNESS:**                                                           **PAGE**

**RICHARD MICHAEL JURY**
    Direct-Examination by Mr. Feller                          8
    Cross-Examination by Mr. Burgess                         12

**HOWARD LOUIS BARKLEY**
    Direct-Examination by Mr. Feller                         14
    Cross-Examination by Mr. Burgess                         38
    Redirect-Examination by Mr. Feller                       72
    Recross-Examination by Mr. Burgess                       79

**JEFFREY PACHOLSKI**
    Direct-Examination by Mr. Feller                         83
    Cross-Examination by Mr. Burgess                         94
    Redirect-Examination by Mr. Feller                      111

**GOVERNMENT RESTS**                                          113

**DEFENDANT RESTS**                                           115

**CLOSING ARGUMENTS**
    Closing Argument by Mr. Feller                          117
    Closing Argument by Mr. Burgess                         126
    Rebuttal Closing Argument by Mr. Feller                 138

**JURY INSTRUCTIONS**
    (Not transcribed.)                                      147

**JURY VERDICT**                                              148

**MOTION TO REMAND DEFENDANT**                                151

# E X H I B I T S

| EXHIBIT NO. | IDENTIFICATION | PAGE |
|---|---|---|
| Government | | |
| 6 | McGee assault rifle photo | 28 |
| 7 | Porter firearm photos | 11 |
| 8 | Barkley assault rifle photo | 27 |
| 19 | Barkley statement | 112 |
| 20 | Barkley statement | 112 |

US v McGee #10-20075

```
 1                              Detroit, Michigan

 2                              Wednesday, October 6, 2010

 3                              8:45 a.m.

 4                         —     —     —

 5              (Jury not present.)

 6              MR. FELLER:  Good morning, Your Honor.  Leonid

 7    Feller, for the United States.

 8              MR. BURGESS:  Good morning, Your Honor.  May it

 9    please this Honorable Court, David Burgess, on behalf of

10    Alistair McGee.

11              THE COURT:  Good morning.  Good morning,

12    Mr. McGee.

13              MR. McGEE:  Good morning.

14              THE COURT:  You have something you want to bring

15    to my attention?

16              MR. FELLER:  Your Honor, two very, very brief

17    issues.

18              One is Mr. Burgess and I have discussed the

19    issue of a possible withdrawal instruction.  I think we agree

20    at this point that withdrawal is not a defense to an 846

21    conspiracy charge.  So, Mr. Burgess will not be arguing

22    withdrawal and the Government therefore does not need the

23    instruction.

24              MR. BURGESS:  That's correct, Your Honor.

25              THE COURT:  All right.  What else?
```

US v McGee #10-20075

1          MR. FELLER:  Your Honor, you had mentioned

2    yesterday having a computer for the jury during their

3    deliberations.

4          It's come to my attention that Department of

5    Justice policy won't allow us to give them a computer to use

6    on their own.  Traditionally what we do, if they want to see

7    some part of the recordings or all the recordings played back,

8    is we would bring them back into the courtroom.

9          THE COURT:  What's the Justice Department policy

10   about following judges' court orders?

11         MR. FELLER:  Which was exactly my response, Your

12   Honor.  And I am happy to follow your orders.

13         THE COURT:  All right.

14         MR. FELLER:  There are practical issues.  All

15   the computers are password protected.  It's just going to be

16   very hard for them to accomplish it as a practical matter in

17   there.  So . . .

18         THE COURT:  Let me see if I understand.

19         I assume that it's password protected when you

20   turn it on to get into the computer, correct?

21         MR. FELLER:  Correct.  And it also times out

22   after -- if you don't use it for five minutes.

23         THE COURT:  You have your tekkies change the

24   timeout period and you can start it and we will give it to

25   them so they don't need to know the password or,

1   alternatively, you can tell them the password and then change

2   it after the jury deliberations.  That's probably the better

3   way.

4               MR. FELLER:  I will see if that's possible, Your

5   Honor.  I am happy to comply.  I . . .

6               THE COURT:  You go right up that chain of

7   command.  The highest one who says no will be in here.

8               MR. FELLER:  Okay.

9               THE COURT:  Who was in here yesterday checking

10  out to see if you were using the computer properly, by the

11  way?

12              MR. FELLER:  Oh, I don't know.

13              THE COURT:  No, I'm telling you that the highest

14  person over there was scouting you.

15              MR. FELLER:  Oh, I didn't know.

16              THE COURT:  You were at your best.  Probably

17  will get a merit raise.

18              MR. FELLER:  That's wonderful, Your Honor.

19              THE COURT:  Actually, I think she was watching

20  your tekkie.

21              MR. FELLER:  Even better.

22              THE COURT:  Okay.

23              MR. FELLER:  Your Honor, also just as a

24  practical matter on the computer, either we can give them the

25  original exhibit -- well, we can give the original exhibit, so

1   they will pop them in and play the whole way through.

2              What we are playing on the screen with the

3   closed captioning is a program called Sanction.  I don't know

4   if they will be able to operate that on their own.

5              THE COURT:  You will do your best.

6              Actually -- okay.  Are we ready?

7              MR. BURGESS:  Yes, Your Honor.

8              MR. FELLER:  The Government is ready.

9              THE COURT:  Do we have copies of all these

10  instructions now?

11             MR. FELLER:  We do, Your Honor.

12             THE COURT:  Where are they?

13             MR. FELLER:  Again, we just need to pull --

14  Oliver has to at some point pull a page out depending on

15  whether or not the Defendant testifies.

16             THE COURT:  Okay.  That's great.

17             You ready, Mr. Burgess?

18             MR. BURGESS:  I am, Your Honor.

19             THE COURT:  All right.  Would you bring in the

20  jury, please.

21             And all rise for the jury.

22             *(Jury enters the courtroom at 8:52 a.m.)*

23             THE COURT:  Good morning.

24             JURORS:  Good morning.

25             THE COURT:  I'm impressed.  The first day you

| | |
|---|---|
| 1 | came in in the right order.  It usually takes two or three |
| 2 | days. |
| 3 | We are ready to go.  Please be seated. |
| 4 | You may call your next witness. |
| 5 | MR. FELLER:  Your Honor, the Government calls |
| 6 | ATF Special Agent Richard Jury. |
| 7 | THE COURT:  Raise your right hand. |
| 8 | RICHARD MICHAEL JURY , GOVERNMENT'S WITNESS, SWORN. |
| 9 | THE COURT:  Please be seated.  Adjust the |
| 10 | microphone so we can hear you. |
| 11 | A.  Thank you, Your Honor. |
| 12 | DIRECT-EXAMINATION |
| 13 | BY MR. FELLER: |
| 14 | Q.  Would you state your full name and spell your last name on |
| 15 | the record, please? |
| 16 | A.  Richard Michael Jury, J-U-R-Y. |
| 17 | Q.  What do you do, sir? |
| 18 | A.  A Special Agent with the Bureau of Alcohol, Tobacco and |
| 19 | Firearms and Explosives. |
| 20 | Q.  Is that commonly known as the ATF? |
| 21 | A.  Yes. |
| 22 | Q.  What do you do for ATF? |
| 23 | A.  I enforce firearms, narcotics violations, violent crime in |
| 24 | the city of Detroit. |
| 25 | Q.  Okay.  And how long have you been with ATF? |

1   A.  Five years.

2   Q.  On February 2nd, 2010, were you involved with an arrest

3   and then subsequent events related to Dennis Porter, Howard

4   Barkley and Mr. McGee?

5   A.  Yes.

6   Q.  Was one of your assignments that day to conduct a search

7   of Mr. Porter's mother's house?

8   A.  Yes, it was.

9   Q.  For what purpose?

10  A.  We had received information that there was possibly

11  firearms were going to be present at the mother's residence

12  that were being stored there by Dennis Porter.

13  Q.  All right.  There is an exhibit book in front of you.

14  I'll ask you to take a look at Exhibit 7 and see if you can

15  identify the four images contained in Exhibit 7?

16  A.  Yes.  The first exhibit is a Ruger Mini-14 --

17  Q.  We will do that in a second.  Just tell me if you can

18  identify it.

19  A.  I apologize.

20          These were firearms that were recovered during

21  the search of 14118 St. Mary's.

22  Q.  That is Mr. Porter's mother's house?

23  A.  Yes, sir.

24  Q.  What are the pictures?  Where were those actually --

25          THE COURT:  Hang on a second, please.

1          Yes?

2          JUROR NO. 8:  We can't see the Defendant.

3          MR. FELLER:  I'm sorry.

4          THE COURT:  Okay.  Is that better?

5          JUROR NO. 8:  Yes.  Thank you.

6          THE COURT:  Okay.  His office has bragged about

7   their transparency, but it doesn't go that far.  You can't see

8   through him.

9          MR. FELLER:  Thank you, Your Honor.

10  BY MR. FELLER:

11  Q.  Agent Jury, where were those photographs taken?

12  A.  It appears they were taken in one of the vaults at the ATF

13  office here in Detroit.

14  Q.  All right.  And do those photographs bear and accurate

15  depiction of the firearms that you found at Mr. Porter's

16  mother's house?

17  A.  Yes.

18          MR. FELLER:  Your Honor, I would offer Exhibit 7

19  into evidence.

20          THE COURT:  Any objection, Mr. Burgess?

21          MR. BURGESS:  I would object to the relevance,

22  Your Honor.  I don't see what they have to do with Mr. McGee.

23          THE COURT:  Your objection is noted.

24          MR. BURGESS:  Thank you.

25          THE COURT:  The exhibits are admitted.

1        *(Government Exhibit 7 was admitted into*

2            *evidence.)*

3    BY MR. FELLER:

4    Q.   If you could just take us through the four or five

5    firearms one-by-one?

6    A.   This is a Ruger Mini-14 .223 caliber rifle that was

7    recovered from the basement storage room of Dennis Porter's

8    mother's residence.

9    Q.   Okay.  Next image?

10   A.   This is a -- let me make sure I get this right.  It's

11   going to be a 12-gauge Mossberg shotgun that was recovered

12   from the basement of the residence.

13   Q.   Okay.  Next image?

14   A.   It's a 20-gauge Springfield shotgun that was recovered

15   from the basement of the residence.

16   Q.   All right.  Next image?

17   A.   It's a .40 caliber HMK handgun that was recovered from the

18   basement -- my mistake.  That was recovered from the first

19   floor kitchen area of the residence.

20   Q.   Okay.  Have you had an opportunity to review either the

21   original audio recording or the transcript of a recorded

22   telephone conversation on February 1st, 2010?

23   A.   Yes, I have.

24   Q.   And that conversation is between Mr. Porter and a

25   confidential informant known as Nop, correct?

```
1    A.  That's correct.
2    Q.  On that recording does Mr. Porter describe a robbery that
3    had just taken place in which firearms were stolen?
4    A.  Yes, he does.
5    Q.  Okay.  Are one or more of the firearms recovered from
6    Mr. Porter's mother's house consistent with the firearms
7    described by Mr. Porter as having been taken during that
8    robbery?
9    A.  Yes.  Two of the firearms that were discussed were
10   recovered were similar to the firearms recovered from Dennis
11   Porter's mother's residence.
12                  MR. FELLER:  That's all the questions I have for
13   Agent Jury.
14                  THE COURT:  Cross-examination?
15                  MR. BURGESS:  Thank you, Your Honor.
16                        CROSS-EXAMINATION
17   BY MR. BURGESS:
18   Q.  Agent Jury, is that . . .
19   A.  Yes, that's correct.
20   Q.  Just so I'm clear, the Government, Mr. Feller asked you
21   some questions about an arrest on February 2nd.
22                  Mr. McGee wasn't arrested on February 2nd, was
23   he?
24   A.  No, he was not.
25   Q.  Okay.  Mr. Porter was?
```

1    A.   Yes, he was.

2    Q.   And all of these guns you are talking about, you testified

3    to today, are -- were in Mr. Porter's house, correct?

4    A.   They were in Dennis Porter's mother's residence.

5    Q.   Thank you.  His mother's residence.

6                    Did you ever search Mr. McGee's residence?

7    A.   No, I did not.

8    Q.   Anything preventing you from doing that that you know of?

9    A.   I was not the case agent.  I was -- during the search of

10   the 14118 St. Mary's residence in the Detroit, I was assisting

11   on the case.

12   Q.   Okay.  So, to your knowledge, anything preventing you from

13   searching Mr. McGee's house or residence to your knowledge?

14   A.   I would not have any knowledge of that.

15   Q.   Were any of these guns preserved for any physical evidence

16   tests, fingerprints, DNA, anything like that?

17   A.   Typically when any firearms are recovered, they are held

18   for print if they believe that -- unless it's purchased from

19   an individual, it would be held for prints, yes.

20   Q.   Do you know if these particular guns were held for prints?

21   A.   I would not have that knowledge.

22                    MR. BURGESS:  No further questions.

23                    MR. FELLER:  Nothing further, Your Honor.

24                    THE COURT:  Any questions from the jury?

25                    You may step down.

```
 1                    Thank you.  You may call your next witness.
 2    A.  Thank you, Your Honor.
 3                    MR. FELLER:  Your Honor, the United States calls
 4    Howard Barkley.
 5                    THE COURT:  Good morning.  Would you raise your
 6    right hand, please.
 7        HOWARD LOUIS BARKLEY, GOVERNMENT'S WITNESS, SWORN.
 8                    THE COURT:  Please be seated.  Adjust the
 9    microphone.
10                    And you may begin.
11                    MR. FELLER:  Your Honor, is it all right if I
12    just stay right here?
13                    THE COURT:  Sure.
14                         DIRECT-EXAMINATION
15    BY MR. FELLER:
16    Q.  Sir, would you state your name and spell your last name?
17    A.  Howard Louis Barkley, B-A-R-K-L-E-Y.
18    Q.  How old a man are you, sir?
19    A.  32 years old.
20    Q.  And do you have a family?
21    A.  Yes, I do.
22    Q.  Are you married?
23    A.  Yes, I am.
24    Q.  Do you have children?
25    A.  Yes, I do.
```

```
1    Q.  How old are your children?

2              MR. BURGESS:  Objection, relevance.

3    A.  12 and 13.

4              THE COURT:  The objection is sustained.

5    BY MR. FELLER:

6    Q.  Mr. Barkley, putting aside this case -- and we'll talk

7    about this case -- do you have any criminal history?

8    A.  Yes, I do.

9    Q.  Could you describe that for the jury?

10   A.  I have an intent to deliver marijuana.

11   Q.  Okay.  When was that?

12   A.  2001.

13   Q.  Okay.  Any other criminal convictions other than the 2001

14   marijuana charge?

15   A.  No, sir.

16   Q.  Anything traffic related?

17   A.  Yes.

18   Q.  What is that?

19   A.  Traffic warrants, too.

20   Q.  Is that for driving with a suspended license?

21   A.  Yes.

22   Q.  All right.  Could I just ask you to speak into the

23   microphone.

24              All right.  So, those are your criminal

25   convictions.
```

1          Again, putting aside this case, is there any

2   criminal conduct for which you haven't been charged that you

3   were involved in?

4   A.  Yes, it is.

5   Q.  Can you describe that?

6   A.  In maybe '97 or so, I was involved in a home invasion.

7   Q.  Okay.  And can you describe that a little bit?

8   A.  Just a regular break-in.

9   Q.  Okay.  Anyone home during that break-in?

10  A.  Yes, it was.

11  Q.  All right.  Any violence done to that person?

12  A.  No, it wasn't.

13  Q.  What was taken?

14  A.  Just clothes and money and guns.

15  Q.  I'm sorry.  I didn't . . .

16  A.  Just clothes, like guns and a little bit of money.

17  Q.  All right.  Any other criminal conduct besides that '97

18  robbery?

19  A.  Yes, in November.

20  Q.  November of 2009?

21  A.  Yes.

22  Q.  What happened in November of 2009?

23  A.  A friend of mine broke into another home and stole some

24  pounds of marijuana.

25  Q.  Okay.  And what was your role when your friend stole these

| | |
|---|---|
| 1 | pounds of marijuana? |
| 2 | A.  I took him over there. |
| 3 | Q.  You drove over there? |
| 4 | A.  Yes, I drove him over there. |
| 5 | Q.  Did you go inside that residence? |
| 6 | A.  No, I did not. |
| 7 | Q.  All right.  Now, you have entered a guilty plea in this |
| 8 | case, correct? |
| 9 | A.  Yes, I have. |
| 10 | Q.  All right.  There is a book in front of you.  Let me ask |
| 11 | you to take a look at Exhibit 9 and tell us if you can |
| 12 | identify that document? |
| 13 | A.  You say 9? |
| 14 | Q.  Yes. |
| 15 | A.  I have it. |
| 16 | Q.  Can you identify that document? |
| 17 | A.  Yes, I can. |
| 18 | Q.  What is that? |
| 19 | A.  It's a plea agreement. |
| 20 | Q.  Okay.  Is that your plea agreement in this case? |
| 21 | A.  Yes, it is. |
| 22 | Q.  Okay.  Let me ask you to turn to Exhibit 10. |
| 23 | Can you identify that document? |
| 24 | A.  Yes, I can. |
| 25 | Q.  What is that document? |

1    A.   It's a cooperation agreement.

2    Q.   Your cooperation agreement in this case?

3    A.   Yes, my cooperation agreement.

4              MR. FELLER:  Your Honor, I would offer Exhibits

5    9 and 10 into evidence.

6              MR. BURGESS:  No objection.

7              THE COURT:  They are received.

8              *(Government Exhibits 9 and 10 were admitted into*

9              *evidence.)*

10   BY MR. FELLER:

11   Q.   Okay.  And if we could start with Exhibit 9.  This is the

12   cover page to your plea agreement?

13   A.   (No response.)

14   Q.   You can flip through the book or you can look up on the

15   screen up there or the screen in front of you, whatever is

16   easier for you to do.

17              Again, Howard Louis Barkley, that's you?

18   A.   Yes.

19   Q.   Okay.  And, again, if we can go to page nine.

20              Is that your signature in the bottom right-hand

21   corner?

22   A.   Yes, it is.

23   Q.   Okay.  And this was signed in March of 2010, correct?

24   A.   Yes, it was.

25   Q.   Okay.  Let's go to page three.  Okay.  If we can highlight

1    the agreed guideline range.

2                    Your plea in this case will carry a guideline

3    sentence range of approximately, depending on some subsequent

4    calculations, either 10 to 12 years or about 15 to 20 years.

5    Do you understand that?

6    A.  Yes.

7    Q.  It also carries a mandatory minimum sentence of 10 years.

8    You understand that as well?

9    A.  Yes, I do.

10   Q.  Okay.  Let's go to Exhibit 10.

11                    Again, this is your cooperation agreement?

12   Howard Louis Barkley, that's you?

13   A.  Yes.

14   Q.  All right.  Let's go to page four.  And if we could

15   highlight that top paragraph A, the top half of it.

16                    Mr. Barkley, if you could read just the first

17   sentence in that paragraph?

18   A.  "Truthful information and testimony.  Defendant will

19   provide truthful and complete information concerning all facts

20   of this case and other criminal wrongdoing known to him."

21   Q.  Mr. Barkley, is it your understanding that the only

22   possible way for you to receive a benefit is if you provide

23   truthful information?

24   A.  Yes.

25   Q.  Okay.  And that is, in fact, what your cooperation

1    agreement expressly requires, correct?

2    A.  Yes.

3    Q.  All right.  Let's go to page four of the cooperation

4    agreement.  And if we could highlight paragraph A, 2A.

5              Mr. Barkley, is it your understanding that in

6    exchange for your testimony here today, the Government may

7    make a recommendation to the judge for you to receive a lower

8    sentence than what is provided for in your agreement?

9    A.  Yes.

10   Q.  Okay.  Who is your sentence ultimately up to?

11   A.  My judge.

12   Q.  Okay.  Is it up to me?

13   A.  No, it isn't.

14   Q.  Can I decide what your sentence is?

15   A.  No.

16   Q.  Who decides what your sentence is?

17   A.  The judge.

18   Q.  Okay.  And, again, what do you have to do to even warrant

19   a recommendation for a lower sentence?

20   A.  Tell the truth.

21              MR. FELLER:  Okay.  You can take that down.

22   BY MR. FELLER:

23   Q.  There is a gentleman sitting to the left of me in a blue

24   shirt.  I would ask you to identify that individual --

25   A.  Stir.

1    Q.  -- if you can?

2                I'm sorry?

3    A.  Stir.

4    Q.  Is that how you knew him?

5    A.  Yes.

6    Q.  By the name Stir?

7    A.  Yes.

8    Q.  Have you subsequently learned what his real name is?

9    A.  Yes, I have.

10   Q.  What is his real name, if you know?

11   A.  Alistair McGee.

12   Q.  Okay.  Did you know that name at the time you had dealings

13   with him prior to today?

14   A.  No, I didn't.

15   Q.  Can you tell the jury how you first met Stir?

16   A.  I met him through my neighborhood just growing up.  I know

17   his little sister, and I began to know him, see him in a lot

18   of clubs, parties.

19   Q.  Okay.  And I'll ask you to speak right into the microphone

20   if you can.  Keep your voice up.

21                Did there come a time in 2008 when you became

22   more friendly with Stir, Mr. McGee?

23   A.  Yes, I did.

24   Q.  Okay.  And what sorts of activities -- did you become

25   friends?

1    A.  Yes, you can say that.

2    Q.  All right.  What sorts of activities would you engage in

3    together?

4    A.  Maybe just hanging out, partying, going out, drinking,

5    whatever, smoking.  Just hanging out with each other.

6    Q.  All right.  Smoking what?

7    A.  Marijuana.

8    Q.  All right.  Was there a time when you were at Mr. McGee's

9    home in late January of 2010?

10   A.  Yes, it was.

11   Q.  All right.  And was Mr. McGee acting in any way unusual on

12   this occasion in late January of 2010 when you were at his

13   house?

14   A.  Yeah.  Yes, he was.

15   Q.  All right.  What was he doing that was unusual?

16   A.  Looking back and forth out of the window watching his

17   neighbor.

18   Q.  Watching his neighbor or watching his name's house?

19   A.  Watching his neighbor, his neighbor's house too.

20   Q.  What was the neighbor doing?

21   A.  Just pulling back and forth in the driveway, pulling up,

22   going in and out of the house.

23   Q.  Okay.  Did you ask Mr. McGee why it is that he was

24   watching his neighbor pull back and forth in his driveway?

25   A.  Yes, I did.

```
 1    Q.  Okay.  And what, if anything, did Mr. McGee say?

 2    A.  I believe that the neighbor had some work.

 3    Q.  I'm sorry.  This is what Mr. McGee said?

 4    A.  Yeah.

 5    Q.  That the neighbor had some work?

 6    A.  Yeah.

 7    Q.  Okay.  And what did you take some work to mean?

 8                   MR. BURGESS:  Objection.  Speculation.

 9                   THE COURT:  He can tell what he thought.

10    A.  Cocaine, drugs.

11    BY MR. FELLER:

12    Q.  Okay.  Is that a common way to refer to cocaine and drugs,

13    as work?

14    A.  Yes, it is.

15    Q.  Okay.  Did Mr. McGee say he intended to do anything with

16    respect to the neighbor having -- possibly having some work?

17    A.  Yes.

18    Q.  What did Mr. McGee say he intended to do?

19    A.  Put together a robbery.

20    Q.  Put together a robbery of?

21    A.  Of the neighbor.

22    Q.  Okay.  Did Mr. McGee say whether he himself would

23    participate in that robbery?

24    A.  No, he wouldn't.

25    Q.  Why would Mr. McGee himself not participate?
```

1   A.   Because his neighbors knew him.

2   Q.   Because his neighbors know him?

3   A.   Yes.

4   Q.   And so if the neighbors saw Mr. McGee, that would be a

5   problem?

6   A.   Yes.

7   Q.   Okay.  Did Mr. McGee ask you to participate in the robbery

8   of the neighbor's house?

9   A.   Yes.

10  Q.   Did you agree to do that?

11  A.   Yes.  I couldn't get around to do it, no.

12  Q.   To participate in the robbery of the neighbor's house?

13  A.   Yes.

14  Q.   Okay.  Why did you not participate in the robbery of the

15  neighbor's house?

16  A.   I wasn't -- I couldn't even get around.  I wasn't around

17  at the time.

18  Q.   What does that mean, you weren't around?

19  A.   No, I couldn't do it.

20  Q.   Okay.  Why couldn't you do it?

21  A.   Because I was at home.  I had my kids.

22  Q.   Okay.  Do you know, if you know, why would Mr. McGee ask

23  you to participate in the robbery?

24              MR. BURGESS:  Objection, speculation.

25

1   BY MR. FELLER:

2   Q.  If you know.

3   A.  Maybe because I was --

4              THE COURT:  Hang on just a second.

5              Ask the first question.  Do you know.

6   BY MR. FELLER:

7   Q.  Do you know why Mr. McGee would have asked you to

8   participate in this robbery?

9   A.  Yes.  Because I wasn't employed at the time and I needed

10  the money.

11  Q.  Was Mr. McGee aware of your prior robbery in 1997?

12  A.  I believe I told him about it before.

13  Q.  Okay.  Was he also aware of the event in late 2009 where

14  you drove to steal some bricks?

15  A.  Yes.

16  Q.  All right.  But if I understand correctly, you decided not

17  to participate in the robbery of the neighbor's house?

18  A.  Yes.

19  Q.  Okay.  The following day did you receive a call from

20  Mr. McGee?

21  A.  Yes.

22  Q.  Okay.  And what on that call did Mr. McGee say?

23  A.  That Denny Moe and a couple other guys went inside the

24  house.

25  Q.  Inside the neighbor's house?

1   A.   Yes.

2   Q.   Okay.  And what, if anything, did Mr. McGee say was taken

3   from the neighbor's house?

4   A.   A bunch of guns and money.

5   Q.   Okay.  Did Mr. McGee ask you to meet him anywhere?

6   A.   Yes, I did.

7   Q.   Did he ask you to meet him somewhere?

8   A.   Oh.  Yes.

9   Q.   Where did he ask you to meet him?

10   A.   I met him at his cousin's house.

11   Q.   Okay.  At Mr. McGee's cousin's house?

12   A.   Yes.

13   Q.   Okay.  And what, if anything, did you see in the cousin's

14   house?

15   A.   Guns.

16   Q.   Okay.  Where in the cousin's house specifically?

17   A.   In the basement of his cousin's house.

18   Q.   Did Mr. McGee ask you to do anything with respect to any

19   of those guns?

20   A.   Yes.

21   Q.   What did he ask you to do?

22   A.   He asked me to put one up for him.

23   Q.   What does that mean, put one up for him?

24   A.   To hold it in my possession for a couple days.

25   Q.   Okay.  And why would he -- do you know why he asked you to

```
1    do that?

2    A.  He already had a couple guns already in his possession.

3    Q.  Okay.  Let me ask you to take a look at Exhibit 8 in the

4    book in front of you.

5                   Can you identify that?

6    A.  Yes.

7    Q.  What is it?

8    A.  Assault rifle.

9    Q.  Okay.  And can you identify that as the firearm that

10   Mr. McGee asked you to put up?

11   A.  Yes.

12               MR. FELLER:  Okay.  Your Honor, I would offer

13   Exhibit 8 into evidence.

14               MR. BURGESS:  No objection.

15               THE COURT:  It's received.

16               (Government Exhibit 8 was admitted into

17               evidence.)

18   BY MR. FELLER:

19   Q.  Okay.  And, again, this is the gun Mr. McGee asked you to

20   put up?

21   A.  Yes.

22   Q.  Okay.  And did you, in fact, direct agents to this firearm

23   in your home after you were arrested?

24   A.  Yes.

25   Q.  During your various interactions with Mr. McGee, do you
```

1    know whether he had any firearms in his possession?

2    A.  I seen him with a couple of them.

3    Q.  Okay.  And I think you just testified, in fact, that he

4    already had a couple guns at his house, correct?

5    A.  Yes.

6    Q.  All right.  Let me ask you if you can identify Exhibit 6

7    in the book?

8    A.  Yes.

9    Q.  What is Exhibit 6?

10   A.  Assault rifle.

11   Q.  Okay.  And can you identify that as one of the firearms

12   you saw in Mr. McGee's possession?

13   A.  Yes.

14            MR. FELLER:  Your Honor, I would offer Exhibit 6

15   into evidence.

16            MR. BURGESS:  No objection.

17            THE COURT:  Received.

18            *(Government Exhibit 6 was admitted into*

19            *evidence.)*

20   BY MR. FELLER:

21   Q.  Okay.  And, again, this is a firearm you saw at Mr.

22   McGee's house?

23   A.  Yes.

24   Q.  Okay.  When you were at Mr. McGee's cousin's house, did he

25   say anything to you with respect to any other robberies?

1   A.  Yes.

2   Q.  What did he say to you?

3   A.  He said that Denny Moe had a lick-up tomorrow.

4   Q.  Okay.  And Denny Moe, did you subsequently learn Denny

5   Moe's real name?

6   A.  Yes.

7   Q.  And what is that?

8   A.  Dennis Porter.

9   Q.  Okay.  So, Mr. McGee tells you that Denny Moe has a

10  lick-up tomorrow; is that what he said?

11  A.  Yes.

12  Q.  Okay.  And what is a lick?

13  A.  A robbery.

14  Q.  Okay.  Did he say what the robbery involved?

15  A.  Involved cocaine, some birds.

16  Q.  Did he say cocaine or did he say birds?

17  A.  He said birds.

18  Q.  What did you understand birds to mean?

19  A.  Cocaine.

20  Q.  Did he say the quantity of cocaine that would be involved

21  in this robbery?

22  A.  He said Denny Moe's connection was getting six, but maybe

23  more.

24  Q.  Did he explain to you that there was an inside person in

25  relation to the robbery?

1   A.   Yes.

2   Q.   Okay.  And did he refer to that as Denny Moe's connection?

3   A.   Yes.

4   Q.   All right.  And he said with respect to that person he was

5   getting how many?

6   A.   Six.

7   Q.   Six what?

8   A.   Six birds.

9   Q.   Okay.  What is a bird?  Is that a quantity of cocaine?

10  A.   Yes.  It is a key of cocaine.

11  Q.   A key?

12  A.   Yes.

13  Q.   And what is a key?

14  A.   A kilogram, cocaine.

15  Q.   It's a kilogram of cocaine?

16  A.   Yes.

17  Q.   All right.  So, the connect was supposed to be getting six

18  and there would be more at the robbery?

19  A.   Yes.

20  Q.   That's what Mr. McGee said to you?

21  A.   Yes.

22  Q.   Okay.  Did he ask you to participate in that robbery that

23  Denny Moe had set up?

24  A.   Yes.

25  Q.   Did you agree to participate in that?

1    A.   Yes, I did.

2    Q.   Why did you agree to participate in the second robbery,

3    having turned down the robbery of the neighbor's house the day

4    before?

5    A.   I kind of believed it wasn't nothin' -- the first robbery,

6    I kind of believed there wasn't nothin' there and the second

7    robbery I believed there was.

8    Q.   If you discussed it, what was your role to be in the

9    robbery?

10   A.   I discussed that I would drive there and get a portion of

11   the cocaine.

12   Q.   All right.  So, your role was to be the driver?

13   A.   Yes.

14   Q.   And is that consistent with what you had done back in

15   November of 2009?

16   A.   Yes.

17   Q.   Did you subsequently agree to meet Mr. McGee, Mr. Porter

18   and the connect at a coney island?

19   A.   Yes.

20   Q.   Okay.

21               MR. FELLER:  If we could get Exhibit 5 up at one

22   seventeen thirty.

23               Yeah, one hour 17 minutes -- no, just 17:30.

24   BY MR. FELLER:

25   Q.   Mr. Barkley, were you late to this meeting?

1    A.  Yes.

2    Q.  Okay.  Were there a series of points in time when -- well,

3    did you receive any phone calls from Mr. McGee on your way to

4    the meeting?

5    A.  Yes.

6    Q.  And what was the substance of those phone calls?

7    A.  Why was I late.

8    Q.  Why were you late, if you remember?

9    A.  I was doing something else.

10   Q.  Okay.  And did you eventually arrive at the meeting?

11   A.  Yes.

12   Q.  At the coney island?

13   A.  Yes.

14   Q.  And is that you that we see in the image from Exhibit 5 at

15   approximately 17 minutes 29 seconds?

16   A.  Yes.

17   Q.  Okay.  Again, who else was present for that meeting when

18   you arrived?

19   A.  Denny Moe, Stir, and two other guys.

20   Q.  Okay.  One was Nop?

21   A.  Yes.

22   Q.  He turned out to be a confidential informant?

23   A.  Yes.

24   Q.  And the other was the undercover ATF agent?

25   A.  Yes.

Q.  Okay.  To your understanding, what was the purpose of the meeting at the coney island?

A.  To understand what was going on.

Q.  And the robbery, that was to take place when?

A.  Probably about an hour after that.

Q.  Okay.  Did anyone -- following the coney island meeting everyone leaves, correct?

A.  Yes.

Q.  For what purpose?

A.  We left to go switch cars and get guns.

Q.  And get guns?  For use in the robbery?

A.  Yes.

Q.  Okay.  Who -- there's various individuals leaving in various cars.

         Can you tell the jury who leaves with who, if you know, from the coney island?

A.  We all left separately, and then I met Stir at his house and then --

Q.  All right.  Slow down.  Slow down.

         So, you leave by yourself in your own vehicle?

A.  Yes.

Q.  From the coney island?

A.  Yes.

Q.  And you go where?

A.  To Stir's house.

1   Q.  Okay.  And is Stir at his house --

2   A.  Yes.

3   Q.  -- when you get there?

4   A.  Mm-hmm.

5   Q.  Anyone else at Mr. McGee's house when you get there?

6   A.  I didn't go in.  Just the people who stay there.

7   Q.  All right.  Does Mr. McGee go inside?

8   A.  Yes.

9   Q.  Does he come out of the house with anything?

10  A.  Yes.  With an assault rifle.

11  Q.  All right.  Do you and Mr. McGee each leave separately

12  from his house or do you leave together?

13  A.  We leave together.

14  Q.  All right.  Who is driving when you leave together?

15  A.  I'm driving.

16  Q.  Okay.  So, you're driving.  Mr. McGee is the passenger?

17  A.  Yes.

18  Q.  Anyone else in the vehicle at that point?

19  A.  No.

20  Q.  All right.  Where are you headed from Mr. McGee's house

21  where he has picked up an assault rifle?

22  A.  Back to his cousin's house that we went to the day before.

23  Q.  All right.  And why are you going to his cousin's house?

24  A.  To pick up the guns.

25  Q.  Did you pick up more guns?

1    A.   Yes.

2    Q.   All right.  And do you arrive at the cousin's house?

3    A.   Yes.

4    Q.   Anyone else arrive at the cousin's house?

5    A.   Yes.  Denny Moe.

6    Q.   Okay.  So, Denny's Porter is now at the cousin's house?

7    A.   Yes.

8    Q.   Along with you and Mr. McGee?

9    A.   Yes.

10   Q.   And the cousin?

11   A.   Right.  Two other guys.

12   Q.   Do you know -- oh, two other guys?

13   A.   Yeah.  It was two other -- it was his cousins, but I don't

14   know their names.

15   Q.   Do you remember their street name even?

16   A.   Outer Drive and Gilchrist.

17   Q.   I meant the cousins' street names.  Not the name of the

18   streets.

19   A.   Oh, no, no, no.

20   Q.   Did you know the cousins' street names?

21   A.   No.

22   Q.   All right.  Are there in fact -- are -- the firearms from

23   the robbery the day or two before, are they still at the

24   cousin's house?

25   A.   No.

1    Q.  Okay.  If you -- do you know why not?  Does anyone say why

2    not?

3    A.  No, I don't know why not.

4    Q.  Okay.  The -- everyone I assume leaves from the cousin's

5    house?

6    A.  Yes.

7    Q.  Okay.

8    A.  I left -- we all left.  I hopped in the car with Denny

9    Moe, and Stir and his two cousins left together.

10   Q.  All right.  So, you and Denny Moe go in one vehicle?

11   A.  Yes.

12   Q.  And Stir and his cousins go in a separate vehicle?

13   A.  Yes.

14   Q.  Where are they going, if you know?

15   A.  Supposedly to go get the guns, because they wasn't at that

16   house.

17   Q.  And do you know did they say where the guns were supposed

18   to be at that point?

19   A.  At his cousin's mother's house.

20   Q.  Okay.  So, they go to get more guns?

21   A.  Yes.

22   Q.  Where do you and Dennis Porter go?

23   A.  We go to the store and wait.

24   Q.  Okay.  Which store?

25   A.  On Lyndon and Schaefer.

1    Q.  Is that a liquor store?

2    A.  Yes.

3    Q.  Across from the storage facility where you end up meeting

4    shortly thereafter?

5    A.  Yes.

6    Q.  All right.  Does Stir, does Mr. McGee arrive at the liquor

7    store as well?

8    A.  Yeah.  We waited and then he arrived.

9    Q.  Who was with Mr. McGee at that point?

10   A.  Still his two cousins.

11   Q.  All right.  Do you and Denny Moe go somewhere from the

12   liquor store?

13   A.  Yeah.  We leave and go to the storage place.

14   Q.  Okay.  Do you pull inside the gate?

15   A.  Yes.

16   Q.  Okay.  And at that point, as far as you know, Mr. McGee is

17   behind you, correct?

18   A.  Yes.

19   Q.  Okay.  And you were subsequently arrested at the storage

20   facility?

21   A.  Yes.

22          MR. FELLER:  Your Honor, that's all the

23   questions I have for Mr. Barkley at this time.

24          THE COURT:  Cross-examination?

25          MR. BURGESS:  Thank you, Your Honor.

```
 1                    Is it all right if I do it from here, Your
 2   Honor?
 3                    THE COURT:  Sure.
 4                    MR. BURGESS:  Thank you.
 5                    THE COURT:  As long as we can hear you.
 6                    MR. BURGESS:  I'll try to speak up.
 7                    THE COURT:  You can move that microphone too
 8   that is at the table, but I don't think we will have a problem
 9   hearing you.
10                         CROSS-EXAMINATION
11   BY MR. BURGESS:
12   Q.  Mr. Barkley, the -- Mr. Feller asked you some questions
13   about your prior criminal conduct.  Is that correct?  Do you
14   remember those questions?
15   A.  Yes.
16   Q.  You said one prior conviction you were selling some
17   marijuana in 2001?
18   A.  Yes, sir.
19   Q.  You were convicted of that?
20   A.  Yes, sir.
21   Q.  Okay.  Is that the only time in your life you sold
22   marijuana?
23   A.  No.
24   Q.  Okay.  So, you've done that more than once?
25   A.  Yes.
```

```
 1   Q.  How many times?
 2   A.  Plenty of times.  I don't know exactly, but more than
 3   once.
 4   Q.  More than ten?
 5   A.  More than ten.
 6   Q.  More than 20?
 7   A.  More than 20.
 8   Q.  So a lot, right?
 9   A.  Yeah.
10   Q.  Okay.  And that's been going on throughout your adult
11   life.  Is that correct?
12   A.  Not all of it.
13   Q.  So, would it be fair to say that for a certain period of
14   your life you've been a drug dealer?  Is that correct?
15   A.  Yes.
16   Q.  Now, did you ever sell anything other than marijuana?
17   A.  Yes.
18   Q.  Cocaine?
19   A.  Yes.
20   Q.  Heroin?
21   A.  No.
22   Q.  Pills?
23   A.  Yes.
24   Q.  Any other kind of drugs?
25   A.  No.
```

1    Q.  What time period would you say you were selling those

2    narcotics, from when to when?

3    A.  From maybe the late 90's to 2009.

4    Q.  Okay.  So, ten-plus years, give or take a year; is that

5    correct?

6    A.  Yeah.

7    Q.  How old are you, sir?

8    A.  32.

9    Q.  32.

10                   So, for pretty much all of your adult life

11   you've been a drug dealer?

12   A.  No.

13   Q.  In the late 90's you were how old?

14   A.  19, 20.

15   Q.  Okay.  Is it fair to say a definition of an adult is when

16   someone turns 18?  Is that correct?

17   A.  Yes.

18   Q.  So since you were 19 or 20, until this year or last year,

19   you sold drugs, right?

20   A.  I've also worked.

21   Q.  I understand.  I'm just talking about you dealing drugs.

22   Which is illegal by the way, right?

23   A.  Yes.

24   Q.  You don't have a license to do that, do you?

25   A.  No, I do not.

```
 1    Q.  Okay.  So, pretty much during your whole adult life you
 2    have been a drug dealer, among other things.  Is that correct?
 3    A.  Yes.
 4    Q.  You just only got caught once --
 5    A.  Yes.
 6    Q.  -- as a drug dealer?
 7    A.  Yes.
 8    Q.  In 1997 you said you had a home invasion.
 9              You weren't caught for that; is that correct?
10    A.  No, sir.
11    Q.  Okay.  You didn't turn yourself in, right?
12    A.  No, sir.
13    Q.  You got away with something.  So, you didn't come forward
14    and say you did something, correct?
15    A.  No, sir.
16    Q.  And in this particular case when you were involved in this
17    robbery, if you hadn't gotten caught, would you have come
18    forward?
19    A.  If I hadn't got caught?
20    Q.  Would you have come forward and turned yourself in in this
21    case?
22    A.  Are you talking about '97 or now?
23    Q.  This case, currently.
24              We know in '97 you walked away from the home
25    invasion.
```

1           In this particular case, if you hadn't got

2   caught on February 2nd, would you have turned yourself in?

3   A.  No.

4   Q.  Now, this home invasion in November 2009, you said you

5   went to a house and stole some pounds of marijuana; is that

6   correct?

7   A.  Yes.

8   Q.  Okay.  Or helped somebody, right?

9   A.  Yes.

10  Q.  How many pounds of marijuana did you get?

11  A.  I believe it was 12.

12  Q.  12.

13           You got 12 yourself?

14  A.  Yes.

15  Q.  What did you do with it?

16  A.  Sold it.

17  Q.  And that was about three or four months before this

18  robbery in this case that brought you here today, right?

19  A.  Yes, sir.

20  Q.  So, at least on one prior occasion, sir, you've actually

21  engaged in this type of activity where you bust in a house,

22  steal some dope and then sell it later on, right?

23  A.  I didn't go in the house.

24  Q.  Well, helped somebody?

25  A.  Yes.

```
1    Q.  And this was the plan in this case too, to steal some
2    dope, turn around and sell it, right?
3    A.  Yes, sir.
4    Q.  Okay.  And you know how to sell dope because you're a dope
5    dealer, right?
6    A.  I know how.
7    Q.  You know how to sell dope, right?
8    A.  Yes.
9    Q.  You know how to package it, break it down, break it down
10   into packages and mix it up and sell it?
11   A.  No.
12   Q.  You don't know how to do that?
13   A.  No.
14   Q.  Do you have somebody else do that for you?
15   A.  No.  I don't know how to mix it.
16   Q.  You know how to package dope?
17   A.  Yes.
18   Q.  And you've packaged dope before, right?
19   A.  Yes.
20   Q.  Okay.  In this case you were arrested February 2nd, 2010,
21   right?
22   A.  Yes, sir.
23   Q.  Okay.  And you were brought to court at some point after
24   that, right?
25   A.  Yes, sir.
```

1    Q.  And you were -- you got an attorney, right?

2    A.  Yes, sir.

3    Q.  Now, you obviously had a number of discussions with your

4    attorney about this case, right?

5    A.  Yes, sir.

6    Q.  And what would be in your best interest, how to resolve

7    your case?

8    A.  Yes, sir.

9    Q.  And your attorney advised you --

10           MR. FELLER:  Your Honor, objection as to

11   anything his attorney advised him.

12           MR. BURGESS:  He is on the stand, Your Honor.

13   He waives his privilege.

14           MR. FELLER:  What?  I've never heard of such a

15   thing, that you waive privilege by testifying.

16           MR. BURGESS:  This is discussion -- well . . .

17           THE COURT:  Mr. Burgess?

18           MR. BURGESS:  I think that's actually -- well,

19   first of all, it's not Mr. Feller's assertion.  It is the

20   witness's assertion.

21           MR. FELLER:  It also calls for hearsay.

22           MR. BURGESS:  I didn't ask him what his lawyer

23   said.  I just asked him if he had a discussion with his

24   attorney.

25           THE COURT:  You may ask him if he had a

1    discussion with his attorney, but not go into the discussion.

2    BY MR. BURGESS:

3    Q.  You had a discussion with your attorney in this case; is

4    that correct?

5    A.  Yes, sir.

6    Q.  Okay.  And during that discussion you learned some things

7    about the charge against you; is that correct?

8    A.  Yes, sir.

9    Q.  Okay.  You learned that this charge carries 10 years

10   mandatory minimum, right?

11   A.  Yes, sir.

12   Q.  Okay.  You also learned that your guidelines in this case,

13   if you went to trial, were anywhere from 16 to 20 years,

14   right?

15   A.  Yes, sir.

16   Q.  Okay.  And that's in prison, right?

17   A.  Yes, sir.

18   Q.  And that's not like you are getting out early or anything.

19   That's 16 to 20 years.  That's your understanding, right?

20   A.  Yes, sir.

21   Q.  And your understanding too is there is no way you can get

22   under that 10 years without cooperating.  That's your

23   understanding, correct?

24   A.  Yes, sir.

25   Q.  Okay.  The Government showed you the cooperation agreement

1   up on the screen.  You know the cooperation agreement.  You've

2   gone over it.  Right?

3   A.  Yes, sir.

4   Q.  You've gone through it with your attorney and you've read

5   it yourself, right?

6   A.  Yes, sir.

7   Q.  And you understand every piece of it, don't you?

8   A.  Yes, sir.

9   Q.  Okay.  Part of that agreement is that -- it says it's

10  exclusively within the Government's discretion to determine

11  whether Defendant has provided substantial assistance.  Right?

12  A.  Yes, sir.

13  Q.  So, that is completely Mr. Feller and his office's call as

14  to whether you get any kind of consideration for your

15  cooperation, right?

16  A.  To my knowledge, it's up to the judge.

17  Q.  Do you see where it says in paragraph 2A?

18  A.  Do you know what number that agreement was?

19          MR. FELLER:  It's Exhibit 10.  We will put it

20  up.

21          MR. BURGESS:  Exhibit 10.  Thanks.

22          MR. FELLER:  Page four.

23          MR. BURGESS:  Page four.  Thanks.

24  BY MR. BURGESS:

25  Q.  The first paragraph there, sir, the first line.

1        MR. BURGESS:  Thank you.

2    BY MR. BURGESS:

3    Q.  Do you see where it says that it's "exclusively within the

4    Government's discretion to determine whether Defendant has

5    provided substantial assistance"?

6    A.  Yes, sir.

7    Q.  So -- and maybe I confused you, sir, and I apologize if I

8    did.  But it's up to the Court to determine the sentence, but

9    it's up to the Government to determine whether or not the

10   recommended guideline range gets lowered and whether or not

11   you can get below that 10-year mandatory minimum.

12        Is that your understanding, sir?

13   A.  Yes, sir.

14   Q.  Okay.  So, it's completely within the Government's

15   discretion regarding the 10-year base, the 10-year mandatory

16   minimum.

17        That's the only way you are going to get under

18   that 10 years possibly, is if you cooperate with the

19   Government.  Is that correct?  Is that your understanding?

20   A.  Yes, sir.

21   Q.  Okay.  And you've been advised of that, correct?  You

22   understand that?

23   A.  Yes, I understand.

24   Q.  The only way you are saving yourself -- that you are going

25   to get less than 10 years is if you are here testifying and

1   cooperating with the Government, right?

2   A.  Uhm . . . yes, sir.

3   Q.  Okay.  And you've had some discussions -- you've had some

4   discussions, and it's your understanding that by testifying

5   here today you have been told that the Government will give

6   you a 50 percent reduction in your guideline range.  Is that

7   correct?

8   A.  No, sir.

9           MR. FELLER:  Objection.  You've been told.  It

10  calls for hearsay.

11          MR. BURGESS:  I will rephrase.

12  BY MR. BURGESS:

13  Q.  Is it your understanding, as you are testifying here

14  today, that you will get a 50 percent reduction in your

15  guideline range, as well as be below that 10 years for

16  testifying here today?  Is that your understanding, sir?

17  A.  To my understanding, sir, it's all up to the judge.  I can

18  get life.  I can get whatever the judge says, to my knowledge,

19  to what I know.

20  Q.  Let me ask you, sir, honestly -- and please you are

21  telling this jury this honestly under oath.  Do you honestly

22  think you are looking at life here because you're testifying

23  here today?

24  A.  Honestly, no.  I don't know.  It's up to the judge how --

25  Q.  I understand it is up to the judge.  What I'm asking you,

| | |
|---|---|
| 1 | sir, is your understanding of your situation. |
| 2 | Your understanding is you are going to get less |
| 3 | time, significantly less time by being here today testifying |
| 4 | under oath.  Yes? |
| 5 | A.  There's not a set . . . |
| 6 | Q.  I'm not asking if it's set. |
| 7 | Your understanding is you believe in your mind |
| 8 | that you are getting substantially less time for being here |
| 9 | today as opposed to not being here today? |
| 10 | A.  Yes, as long as I tell the truth. |
| 11 | Q.  On February 2nd you were arrested.  And when was the first |
| 12 | time -- did you ever -- strike that.  Excuse me. |
| 13 | Did you ever meet with agents in this case?  Did |
| 14 | you ever talk to the Government and its agents, ATF agents? |
| 15 | A.  No. |
| 16 | Q.  Ever? |
| 17 | A.  Would you -- I don't understand the question. |
| 18 | Q.  I will rephrase it. |
| 19 | After you were arrested February 2nd, any time |
| 20 | after February 2nd, have you ever spoken to agents in this |
| 21 | case?  Have you ever sat down in a room with maybe Mr. Feller |
| 22 | and one of the agents and your attorney and been asked |
| 23 | questions? |
| 24 | A.  Yes. |
| 25 | Q.  When was the first time that happened, sir? |

US v McGee #10-20075

1   A.  I don't --

2   Q.  Approximately.  Approximately.  If you don't remember the

3   date, that's okay, but approximately.

4   A.  Maybe a few weeks after.

5   Q.  After this happened, after February 2nd?

6   A.  Yes.

7   Q.  Okay.  And where was that done?

8   A.  I believe it was here.

9   Q.  Here in the courthouse or . . .

10  A.  In this building.

11  Q.  Okay.

12  A.  I had been to court a few times before.

13  Q.  Okay.  And you met in a room maybe in this building with

14  your lawyer and an agent and Mr. Feller?  Is that correct?

15  A.  Yes, sir.

16  Q.  And did they ask you questions?

17  A.  Yes.

18  Q.  Okay.  And they had a file in front of them with some

19  documents and stuff that they referred to when they asked you

20  these questions, right?

21  A.  I'm not sure.

22  Q.  Did you see anything in front of them when they were

23  asking you questions?

24  A.  Oh.  Yes.

25  Q.  Okay.  And did they appear to be referring to documents or

1   pieces of paper in front of them when they were asking you

2   questions?

3   A.  I can't really remember, sir.

4   Q.  When the agents were asking you questions, from your

5   perspective, did it sound like they had a lot of information

6   already prior to talking to you?

7   A.  They had information.

8   Q.  Okay.  And they were providing this information while they

9   were asking you these questions.  Is that correct, sir?

10  A.  No, sir.

11  Q.  You said they had information.  Prior to talking to you,

12  they had information?

13  A.  Yeah, I guess they had their own observation of it, of

14  what was going on.  I don't know.

15  Q.  And they had an observation, what you learned about from

16  their questioning, correct?

17  A.  Some of the things I already knew.

18  Q.  Some of the things you knew.  Some of the things you were

19  told by the agents, correct?

20  A.  I just heard them, yeah.

21  Q.  You heard it at that time.  So, you were informed at that

22  time during these conversations about some of this information

23  that you didn't have prior to having these conversations,

24  correct?

25  A.  Yes, sir.

1    Q.  Now, if you know, sir, when you are in this room having

2    these conversations -- excuse me.  Let me back up a little

3    bit.

4                How many times did you meet with the Government

5    in this case, any agents or Mr. Feller?  How many times?

6    A.  Maybe once or twice.

7    Q.  Was it in the same place both times?

8    A.  Yes, I believe so.

9    Q.  Okay.  And was this meeting prearranged?  Was it like your

10   lawyer called you and said, you know, we are going to meet a

11   at this place and then you met there?

12   A.  No.

13   Q.  It was what?  It was done on the fly?  It was done without

14   an arrangement?

15   A.  Well, actually I thought I was going to court for this,

16   and I just . . .

17   Q.  Okay.  Both times you met you thought you were going to

18   court?

19   A.  I was still incarcerated.

20   Q.  Okay.  Now, you -- you were incarcerated at this time?

21   A.  Yes.

22   Q.  Or before you cooperated?

23   A.  Yes.

24   Q.  Okay.  So, after you cooperated, after you talked to the

25   Government and had these discussions with them, were you

1    released?

2    A.  No, sir.  I was still having a bond hearing.

3    Q.  Okay.  And -- but your bond hearing, when you finally got

4    released, this was after you had started to cooperate with the

5    Government, right?

6    A.  Yes, sir.

7    Q.  Okay.  And when you had that bond hearing, did the

8    Government oppose your bond or did they agree to release you?

9    A.  What do you mean by did they oppose it?

10   Q.  Did Mr. Feller come into court and argue that you

11   shouldn't be released on bond or did he say we are okay with

12   you being released on bond?

13   A.  Oh.  He argued it.

14   Q.  He argued it?

15   A.  Yes.

16   Q.  Who let you out on bond?

17   A.  The judge.

18   Q.  Judge Tarnow?

19   A.  Yes.

20   Q.  When you were being questioned, did you notice in whatever

21   room you were in -- I'm sorry.  Let me back up a little bit.

22              Were you just taken to these rooms?  You didn't

23   actually voluntarily -- you were brought to these rooms.  You

24   were taken to these rooms because you were in custody?

25   A.  No.  I met with my attorney before.

```
1    Q.   Okay.  Where did you meet with your attorney before?

2    A.   In a separate room.

3    Q.   And then you went and spoke to the Government after that?

4    A.   Yes, sir.

5    Q.   If you remember, do you know if your conversations with

6    the Government were video taped?

7    A.   I'm not sure.  I don't think it was video taped.  I'm not

8    sure.

9    Q.   Did you see any recording devices anywhere when you were

10   being questioned by the Government, when you were talking to

11   the Government?

12   A.   Uhm . . .

13   Q.   If you remember?

14   A.   I'm not sure now.  I believe it was though.  I didn't see

15   a video camera -- no video camera though.

16   Q.   Okay.  So, basically you are not really sure whether the

17   conversation was recorded or not.  You just don't know at this

18   point?

19   A.   No.  I believe it was recorded, but I don't -- I didn't

20   see a video, like that video.  I believe it was recorded.

21   Q.   Why do you think it was recorded?

22   A.   I don't know.

23   Q.   Are you assuming it was recorded or did you actually see

24   like a recording device somewhere?

25   A.   Oh, yes.  Yeah.
```

1   Q.  You saw something?

2   A.  Yes.

3   Q.  Okay.  Now, sir, this cooperation agreement that you

4   entered into with the Government, that is something that the

5   Government has asked you to do as far as help them with their

6   case, correct?

7   A.  I guess it's to help me with my case.  I don't know.  I'm

8   not sure right now.

9   Q.  I mean you are helping -- that's true too.  You are

10  helping yourself in the process, right?

11  A.  Hopefully.  I don't know.  It's up to the judge.

12  Q.  It is up to the judge ultimately.  But in your mind today

13  you are helping yourself, right?

14  A.  I'm trying to.

15  Q.  Now, you are here testifying on behalf of the Government,

16  right?

17  A.  I'm not sure of the process, who I am on the behalf of.

18  Q.  Who called you here today?

19  A.  The Government, I guess.  I'm here to testify.  I'm not

20  sure who I am here on the behalf of.

21  Q.  Did I call you to testify?

22  A.  No, you didn't.

23  Q.  Have we met before?

24  A.  No, we haven't.

25  Q.  So, you are here to provide assistance with the

1   Government's case today, right?  That's your understanding,

2   correct?

3   A.  Yes, sir.

4   Q.  The Government, Mr. Feller, asked you some questions about

5   being over at Mr. McGee's house and he was looking at his

6   neighbor.  Do you remember that?

7   A.  Yes, sir.

8   Q.  Okay.  That's information you provided to the Government,

9   right, during these conversations, these one or two

10  conversations that you had?

11  A.  Yes, sir.

12  Q.  Now, you said you didn't want to participate in that,

13  right?

14  A.  Yes, sir.

15  Q.  Okay.  Because you didn't think anything was there, right?

16  You didn't think there would be a reason to go over there

17  because you didn't think anything would be there, right?

18  A.  Yes, sir.

19  Q.  That was your main motivation, right, to not go over

20  there, is because you didn't think you would get anything out

21  of it, right?

22  A.  I wasn't around.  I couldn't get over there.

23  Q.  According to your testimony, you said you didn't think

24  there would be anything at the house; that's one of the

25  reasons why you didn't go.  Right?

1    A.  Yes, sir.

2    Q.  Now, this November robbery or home invasion when you stole

3    the marijuana, you did that with someone else, right?

4    A.  Yes, sir.

5    Q.  Okay.  That wasn't done with Mr. McGee, was it?

6    A.  No, sir.

7    Q.  Had you ever gone and done home invasions at other houses

8    where you stole dope besides November 2009?

9    A.  Yes, sir.

10   Q.  How many times?

11   A.  Just once in 1997.

12   Q.  Okay.  So, in 1997 you did a home invasion and stole some

13   dope?

14   A.  No.  Some guns and some money.

15   Q.  And then --

16   A.  Clothes -- I mean shoes.

17   Q.  And then you waited 12 years.  And that was -- according

18   to your testimony, that's when you committed your next home

19   invasion 12 years later?

20   A.  (No response.)

21   Q.  Is that what you're saying?

22   A.  Yes, sir.

23   Q.  But you were all about doing another one four months later

24   after you did the one in November 2009?

25   A.  Yes, sir.

1    Q.  You had no hesitation about it.  It sounded good to you.

2    Right?

3    A.  Yes, sir.

4    Q.  Because you figured you would get something out of it,

5    right?

6    A.  Yes, sir.

7    Q.  I mean that's what motivates a lot of people.  If they

8    think they are going to get something out of something,

9    they'll do certain things, right?

10   A.  Yes, sir.

11   Q.  Is that correct?

12                I mean you have no problem breaking the law if

13   you can get something out of it, right?

14   A.  (No response.)

15   Q.  If there's some benefit to you, you have no problem

16   breaking the law, right?

17   A.  At that time?  It's a hard thing, but that's the choice I

18   made, yes, sir.

19   Q.  As recent as this February, with that mindset, you had no

20   problem breaking the law if you got something out of it.

21   Right?

22   A.  Yes, sir.

23   Q.  You know what perjury is, right?

24   A.  Yes, sir.

25   Q.  Okay.  That's breaking the law, right?

1    A.  Yes, sir.

2    Q.  Okay.  So, this robbery that occurred at Mr. McGee's

3    neighbor's house, you weren't present for it, right?

4    A.  No, sir.

5    Q.  You only heard about it, right?

6    A.  Yes, sir.

7                    (Juror sneezes.)

8                    MR. BURGESS:  Bless you.

9    BY MR. BURGESS:

10   Q.  So, you are not a witness to it, nor did you see anything

11   go down as relates to this robbery, right?

12   A.  No.  No, sir.

13   Q.  And this was --

14   A.  I'm a witness.  I didn't see anything go down though.

15   Q.  This is information that you again relayed during these

16   conversations that you had back and forth with the Government,

17   right?

18   A.  No, sir.

19   Q.  You didn't?  You didn't tell the Government about that?

20   A.  Oh, yeah.  But they didn't tell me about that.

21   Q.  Tell you about that robbery?

22   A.  Yes.

23   Q.  Do you know Denny Moe or Mr. Porter?

24   A.  I don't know him.  I know of him.

25   Q.  Did you know him before February 2nd, 2010?

1    A.   Yeah.

2    Q.   You had met him before?

3    A.   Yeah, I had met him before.

4    Q.   What kind of guy is he?

5    A.   I really don't know too much about him like that.

6    Q.   Okay.

7    A.   I know what he does sometimes, but I never hung out with

8    him or . . .

9    Q.   Is he a dangerous guy?

10   A.   Yeah.

11   Q.   I mean, is he a violent guy?

12   A.   I mean, I found all that out later.  I don't -- before

13   then I didn't know that.

14   Q.   You didn't know it on February 2nd?

15   A.   I mean, I know he did robberies.  He did one the day

16   before.  So, I know that's dangerous.  He went in a house and

17   burned it up.  So, I know it's dangerous.  I knew he's a

18   dangerous guy, yes.

19   Q.   You knew that on February 2nd that he was a dangerous guy?

20   A.   Yes.

21   Q.   Okay.  And you didn't really know him on February 2nd?

22   A.   I knew him.

23   Q.   How many times had you met him before February 2nd, 2010?

24   A.   A few times.

25   Q.   Would you say you were friends?

1   A.  No.

2   Q.  Who did you know -- on February 2nd, 2010, who did you

3   know the best?  Mr. McGee?

4   A.  Yes.

5   Q.  And, yet, you went in the car with Mr. Porter, right?

6   A.  Yes.

7   Q.  Were you driving or the passenger?

8   A.  Passenger.

9   Q.  Mr. McGee -- you weren't with Mr. McGee that night.  You

10  were with Mr. Porter?

11  A.  I was with Mr. McGee that night.  Me and him --

12  Q.  In vehicles.  You were in Mr. Porter's vehicle, right?

13  A.  That night, yes.

14  Q.  That's all I'm talking about, February 2nd, 2010.

15  A.  February 2nd I was with Mr. McGee also.

16  Q.  You were in his vehicle earlier and then you went --

17  A.  He was in mine.

18  Q.  He was in your vehicle.

19  A.  Yes, sir.

20  Q.  And then you went to get in Mr. Porter's vehicle?

21  A.  Yes, sir.

22  Q.  Where did you leave your vehicle?

23  A.  At the house we went to.

24  Q.  Is that the cousin's house you were talking about?

25  A.  Yes, sir.

1   Q.  Did you have any problem getting in the car with

2   Mr. Porter?

3   A.  No.

4   Q.  You didn't say anything to anybody about, hey, man, can I

5   ride with you, or anything like that, did you?

6   A.  Mr. Porter didn't have nobody in the car with him, and it

7   was three of them in another car.

8   Q.  I understand that.  But you didn't voice any objection.

9   You didn't say I really don't want to go with that guy?

10  A.  No, I didn't say nothin'.

11  Q.  So, you went voluntarily with Mr. Porter in the vehicle

12  that he was driving, right?

13  A.  Yes, sir.

14  Q.  Now, the first assault rifle, I believe the second M16,

15  you said that was at your house?

16  A.  Yes, sir.

17  Q.  Did you handle that gun?

18  A.  I don't understand what you mean by did I handle it.

19  Q.  Did you handle the gun?  Did you physically handle it in

20  your hands?  Did you handle the gun?

21  A.  I touched it when I put it up, yes.

22  Q.  Where did you put it up?

23  A.  My mother's basement.

24  Q.  Is that where you were staying at the time?

25  A.  No, sir.

1    Q.   Where was that gun recovered from?

2    A.   In my mother's basement.

3    Q.   Okay.  And you told somebody that's where the gun was?

4    A.   Yes, sir.

5    Q.   Did you tell somebody during the time you were talking to

6    the Government?

7    A.   Yes, sir.

8    Q.   Now, you're a felon, right?  You were a felon back in

9    February of 2010?

10   A.   Yes.

11   Q.   Okay.  And possessing a firearm, as a felon, that's a

12   separate crime.  You understand that?

13   A.   Yes, sir.

14   Q.   Okay.  You were not charged with felon in possession of a

15   firearm.  Are you?

16   A.   No, sir.

17   Q.   Even though you did possess that assault rifle in your own

18   home.

19              You understand you could be charged with felon

20   in possession of a firearm, correct?

21   A.   Yes, sir.

22   Q.   And that's the Government's call to charge you, right?  Is

23   that your understanding?

24   A.   I believe so.

25   Q.   Okay.  But they haven't charged you with it?

1    A.  No, sir.

2    Q.  Any other guns recovered at your mother's house?

3    A.  No, sir.

4    Q.  And the only thing we have to say that this gun was

5    delivered to your house by Mr. McGee is you, right?

6    A.  Yes, sir.

7    Q.  Nobody else witnessed that?

8    A.  No, sir.  Well -- yeah.  No, sir.

9    Q.  Did Mr. McGee handle this gun when it was brought over to

10   the house?  Did he have it in his hands?

11   A.  Yes, sir.

12   Q.  Did you see the gun removed from your mother's house or

13   no?

14   A.  No, sir.

15   Q.  On February 2nd, sir, you said that you were running late

16   to the meeting at the coney island; is that correct?

17   A.  Yes, sir.

18   Q.  And you said you were doing something else according to

19   your testimony.

20            What was that something else you were doing?

21   A.  I was running late.

22   Q.  You said you were doing something else according to your

23   direct-examination.

24            What were you doing?

25   A.  I was on my way there.  I was just running late.  It was

```
1    bad outside.

2    Q.  Do you remember testifying that you said you were doing

3    something else?

4    A.  Yes.

5    Q.  Do you remember saying it was bad outside; do you remember

6    ever saying that before?

7    A.  No, I didn't.

8    Q.  Okay.  But you said you were doing something else.

9                Is there a reason why you don't want to say what

10   you were doing?

11   A.  There's no reason.

12   Q.  Okay.  Now, you say you left the coney island -- you left

13   your vehicle, and Mr. McGee went with you, right?

14   A.  We left in the vehicle -- we all left in separate cars.

15   Q.  Okay.  And when you all left in separate cars, Mr. McGee

16   was with you, right?

17   A.  He was in his own -- he was in a separate car.

18   Q.  So, he wasn't with you?

19   A.  We was following each other.

20   Q.  You went to his house?

21   A.  Yes.

22   Q.  Anybody else go with you?

23   A.  No.

24   Q.  Okay.  So, as far as Mr. McGee removing this gun, the gun

25   that was shown to you -- I believe it looked like an AK.
```

1    According -- did anybody else see that out there?

2    A.   They saw it when we got to his cousin's house.

3    Q.   When you say "they," who are you talking about?

4    A.   Denny Moe and two of his cousins.

5    Q.   Okay.  Now, all of these crimes you are talking about

6    having committed, these robbery crimes you are talking about,

7    you've never done anything with Mr. McGee before, have you?

8    A.   No, sir.

9    Q.   Okay.  Mr. McGee's house that you first went to, do you

10   know where that is?  Do you know the location of it?

11   A.   The house we first went to?

12   Q.   Yes.

13   A.   When we left the coney island?

14   Q.   Yes.

15   A.   Yes.

16   Q.   Okay.  Do you know the address?

17   A.   No.

18   Q.   Could you find it again if you wanted to?

19   A.   Yes.

20   Q.   Okay.  You could help the Government find it if they asked

21   you to find it for them, correct?

22   A.   Uhm . . .

23   Q.   You could point out the house to the Government, right, if

24   you went down the street?

25   A.   Yes.  They know where -- yes.

1  Q.  They know where it is?

2  A.  Yes.

3  Q.  Did you tell them where it was?  I mean, you may not have

4  known the address.  But did you tell them where it was or did

5  they already know that?

6  A.  What do you mean did I tell them where it was?

7  Q.  Did you give them information where this house was or did

8  they already have that information?

9  A.  Yes.

10 Q.  Which one?  Did they have the information before or did

11 you provide it to them?

12 A.  You're talking about the house we went to when we left the

13 coney island?

14 Q.  Yes.  The first house.

15 A.  Yeah, I told them.

16 Q.  You told the Government?

17 A.  Yes.

18 Q.  Okay.  And the second house you went to, do you know where

19 that was?

20 A.  Yes.

21 Q.  Okay.  Did you tell the Government about that house?

22 A.  Yes.

23 Q.  Give them a description at least where it was and the

24 cross streets, that kind of thing?

25 A.  Yes.

1  Q.  You said you don't know the cousins, the name of the

2  cousins.  Is that correct?

3  A.  Not both of them that was with him.

4  Q.  Did they come with you?

5  A.  Come with me where?

6  Q.  Did they -- when you left the cousin's house and you went

7  to the storage place, did they come with you?

8  A.  Excuse me.  No.  They were with Stir.

9  Q.  So, they were in a different car, but they went in the

10  same direction as you, right?

11  A.  When we left, yes.

12  Q.  Okay.  That was a red SUV, right?

13  A.  Yes.

14  Q.  And you weren't in that vehicle?

15  A.  No.

16  Q.  Nor did you go in that vehicle that evening, did you?

17  A.  No.

18  Q.  Now, you turned in to this storage place with Mr. Porter.

19  And Mr. McGee's vehicle was behind you?

20  A.  Yes.

21  Q.  Directly behind you or farther back?

22  A.  I'm not sure.  There might have been a car or two behind

23  us, but . . .

24  Q.  Were you really paying that much attention to it?

25  A.  In a way I was, but he kept going and turned around and

1    came back.

2    Q.  He kept going, turned around and came back?

3    A.  Yes.

4    Q.  And he took off at some point?

5    A.  Afterwards, yes.

6    Q.  Did you see the vehicle take off?

7    A.  I seen it come back.

8    Q.  Come back?

9    A.  Yes.

10   Q.  When you say come back, did it go in the storage place or

11   just drive down the street?

12   A.  I'm not sure if it went in or turned.  He was on the phone

13   with Denny Moe and the agent, and they was directing him back

14   in or telling him to pull in, but he said he couldn't; there

15   was a truck blocking him or something.

16   Q.  Did you see a truck blocking him?

17   A.  No.  I couldn't see.  I was in the storage place already.

18   Q.  You were inside?

19   A.  Yes.

20   Q.  As far as what you are talking about, turning around, you

21   are just getting that as information.  You aren't actually

22   viewing that.  Is that correct?

23   A.  When we came out of the store and turned into the storage

24   facility, he was behind us.

25   Q.  Okay.  But after that, you didn't see him again?

A.   After he kept straight.  And that's when Denny Moe called

him and asked him why he didn't turn in and --

Q.   Let me stop you right there.

When Denny Moe called him, you are in the

storage facility?

A.   We are not in there yet.  We are just turning in.  We are

at the gate.

Q.   Okay.  When you are turning in, the car keeps going.  The

SUV keeps going, right?

A.   Right.

Q.   Okay.  Then you say it turns around.  Did you view it,

sir?  Did you see it turn around?

A.   I seen it come right back towards the storage facility.

Q.   Okay.  And then after that, did you go in the storage

facility?

A.   Yes.

Q.   Okay.  Did you see the vehicle again after it went in the

storage facility or no?

A.   No.

Q.   After it turned around, you have no idea where it went?

A.   No.  It turned around.  By the time it turned around, we

was inside the storage facility already.

Q.   Right.  And then after that --

A.   He was on the phone.  And we seen the truck come right

back past with the blinker on like it was coming in, but it

```
 1    never came in.
 2    Q.  Okay.  So, they never came into the storage facility.
 3    They turned around and took off.  You don't know where the
 4    vehicle went.  Right?
 5    A.  (No response.)
 6    Q.  Correct?
 7    A.  Correct.
 8    Q.  All right.  Now, just so I'm clear, sir, it's up to the
 9    judge -- is this your understanding.  It's up to the judge
10    what your ultimate sentence is.  But isn't the only way you
11    are going to get below 10 years is if you are here
12    cooperating?
13    A.  Yes.
14    Q.  And that's at the discretion of the Government, right?
15    A.  Yes.
16    Q.  All of these other people who supposedly saw Mr. McGee,
17    his cousins and stuff, do you know where they are right now?
18    A.  No.
19    Q.  Do you see them in court anywhere?
20    A.  No.
21    Q.  Okay.  So, as far as this story about the guns and what
22    was brought and everything, all we have is your testimony,
23    correct?
24    A.  Yes.
25                   MR. BURGESS:  One second.
```

1          Thank you, Your Honor.

2          THE COURT:  Redirect?

3          MR. FELLER:  Briefly, Your Honor.

4                REDIRECT-EXAMINATION

5  BY MR. FELLER:

6  Q.  All right, Mr. McGee, just very briefly, just so there's

7  no confusion and we get the sequence of events right.  You

8  leave the coney island in your own vehicle by yourself,

9  correct?

10  A.  Yes, sir.

11  Q.  You meet at Stir's, Mr. McGee's house, and Mr. McGee has

12  driven to his house by himself?

13  A.  Yes.

14  Q.  Mr. McGee goes inside the house.  You do not.

15  A.  I went in for a second, and we both walked out.

16  Q.  You both went in for a second and walked out.  Mr. McGee

17  walks out with a firearm?

18  A.  Yes.

19  Q.  Okay.  Mr. McGee then gets into your car?

20  A.  Yes.

21  Q.  You and Mr. McGee drive together to his cousin's house?

22  A.  Yes, sir.

23  Q.  Dennis Porter meets you as well at the cousin's house?

24  A.  Yes, sir.

25  Q.  The reason everyone has assembled at the cousin's house is

1   because that's where the firearms from the robbery of the day

2   before are supposed to be?

3   A.  Yes, sir.

4   Q.  Okay.  Those firearms -- and everybody else needed

5   firearms as well, correct?

6   A.  Yes, sir.

7   Q.  Those firearms have been moved?

8   A.  Yes, sir.

9   Q.  You and Mr. Porter in your vehicle -- I'm sorry.  Is it

10  your vehicle or Mr. Porter's vehicle?

11  A.  Mr. Porter's.

12  Q.  You and Mr. Porter proceed to a liquor store across the

13  street from the storage facility, correct?

14  A.  Yes, sir, because the guns wasn't there, and they was

15  supposed to be going --

16  Q.  You and Mr. Porter proceed to the storage facility -- to

17  the liquor store across from the storage area?

18  A.  Yes, sir.

19  Q.  To your understanding, Mr. McGee and his cousins proceed

20  to one of the cousin's mother's house where the guns have

21  since been moved?

22  A.  Yes, sir.

23  Q.  Mr. McGee and the cousins are in the red Mercury SUV?

24  A.  Yes, sir.

25  Q.  They proceed to meet you at the liquor store?

1   A.  Yes.

2   Q.  So, now you have got -- well, the agent and Nop, the

3   confidential informant, are in one vehicle?

4   A.  Yes, sir.

5   Q.  You and Mr. Porter are in a second vehicle?

6   A.  Yes.

7   Q.  Mr. McGee and his cousins are in a third vehicle, a

8   Mercury Mariner?

9   A.  Yes.

10  Q.  The agent's vehicle proceeds first into the storage

11  facility, correct?

12  A.  Yes.

13  Q.  You and Mr. Porter follow him into the storage facility?

14  A.  Yes, sir.

15  Q.  The Mercury Mariner is behind you when you go inside,

16  correct?

17  A.  Yes.  They are --

18  Q.  It's coming from the liquor store to the storage facility?

19  A.  Yes.

20  Q.  At that point, you hear a telephone conversation between

21  Mr. Porter and Mr. McGee, correct?

22  A.  Yes.

23  Q.  Okay.  And it's your understanding -- did you hear the

24  portion of the conversation -- did you hear a portion of the

25  conversation involving Mr. McGee attempting to type in the

1  code to get into the storage facility?

2  A.  Yes, sir.  He was given -- talking to Denny Moe and the

3  agent.  And the agent was saying let me talk to him so I can

4  give him a code --

5            MR. BURGESS:  Just a minute, Your Honor.  Just

6  for clarification -- is he hearing Mr. McGee's voice or just

7  Mr. Porter's house, just for clarification?

8  BY MR. FELLER:

9  Q.  You are hearing one side of the telephone conversation?

10 A.  Yes.

11 Q.  So, you hear the agent or Denny Moe talk to who you

12 understand to be Mr. McGee?

13 A.  Yes, sir.

14 Q.  And you hear a conversation which you understand to be

15 Mr. McGee give him a code to come into the storage facility,

16 correct?

17 A.  Yes.  The agent gave him a code.

18 Q.  You also hear the conversation about a truck being in the

19 way preventing Mr. McGee from getting into the facility?

20 A.  Yes, sir.

21 Q.  And then there is an arrest?

22 A.  Yes, sir.

23 Q.  Can you describe what happens when the arrest takes place?

24 A.  They was in the storage facility, and all of a sudden just

25 lights and shots went off or whatever.  I don't know what it

```
 1   was, but --

 2   Q.  Flash bang?

 3   A.  Flash bang, they went off.  And they came out in the

 4   storage facility and we was arrested.

 5   Q.  That flash bang grenade would have been seen from the

 6   entrance of the storage facility as well?

 7              MR. BURGESS:  Objection.  Speculation.

 8              THE COURT:  If you know.

 9   BY MR. FELLER:

10   Q.  If you know.  Based on your observation of the flash bang

11   grenade, do you think you would have been able to see it if

12   you were at the entrance of the storage facility?

13   A.  It was pretty loud, yes.

14   Q.  Okay.  Let's just get clear on the statements you have

15   made to law enforcement over time.

16              Your first statement was actually the day you

17   were arrested, correct?

18   A.  Yes.

19   Q.  You recall making a statement the very day you were

20   arrested?

21   A.  Yes.

22   Q.  February 2nd of 2010?

23   A.  Yes.

24   Q.  I wasn't there, correct?

25   A.  No, sir.
```

1   Q.  All right.  It was just the various agents and officers at

2   that point.  The prosecutor's office wasn't involved at that

3   point.  Right?

4   A.  No, sir.

5   Q.  Okay.  In that statement did you tell the agents that your

6   boy Stir had recruited you to participate in that robbery?

7   A.  Yes, sir.

8   Q.  Okay.  Your first statement was the day of your arrest,

9   February 2nd, 2010.

10              Your second statement, of which I was present,

11  as well as two agents, was February 22nd, 2010?

12  A.  Yes, sir.

13  Q.  Correct.  So, that was about -- does that sound right?

14  A.  Yes, sir.

15  Q.  About three weeks later?

16  A.  Yes, sir.

17              MR. FELLER:  Okay.  Can we cull up Exhibit 9,

18  which is your plea agreement.  And can we go to page nine.

19  BY MR. FELLER:

20  Q.  What's the date on your plea agreement, if you can see it?

21              It is in the bottom left-hand corner there.

22  A.  Is that 3/17.

23  Q.  Right.  So, the Government submitted it to you on February

24  24th, 2010.  That's when I signed it, correct?

25  A.  Right.

```
 1    Q.  And you actually didn't go over it with your lawyer and
 2    sign it until March 17th, 2010, correct?
 3    A.  Yeah.  That was about a week before, yep.
 4    Q.  Okay.  So, certainly on the day you were arrested,
 5    February 2nd, 2010, when you first told law enforcement Mr.
 6    McGee had recruited you, you didn't have any agreement with
 7    the Government at that point?
 8    A.  No, sir.
 9    Q.  Okay.  How about on February 22nd, 2010 when you made a
10    more detailed statement to me and to law enforcement, did you
11    have an agreement in place at that point?
12    A.  No, sir.
13    Q.  Okay.  And, again, on February 22nd, 2010, did you tell
14    law enforcement that Stir had recruited you to participate in
15    this robbery?
16    A.  Yes, sir.
17    Q.  Okay.  And did you tell them about the robbery the day
18    before on February 1st when you got the machine guns?
19    A.  Yes, sir.
20              MR. FELLER:  Your Honor, I would offer ATF
21    reports 9 and 16 into evidence as Exhibits 17 and 18, as prior
22    consistent statements of Mr. Barkley.
23              THE COURT:  Any objection?
24              MR. BURGESS:  I would object.  I don't think
25    those are relevant.  They are bolstering anyway.  I object,
```

```
 1    Your Honor.
 2                    MR. FELLER:  Your Honor, these are --
 3                    THE COURT:  I think they are admissible.
 4                    MR. FELLER:  Thank you, Your Honor.
 5                    THE COURT:  And they are in rebuttal of your
 6    cross-examination.
 7                    MR. FELLER:  Thank you, Your Honor.  That's all
 8    I have.
 9                    (Government Exhibits 17 and 18 were admitted
10                    into evidence.)
11                    THE COURT:  Mr. Burgess.
12                    MR. BURGESS:  Thank you, Your Honor.
13                         RECROSS-EXAMINATION
14    BY MR. BURGESS:
15    Q.  When was the first time you came to court; do you know?
16    Was it the day of your arrest, the day after?
17    A.  I believe the day after.
18    Q.  Okay.
19    A.  The next -- yeah, the next morning.
20    Q.  The next morning.  Okay.
21                    And when you were brought to court, you got a
22    lawyer, right?
23    A.  Yes, sir.
24    Q.  Okay.  You were -- were you assigned counsel?
25    A.  Yes, sir.
```

1   Q.   Okay.  And when you were assigned counsel, your attorney

2   spoke to you on a couple different occasions; is that correct?

3   A.   Yes, sir.

4   Q.   And it's your understanding that if you were going to

5   cooperate in this case, that you should do it early on,

6   correct?

7   A.   No, sir.  We didn't have -- we didn't -- no.

8   Q.   You didn't have that discussion with your lawyer?

9   A.   No, sir.  We just went --

10              MR. FELLER:  Your Honor, I'm going to object to

11  discussions with his attorney.

12              MR. BURGESS:  Your Honor --

13              MR. FELLER:  Mr. Burgess is certainly free to

14  ask about this Defendant's understanding.  He's not free to go

15  into conversations with the attorney.

16              MR. BURGESS:  It's not Mr. Feller's assertion,

17  first of all.

18              MR. FELLER:  It's hearsay and it's still

19  privileged.

20              MR. BURGESS:  It's not privileged.  It is a

21  state of mind.  It is an exception.

22              It is not hearsay, Your Honor.  It goes to state

23  of mind, this exception.  I'm asking questions regarding his

24  mindset when he's making these statements.  That is the reason

25  I asked the question.  It's just background, state of mind.

1          THE COURT:  First of all, this is very similar

2     to the ruling I made before.  You may ask the question did you

3     have discussions with your attorney.  You may not go into what

4     those discussions -- or, what the attorney's advice was.

5          Do you want to rephrase your question?

6          MR. BURGESS:  I will, sir.

7     BY MR. BURGESS:

8     Q.  Sir, is it your understanding that if you were going to

9     cooperate in this case, it would be more beneficial to you if

10    you did it early on as opposed to wait?  Is that your

11    understanding?

12    A.  No, that is not what we talked about my first meeting with

13    my lawyer.

14    Q.  Any discussions you had with your lawyer before February

15    22nd, is it your understanding that if you cooperated early

16    on, it would be more beneficial to you?

17    A.  Yes, sir.

18    Q.  You said you spoke to the agents without Mr. Feller

19    present on February 2nd.

20          Where was that done?

21    A.  At the station.

22    Q.  At the station?

23    A.  Mm-hmm.

24    Q.  Which station?

25    A.  They took me to the police station.

```
1    Q.  Were you in an interrogation room?

2    A.  Yeah.

3    Q.  Do you know if there was recording equipment on that date?

4    A.  I believe so.  I'm not sure.  I believe so though.

5                   MR. BURGESS:  Nothing further.

6                   MR. FELLER:  Nothing else from this witness,

7    Your Honor.

8                   THE COURT:  Any questions from the jurors?

9                   You may step down.  Thank you.

10                   You may call your next witness.

11                   MR. FELLER:  Your Honor, the Government calls --

12   do we want to take a break or no?

13                   THE COURT:  I don't think so.  Your next witness

14   is short as I understand it.

15                   MR. FELLER:  Shortish.

16                   Your Honor, the Government calls --

17                   THE COURT:  Are you asking for a break?  I

18   certainly don't want --

19                   MR. FELLER:  No.  It's 10:15.  I just thought it

20   was a convenient time and then we could finish and we could --

21   yeah.

22                   THE COURT:  Yeah.  We can finish with the

23   witness and then we can do the discussions we have to do to

24   get ready for the closing argument.

25                   MR. FELLER:  Very good, Your Honor.
```

```
 1                    The Government calls ATF task force Agent Jeff
 2   Pacholski.
 3                    THE COURT:  Is this your last witness?
 4                    MR. FELLER:  It is, Your Honor.
 5                    THE COURT:  Okay.  Raise your right hand.
 6         JEFFREY PACHOLSKI, GOVERNMENT'S WITNESS, SWORN.
 7                    THE COURT:  Please be seated.
 8                    Go on.
 9                         DIRECT-EXAMINATION
10   BY MR. FELLER:
11   Q.  Sir, would you state your full name, and for the court
12   reporter please spell your last name for the record?
13   A.  Jeffrey Pacholski.  My last name is P-A-C-H-O-L-S-K-I.
14   Q.  And what do you do, sir?
15   A.  I'm a Detroit Police Sergeant.
16   Q.  And how long have you been employed by the Detroit Police
17   Department?
18   A.  About 21 1/2 years.
19   Q.  Are you assigned to any special squads or task forces?
20   A.  Yes.
21   Q.  And what are those?
22   A.  I'm federally deputized and assigned to the Detroit ATF
23   Task Force.
24   Q.  Okay.  And how long have you been on the Detroit ATF Task
25   Force?
```

1    A.  Almost two years now.

2    Q.  And in that role are you in fact the case agent

3    responsible for Mr. Porter and Mr. Barkley and Mr. McGee's --

4    the investigation in that case?

5    A.  Yes.

6    Q.  Were you involved in any capacity on February 2nd, the

7    date of Mr. Porter's and Mr. Barkley's arrest?

8    A.  Yes.

9    Q.  And what was your role at the time of the arrest?

10   A.  I was a part of a surveillance team, as well as prepared

11   to be a part of an arrest team if the need arose.

12   Q.  Okay.  And where were you physically located; inside the

13   storage facility or outside?

14   A.  Outside.

15   Q.  Okay.  And outside of the facility did you witness a red

16   Mercury Mariner?

17   A.  Yes.

18   Q.  And what was it doing when you first saw it?

19   A.  When I first saw the red Mariner, it was traveling

20   southbound on Schaefer, away from the storage facility.

21   Q.  Okay.  Did you pursue it?

22   A.  Not at that time.

23   Q.  Okay.  Well, what did you do?

24   A.  Maintained surveillance of it.

25   Q.  Okay.  And where did it go after -- while you were

1  maintaining surveillance?

2  A.   It went eastbound on Lyndon Street and into a grocery

3  store parking lot located on the southeast corner of Lyndon

4  and Schaefer.

5  Q.   Okay.  Did you attempt to effect an arrest at that point?

6  A.   No, sir.

7  Q.   Why not?

8  A.   The signal to make an arrest had not been given at that

9  point.

10  Q.   Okay.  What did you do then?

11  A.   Maintained surveillance of the vehicle.

12  Q.   Okay.  What happened next?

13  A.   The vehicle pulled out of the grocery store parking lot.

14  It went westbound on Lyndon and then northbound on Schaefer.

15  Q.   Okay.  Then what?

16  A.   I followed it, and it continued northbound on Schaefer and

17  made a left turn, which would have been westbound on the first

18  side street that ran behind the storage facility.  I don't

19  know the name of that street.

20  Q.   Okay.  What next?

21  A.   Maintained surveillance of the vehicle.  The take-down

22  signal was given to arrest the persons in the Mariner as well

23  as the persons within the storage facility.

24           As we passed the street that dead-ended into the

25  storage facility, the flash bangs went off and lit up the sky.

1   The vehicle that Mr. McGee was believed to be in, the Mariner,

2   went down a side street northbound and parked.

3   Q.  Okay.  What happened then?

4   A.  I continued past the vehicle because the Michigan State

5   Police arrest team, marked cars, were en route to effect a

6   traffic stop on the Mariner.  I went around the block to the

7   next street north and saw the Mariner again.

8   Q.  Okay.  So, your job was to continue with the surveillance.

9   It wasn't actually to effect the arrest?

10  A.  It would have been to effect the arrest at the appropriate

11  time.  That time was not the appropriate time.

12  Q.  Okay.  What happened when you next saw the Mariner?  Was

13  anybody in it?

14  A.  When we first saw the Mariner, we were unsure if it was

15  occupied at that time.  I had never seen anybody get out of

16  it.  And we attempted to make contact at that point with the

17  marked Michigan State Police cars as well as the part of the

18  arrest team in undercover cars and plain clothes.

19  Q.  Okay.  What happened?

20  A.  Nobody responded.  We checked the vehicle and it was

21  unoccupied.

22  Q.  Okay.  It was empty?

23  A.  Yes.

24  Q.  All right.  What did you do next to try and figure out

25  where these folks went?

1    A.  It was snowing that evening and there was fresh snow on

2    the ground, and we could see footprints leading away from the

3    Mariner, a set which lead to a house and a set which we found

4    later led away from the house.

5    Q.  All right.  Did you attempt to -- well, did you have any

6    idea who was inside the vehicle?

7    A.  No.  We just -- two black males that were given out.  No

8    names.  No identifications.

9    Q.  Okay.  Did you have a street name for one of the

10   individuals?

11   A.  Not at that point, no.

12   Q.  Did you at some point learn from Agent Nether that at

13   least one of the people was known as Stir?

14   A.  Yes.

15   Q.  Okay.  What did you do to attempt to locate Stir -- well,

16   first of all, did you identify Stir by a name and then to

17   locate him?

18   A.  That would have been later on, not that same night, at the

19   proffer with Mr. Barkley as to --

20   Q.  Well, let's go through it chronologically.  What, if

21   anything else, did you do as part of the investigation that

22   evening?

23   A.  That evening we actually surrounded the house that one of

24   the footprints went to.  I eventually made contact with the

25   occupants, and we searched the house and found nobody we were

1   looking for in there.  It was just occupied by a female.

2   Q.  Okay.  Did the female give you any information about

3   whether anyone had come to her house or not that night?

4   A.  No.  She said nobody had come to her house.

5   Q.  Anything else that subsequently happened?

6   A.  We looked for the individuals.  We were following the

7   footprints and basically lost the footprints when it hit Grand

8   River, which is a busy street.  It was free of snow, so we

9   couldn't follow the footprints anymore.

10  Q.  Okay.  What was the next step in your investigation to try

11  to identify Stir and the other individual?

12  A.  That would be Mr. Barkley.

13  Q.  Okay.  Mr. Howard Barkley?

14  A.  Yes.

15  Q.  Did Mr. Barkley give you any information that would be

16  relevant to identifying Stir?

17  A.  Yes.

18  Q.  What information did he give?

19  A.  He had given me a street where he knew Stir to live, as

20  well as the location of who he identified as Stir's

21  grandmother, who had recently passed and lived on Ward, and

22  descriptively gave me basically the street she lived between.

23  It was across from a school, and described the house to me.

24  Q.  Okay.  Did you then go to that location?

25  A.  Yes.

```
 1    Q.  Okay.  And what happened?

 2    A.  I could not readily identify the house.  So, I wrote every

 3    single address down on that block, which it's not a very long

 4    block.  And I started running houses and actually came up with

 5    a person who had recently -- an older female that was

 6    deceased; checked further into her address and found Alistair

 7    McGee.

 8    Q.  Okay.  And that was the basis of your determination that

 9    Alistair McGee was in fact the person you were looking for?

10    A.  It made sense.  The street name of Stir; Alistair, Stir.

11    I got a picture of Alistair McGee off a computer and showed it

12    to Special Agent Nether who he positively identified.  And I

13    saw the video as well and I could tell that it was Alistair

14    McGee.

15    Q.  Okay.  So, now you knew who Stir was.

16                What did you do to actually locate him and

17    arrest him?

18    A.  We enlisted the assistance of the U.S. marshals.

19    Q.  Okay.  And what, if you know, did they do to try to locate

20    Mr. McGee?

21    A.  We had obtained a new phone number for Mr. McGee from an

22    ATF informant and provided that to the marshals, and we began

23    tracking the cellular phones.

24    Q.  And were you able to track the cellular phones to a

25    specific location?
```

1   A.  Yes.

2   Q.  And where was that?

3   A.  11714 Rosemont in Detroit.

4   Q.  And who was the registered owner or renter of that?

5   A.  We learned about a person by the name of Errol Shaw was

6   the person that lived at that location.

7   Q.  Okay.  Did you initiate surveillance on that location?

8   A.  Yes.

9   Q.  Did you observe Mr. McGee at that location?

10  A.  Mr. McGee was observed by a Deputy U.S. Marshal step on to

11  the front porch while on his cell phone that we were tracking

12  and then go back into the house.  And we then basically

13  assaulted the house and arrested Mr. McGee in the basement.

14  Q.  Okay.  And you anticipated my next question.  Based on

15  being inside the house, were you able to determine where in

16  the house Mr. McGee was staying?

17  A.  He was in the basement.

18  Q.  Okay.  Other than Mr. McGee himself, did you locate

19  anything else in the basement?

20  A.  Yes.  There was an assault weapon.

21  Q.  Okay.  Let me ask you to take a look at Exhibit 6.

22  A.  Okay.

23  Q.  Is Exhibit 6 the weapon you found in the basement?

24  A.  Yes.

25  Q.  Was it in a box like that when you found it?

1    A.  No.  It was lying on the floor behind the couch, and the

2    magazine was in the weapon, and there were live rounds in the

3    magazine weapon.

4    Q.  Okay.  Now, as the case agent responsible for the

5    investigation, you are aware that there were a number of

6    firearms found in this case, correct?

7    A.  Yes.

8    Q.  Okay.  So, this is Mr. -- this is the firearm found when

9    Mr. McGee was arrested, correct?

10   A.  Yes.

11   Q.  If we go to Exhibit 7 we have -- we can just scroll

12   through these.  We have four firearms found at Mr. Porter's

13   house?

14                    MR. BURGESS:  Mother.

15   BY MR. FELLER:

16   Q.  Mr. Porter's mother's house.  I'm sorry.

17                    Is that correct?

18   A.  Yes.

19   Q.  And you heard Mr. Jury's testimony that at least two of

20   these firearms were consistent with Mr. Porter's description

21   of the burglary that had taken place the day before, correct?

22   A.  They were -- that part about the burglary, I didn't

23   understand that part.

24   Q.  You have heard --

25                    THE COURT:  Let me stop.

1          We don't need witnesses commenting on other

2     witnesses' testimony.  And now it's cumulative.

3               MR. FELLER:  Very good, Your Honor.

4     BY MR. FELLER:

5     Q.  In fact, did Mr. Porter make a statement to you in this

6     case?

7     A.  Yes.

8     Q.  All right.  And did he in fact direct agents to where

9     these firearms were located in his mother's house following

10    his arrest?

11    A.  I actually directed the agents to the firearms that were

12    in Porter's house.  I was the one that interviewed Porter.

13    Q.  Based on information Porter had provided to you?

14    A.  Yes.

15    Q.  So, there was no doubt in your mind as to who these

16    firearms belonged to?

17    A.  That's correct.

18    Q.  Okay.  And again was the same thing true with Mr. McGee;

19    the firearm found in Mr. Low's (sic) basement as to Mr. McGee?

20    A.  Correct.

21    Q.  Okay.  And if we could go to Exhibit 8.

22              This is the firearm that was in Mr. Barkley's

23    mother's house, I believe?

24    A.  Yes.

25    Q.  And, again, did Mr. Barkley direct you to where that

1   firearm was during his statement?

2   A.  Yes.

3   Q.  All right.  So, is it fair to say that with respect to all

4   six firearms in this case, did you have any doubt as to who

5   they belonged to?

6   A.  No, I did not.

7   Q.  Okay.  So, with respect to these six firearms, did you

8   undertake to have any sort of ballistic testing,

9   fingerprinting or any of that done with respect to these

10  firearms?

11  A.  The firearms were processed as evidence, and at some point

12  ballistics are done.  I don't know if the results are done or

13  back, but fingerprinting was not done.

14  Q.  Okay.  Why was fingerprinting not done?

15  A.  At that point the rifle -- it had been some time since the

16  crime, and my experience has been you rarely get fingerprints

17  off a firearm --

18              MR. BURGESS:  Objection.  Relevance.

19              THE COURT:  Sustained.

20              MR. FELLER:  Your Honor, that's all the

21  questions I have for Agent Pacholski.

22              THE COURT:  Cross-examination?

23              MR. BURGESS:  Thank you, Your Honor.

24

25

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MR. BURGESS: |
| 3 | Q.  Pacholski? |
| 4 | A.  Pacholski. |
| 5 | Q.  Pacholski. |
| 6 | Is it Agent Or sergeant? |
| 7 | A.  I'm a Detroit Police Sergeant, and my title with the ATF |
| 8 | is Task Force Officer. |
| 9 | Q.  Agent Pacholski -- or, Officer Pacholski, you said you |
| 10 | were working surveillance at the -- on February 2nd outside of |
| 11 | the storage facility; is that correct? |
| 12 | A.  Yes, but not just outside of the storage facility.  It was |
| 13 | a mobile surveillance following -- |
| 14 | Q.  Okay.  I don't mean stationary. |
| 15 | So, you were in a vehicle, correct? |
| 16 | A.  Yes. |
| 17 | Q.  But you were stationary initially when you were doing |
| 18 | surveillance, right? |
| 19 | A.  Yes. |
| 20 | Q.  And this vehicle, what kind of vehicle is it? |
| 21 | A.  It's a -- it was a 2010 Ford Explorer. |
| 22 | Q.  Okay.  This is not a marked police car, is it? |
| 23 | A.  No, it is not. |
| 24 | Q.  It's an undercover vehicle, right? |
| 25 | A.  Yes. |

1    Q.   Okay.  So, you want to make sure it doesn't look anything

2    like a police vehicle; is that correct?

3    A.   Correct.

4    Q.   When you were doing surveillance were you with a partner

5    or alone?

6    A.   I was with a partner.

7    Q.   Okay.  Just one?

8    A.   Yes.

9    Q.   So, there were two people in the Explorer doing

10   surveillance?

11   A.   Yes.

12   Q.   Now, when you were doing surveillance, where were you

13   located in relation to the front of the storage facility?

14   A.   I was never in stationary surveillance at the storage

15   facility.  I was actually arriving in the area.

16   Q.   Okay.  So, you never had fixed surveillance set up.  You

17   actually never stopped moving during this whole . . .

18   A.   No.  There were times I would stopping moving, I was

19   stationary.  But I was not specifically assigned to just watch

20   the storage facility.

21   Q.   Okay.  Were you at the front of the storage facility when

22   the vehicles in this case pulled in?

23   A.   No, I was not.

24   Q.   Where were you located at that point?

25   A.   I was making my way to that area.

1               It was rough traveling that night even with the

2   four-wheel drive, and I arrived on to Schaefer as the Mariner

3   was coming at me, away from the storage facility.

4   Q.  So that by the time -- when you arrived at the front of

5   the storage facility, the Mariner is exiting the area?

6   A.  I never made it to the front of the storage facility.  I

7   was on Schaefer and Lyndon when I saw the Mariner leaving away

8   from the storage facility.

9   Q.  By the time you see the Mariner, it's already driving away

10  from the storage facility?

11  A.  Yes.

12  Q.  Okay.  And you follow the Mariner, right?

13  A.  I did not get behind it and follow it.  I didn't have to.

14  I just turned into the parking lot of the grocery store after

15  he did.

16  Q.  Okay.  So, you weren't actively like tailing, so-to-speak,

17  the Mariner.  Is that correct?

18  A.  That's correct.

19  Q.  And do you maintain consistent -- a consistent view of the

20  Mariner during the time you are sort of following it?

21  A.  I did up until the point I bypassed it when I went north

22  on the side street and I circled around.  So, it was out of my

23  sight for 30 seconds or so, relatively drive around the block.

24  Q.  And the side street, that is not the side street that the

25  storage facility is on.  Is that correct?

1    A.   No.   The storage facility is on Schaefer and occupies

2    Schaefer and Lyndon.

3    Q.   But in response to my question, the storage facility is

4    not on that side street, correct?

5    A.   No.

6    Q.   And by the time you actually -- when you view the Mariner,

7    do you approach it at that point?  When you regain sight of

8    the Mariner, you approach it at that point, correct?

9    A.   Eventually, yes.

10   Q.   Do you lose sight of it again or do you . . .

11   A.   No.

12   Q.   As you are approaching it you maintain a visual of the

13   Mariner?

14   A.   Yes.

15   Q.   And when he you arrive at the Mariner there's nothing in

16   the vehicle?

17   A.   Correct.

18   Q.   Do you go in the vehicle?

19   A.   Not at that point, no.

20   Q.   Do you look in the vehicle?

21   A.   No, I did not.

22   Q.   Was the vehicle inventoried?

23   A.   Yes.

24   Q.   Okay.  Did you inventory it or did someone else?

25   A.   I believe myself and Officer Jerold Blanding.

1        *(Interjection by court reporter.)*

2    A.   Blanding is B-L-A-N-D-I-N-G.  His first name is Jerold,

3    J-E-R-O-L-D.

4    BY MR. BURGESS:

5    Q.   When this vehicle is inventoried, there's no weapons

6    recovered?

7    A.   That's correct.

8    Q.   No evidence of any kind recovered or logged as relates to

9    this vehicle, correct?

10   A.   Correct.

11   Q.   And you obviously didn't see anybody exit that vehicle or

12   leave the scene.  You saw footprints?

13   A.   That's correct.

14   Q.   And as far as you mentioned something about the Michigan

15   State Police, they never got close enough to the area to be of

16   assistance to you.  Is that correct?

17   A.   No.  They are the ones who made the initial contact with

18   the vehicle, because they were the marked units.

19   Q.   Okay.  When you say "initial contact," you mean when it

20   was parked?

21   A.   Yes.

22   Q.   Okay.  So, they weren't making a traffic stop, per se.

23   They just arrived at an empty vehicle parked on a side street?

24   A.   No.  It was treated as though it was a traffic

25   stop/vehicle.

1    Q.   In order for the jury to be clear, even though it was

2    treated as a traffic stop, the vehicle was never occupied when

3    MSP arrived at it.  Is that correct?

4    A.   We learned that after the traffic stop of the vehicle.

5    Q.   That would be correct, that the vehicle was never occupied

6    when MSP effectuated their traffic stop?  Correct?

7    A.   Would you rephrase that, please?

8    Q.   Absolutely.

9              Your understanding is that MSP arrived and

10   effectuated what you referred to as a traffic stop, but there

11   were no occupants of the vehicle at that time?

12   A.   That's correct.

13   Q.   Okay.  And MSP, to your understanding, did not report

14   seeing anybody exit that vehicle or anything to that effect;

15   is that correct?

16   A.   No, they did not.

17   Q.   Now, you said you followed these footprints to a house.

18             How far was the house from this vehicle?

19   A.   It was -- the vehicle was parked right in front of that

20   house.

21   Q.   So, right on that same street.

22             Just walking on the same side of the street or

23   across the street?

24   A.   Same side of the street.

25   Q.   Okay.  And did you see the -- did these footprints -- you

1    said you went in -- you knocked on the door and you wanted to

2    see if they were there, obviously, the people who the

3    footprints belonged to, right?

4    A.   Actually, the Michigan State Police broadcast over the

5    loud speaker for the occupants of the house to come to the

6    door.

7    Q.   Okay.  And they complied obviously, right?

8    A.   Eventually, yes.

9    Q.   Did you search that house?

10   A.   I did not.

11   Q.   Do you know if anybody did?

12   A.   Yes.

13   Q.   Was anything recovered in that house?

14   A.   No.  It was only a female home.

15   Q.   Okay.  So, no weapons were recovered in that house, right?

16   A.   That's correct.

17   Q.   And the footprints, they went away from this area again?

18   A.   Well, there was a set of footprints that we believed to

19   lead to the house, but after sorting them out, the footprints

20   eventually actually led across the street and through the

21   yards, and from there unknown.

22   Q.   Okay.  Now, this is -- these footprints -- strike that.

23             You said you heard the flash bang go off.  Is

24   that correct?

25   A.   I heard them and saw the flash.  There was more than one.

1    Q.  There was more than one.

2                    And those are loud booms, right?

3    A.  Yes.

4    Q.  Do they resemble gunshots?

5    A.  I don't think so.

6    Q.  Not personally.  But do you think someone could mistake

7    them for gunshots possibly?

8    A.  It's more of an explosion as opposed to a gunshot.

9    Q.  Startling though?

10   A.  That's what they are for, yes.

11   Q.  Okay.  And how many were there?

12   A.  I want to say four to six of them that all went off at the

13   same time.

14   Q.  So, four to six continuous really loud booms in the area?

15   A.  Just one giant explosion.

16   Q.  It was one giant.  Even though there were four to six,

17   they all went off at once?

18   A.  They were all wired together, yes.

19   Q.  So, it wasn't like consecutive.  It was just one loud

20   boom?

21   A.  Yes.

22   Q.  Now, you followed these footprints until they got to Grand

23   River.

24                    How far from this house to Grand River in feet;

25   how far is that?

1   A.  I did not follow the footprints.

2   Q.  Do you know how far that is approximately in feet?

3   A.  No.  It's probably a mile, I'm guessing.

4   Q.  Okay.

5   A.  You know, and I misspoke.  It was not Grand River.  It was

6   Puritan Street, not Grand River.  Grand River is behind us.

7   Q.  Puritan is a main road though?

8   A.  It's -- it's -- I wouldn't consider it a main road, no,

9   but it's heavily traveled.  It's not like a side street.

10  Q.  Okay.  There was no snow on the ground when you got to

11  Puritan.  That's when you --

12  A.  No, there was.

13  Q.  But you didn't see the tracks anymore?

14  A.  I never saw the tracks.

15  Q.  Oh, you never saw --

16  A.  I was informed they lost the tracks at Puritan, which was

17  a couple streets out.

18  Q.  Now, you mentioned a proffer with Mr. Barkley.

19          A proffer -- just for purposes of the jury, a

20  proffer is when you talk to somebody to get information from

21  them basically, right?

22  A.  Yes.

23  Q.  And was this -- the first time Mr. Barkley gave you that

24  information, was that February 2nd?

25  A.  The information -- what information?

1   Q.  Was that the first time you spoke with Mr. Barkley, was

2   February 2nd?

3   A.  Yes.

4   Q.  Okay.  Had you already generated any paperwork or

5   documentation on February 2nd?

6   A.  There were reports done in this case, yes.  I don't recall

7   if I authored them or not.

8   Q.  But you had access to them.  You could reference them if

9   you chose to do so?

10  A.  Yes.

11  Q.  And you could reference them if you chose to do so on

12  February 2nd, 2010 when you spoke first to Mr. Barkley?

13  A.  Yes.  I didn't speak to Mr. Barkley on February 2nd.

14  Q.  When did you first speak to Mr. Barkley?

15  A.  It would have been February 22nd, I believe.

16  Q.  And that's when Mr. Feller was present?

17  A.  That was at the proffer.

18  Q.  Where was that done?

19  A.  Here in the U.S. Marshal holding area.

20  Q.  In the detention back in one of the rooms there?

21  A.  Yes.

22  Q.  Was that proffer, was that video taped or audio taped?

23  A.  It was audio taped.

24  Q.  Now, you said based on that information you received on

25  February 22nd, you went to a residence or you -- I guess you

1   picked a bunch of -- you wrote down a bunch of addresses.  And

2   then you went to one of the residences after you found out

3   that Mr. McGee's grandmother had resided there or owned it at

4   some point; did you go to that residence?

5   A.  I took the information from the proffer and went to Ward

6   Street.

7   Q.  Okay.  And when you went on Ward Street, did you search

8   the house?

9   A.  No.

10  Q.  Anything preventing you from obtaining a warrant to search

11  the house?

12  A.  Probable cause.

13  Q.  Did you seek a warrant in that case?

14  A.  No.

15  Q.  You never made an attempt to even ask for a warrant?

16  A.  As I recall, the house was vacant and for sale, the one

17  that ended up being the right house.

18  Q.  So, a vacant property where nobody lives, it would

19  probably be easier to get a warrant for a vacant property,

20  right, than an occupied one in, your 20 years of experience,

21  Officer?

22  A.  You need probable cause for either.

23  Q.  You don't make that probable cause determination.  That's

24  a magistrate's job, right?

25  A.  Correct.

1   Q.   And you did not even request a warrant for this house,

2   correct?

3   A.   I had no probable cause to request a warrant.

4   Q.   So, that's a no?

5   A.   Absolutely not.

6   Q.   And, again, probable cause is not determined by you, but

7   by a magistrate, correct?

8   A.   No, I really don't know how to answer that question.   I

9   would say no.

10  Q.   Do you get to sign your own warrants or does a judge have

11  to sign it?

12  A.   A judge has to sign it.

13  Q.   Okay.   So, that house wasn't searched.

14               The other residence you went to, you said

15  Mr. McGee -- you found him in the basement of that residence?

16  A.   Yes.

17  Q.   But you first saw him outside the residence?

18  A.   I did not see him, but he was seen outside the

19  residence -- stepped out of the residence on to the front

20  porch.

21  Q.   I think your testimony was you assaulted the house.

22               How many people were present when you assaulted

23  the house?

24  A.   I'm going to guess at left ten, plus a helicopter.

25  Q.   Okay.   And you said that there was somebody else.   There

1   was another owner or another renter that occupied that

2   residence?

3   A.  Yes.

4   Q.  Was it a renter or an owner?

5   A.  I don't know.

6   Q.  Okay.  But there was definitely someone other than

7   Mr. McGee that actually occupied that residence, correct?

8   A.  Yes.

9   Q.  And you found that out before you actually went in there,

10  right?

11  A.  No.

12  Q.  You found that out after you went in there?

13  A.  Yes.

14  Q.  How did you -- how did you know to go in there if you

15  didn't even know who -- how did you know to go in there to

16  look for Mr. McGee?

17  A.  The cell phone led us to -- Mr. McGee's cell phone -- what

18  we believed to be Mr. McGee's cell phone led to us that

19  location.

20  Q.  Okay.  Did you have a warrant to go in that house?

21  A.  No.

22  Q.  You just went in without a warrant?

23  A.  Mr. Shaw let us in.

24  Q.  Okay.  So, there was a person there.  Mr. Shaw or

25  Ms. Shaw?

```
 1    A.   Mr. Errol Shaw is his name.

 2    Q.   Mr. Errol Shaw.

 3              That is how you found out who resided there?

 4    A.   Yes.  He said he resided there.

 5    Q.   Did Mr. Shaw say that anybody else resided there?

 6    A.   No.

 7    Q.   Did you find out if anybody else resided there?

 8    A.   No.

 9    Q.   Did Mr. Shaw give you permission to search the house?

10    A.   Yes.

11    Q.   And you searched the whole house?

12    A.   Yes.

13    Q.   When you recovered the -- the one weapon you recovered,

14    that was recovered in the basement?  Is that where you said

15    Mr. McGee was apprehended?

16    A.   Yes.  He was in the basement.

17    Q.   Were you the one that apprehended him or was it somebody

18    else that did that?

19    A.   It was a group effort.  I did not physically place

20    handcuffs on him.

21    Q.   Were you present when you -- did you view Mr. McGee in the

22    basement, you personally?

23    A.   Yes.

24    Q.   And who else was present during that -- when the first

25    contact was made with Mr. McGee, who else was present?
```

1    A.   They were a combination of Detroit police officers and

2    U.S. Marshals that work a task force apprehending fugitives.

3    I don't know exactly.

4    Q.   When Mr. McGee was arrested in this case, you said you

5    found that there was a -- the gun was on the couch?

6    A.   It was behind the couch.

7    Q.   Behind the couch?

8    A.   Yes.

9    Q.   When you say behind, like what do you mean; like

10   underneath or was it propped up or how was it?

11   A.   It was lying on the floor behind -- against the wall

12   behind the couch.  The back of the couch would be up against

13   the wall.  The gun would be lying on the floor.

14   Q.   Was the couch up against the wall?

15   A.   I don't know.  I didn't initially find the gun.

16   Q.   Okay.  Do you know personally if the gun -- if the couch

17   had to be moved to locate the weapon?

18   A.   I don't know.

19   Q.   When you -- did you ever view the basement?

20   A.   Yes.

21   Q.   When you viewed the basement, where was the gun?

22   A.   It was behind the couch on the floor.

23   Q.   Okay.  Did the couch look like it was angled out at all?

24   A.   Yes.  The couch was angled out.

25   Q.   Okay.  Did it appear to have been moved?

1   A.  It was away from the wall, but I don't know if it was that

2   way or -- it was not flat up against the wall.

3   Q.  Okay.  So, just from your own personal knowledge, if that

4   couch had been against the wall, you would not have been able

5   to physically see the gun just out in the open, correct?

6   A.  Correct.

7   Q.  And you said that gun was not preserved for fingerprints?

8   A.  It was not.

9   Q.  Was there any reason it couldn't have been?

10  A.  No.  It could have been.

11  Q.  Nothing preventing you from fingerprinting that gun,

12  right?

13  A.  Correct.

14  Q.  Did you ever try to get --

15          From speaking to Mr. Barkley, did you ever try

16  to get any warrants, any search warrants to search any other

17  properties that Mr. McGee may have resided at?  Did you ever

18  try to do that?

19  A.  No.

20  Q.  And all these guns that Mr. Feller keeps flashing on the

21  screen, the only gun attributable to Mr. McGee in this case,

22  according to you, is the one that was found in the house

23  behind the couch where he was in.  Is that correct?

24  A.  That's not correct.

25  Q.  Is that the only gun found in proximity to Mr. McGee?

1    A.  Yes.

2    Q.  And you have no -- other than speaking to Mr. Barkley, you

3    have no personal knowledge that Mr. McGee ever handled that

4    weapon, right?

5    A.  That's correct.

6    Q.  And we have no fingerprints to verify that he ever handled

7    that weapon?

8    A.  Correct.

9    Q.  How many times was Mr. Barkley debriefed or was there a

10   proffer done?

11   A.  Just the once.

12   Q.  Okay.  And he was spoken to on February 2nd by other

13   agents?

14   A.  Yes.  He was interviewed on February 2nd after his arrest.

15   Q.  And on February 22nd when you spoke with Mr. Barkley, did

16   you have your case file with you?

17   A.  No.

18   Q.  Did you have any notes with you at all?

19   A.  No.

20   Q.  Did you have knowledge of this case after working it for

21   at least probably about a month?

22   A.  Yes.

23   Q.  You had a working knowledge of the case?

24   A.  Yes.

25   Q.  In your mind?

1    A.  Yes.

2    Q.  When you were speaking to Mr. McGee, right?

3    A.  Speaking to Mr. Barkley?

4    Q.  When you were speaking to Mr. Barkley.  I apologize.

5    A.  Yes.

6              MR. BURGESS:  Nothing further.

7              THE COURT:  The Government?

8                    REDIRECT-EXAMINATION

9    BY MR. FELLER:

10   Q.  Mr. Shaw gave you permission to search his house, correct?

11   A.  Yes.

12   Q.  Did Mr. Shaw also provide a statement to you or to other

13   law enforcement agents?

14   A.  Yes.  To Curtis Bronson.

15   Q.  Did Mr. Shaw in his statement, if you know, was he asked

16   about whether Mr. McGee was staying in his house?

17   A.  Yes.

18   Q.  Was he asked about where in the house Mr. McGee was

19   staying?

20   A.  Yes.

21   Q.  Was he asked about ownership of the firearm that was found

22   in the basement?

23   A.  Yes.

24   Q.  Based on where the firearm was found, based on Mr. Shaw's

25   statement, did you see any need to obtain fingerprints on the

```
 1    firearm?

 2    A.  No.

 3                MR. FELLER:  Okay.  Your Honor, in connection

 4    with this witness's testimony, we have the reports of

 5    Mr. Barkley's February 2nd and February 22nd statements.

 6    Mr. Burgess has correctly pointed out that those statements

 7    were recorded.

 8                The Government would offer the recordings of

 9    Mr. Barkley's statements into evidence as well.

10                THE COURT:  Any objection?

11                MR. BURGESS:  No, Your Honor.

12                THE COURT:  They are received.

13                MR. FELLER:  Thank you, Your Honor.  That will

14    be Exhibits 19 and 20.

15                (Government Exhibits 19 and 20 were admitted

16                into evidence.)

17                THE COURT:  Are you done?

18                MR. FELLER:  I am, Your Honor.  Government

19    rests.

20                MR. BURGESS:  Nothing further, Your Honor.

21                THE COURT:  You may step down.  Thank you.

22                JUROR NO. 7:  Your Honor, I have a question.

23                THE COURT:  I'm sorry.  The one time I didn't

24    ask.

25                JUROR NO. 7:  I would like to know --
```

```
 1                    THE COURT:  No, no.  Write it down.

 2                    Sidebar, gentlemen.

 3                    (Bench Conference held out of the hearing of the

 4                    jury, between the Court and counsel, on the

 5                    record as follows:)

 6                    THE COURT:  There's no objection.

 7                    (End of Bench conference.)

 8                    THE COURT:  All right.  Here's the question.

 9                    Whose name is the Mariner registered in, if you

10        know?

11        A.  A gentleman by the name of Torrey Smith, T-O-R-R-E-Y.

12                    THE COURT:  Any follow-ups?

13                    MR. FELLER:  Not from the Government, Your

14        Honor.

15                    MR. BURGESS:  No, Your Honor.

16                    THE COURT:  Any follow-ups from the jurors?

17                    You may step down.  Thank you.

18        A.  Thank you.

19                    THE COURT:  Now, did I hear you say you rested?

20                    MR. FELLER:  The Government rests, Your Honor,

21        yes.

22                    THE COURT:  All right.  That means this is a

23        great time for a break.

24                    It's about ten minutes to 11.  So, at about ten

25        minutes after 11 we'll come back and proceed with the trial.
```

```
 1                    Remember, don't talk about the case.  It's not
 2     over until it's over.
 3                    So, all rise for the jury.
 4                    We'll see you in about 20 minutes.
 5                    (Jury leaves the courtroom at 10:52 a.m.)
 6                    THE COURT:  Anything anyone wants to put another
 7     record?
 8                    MR. FELLER:  No, Your Honor.  Just with respect
 9     to those last two exhibits, 19 and 20, we will have to
10     physically retrieve them from my office.
11                    THE COURT:  Are they on a computer so the
12     computer you bring back will play them?
13                    MR. FELLER:  Agent Pacholski is telling me he
14     may actually have them with him.  So, that will be convenient.
15     But yes, they are on discs, and the jury will --
16                    THE COURT:  Anything else?
17                    MR. FELLER:  Not from the Government, Your
18     Honor.
19                    THE COURT:  Mr. Burgess?
20                    MR. BURGESS:  Your Honor, I had spoke with my
21     client before.  I don't believe that -- I just want to inquire
22     through him as to whether or not he is choosing to testify in
23     this case.  I don't believe he is, but I just wanted to
24     inquire on the record.
25                    THE COURT:  You may.
```

1          MR. BURGESS:  Thank you, Your Honor.

2          Mr. McGee, the Government has rested their case

3     at this point, and I'm basically asking you -- you --

4     obviously now you have a right to remain silent as well as an

5     absolute right to testify.

6          Are you choosing to testify or are you choosing

7     to remain silent at this time?

8          MR. McGEE:  I will remain silent.

9          THE COURT:  I'm sorry?

10         MR. McGEE:  I'm going to remain silent.

11         THE COURT:  All right.  You have that

12    constitutional right.  I'm sure your attorney has consulted

13    with you.  And now you've made your decision.

14         I was a little troubled by the absence of

15    Mr. Epstein, the witness's attorney, but I don't think that's

16    a problem anymore.

17         MR. FELLER:  And, Your Honor, candidly, now that

18    you mention it, that is my oversight, and I . . .

19         THE COURT:  Well, he was here yesterday.

20         All right.  So that I understand, we are ready

21    for closing arguments?

22         MR. FELLER:  The Government stands ready, Judge.

23         MR. BURGESS:  The Defense is ready, Your Honor.

24         THE COURT:  All right.  And I want the

25    instructions -- the jurors' copies of the instructions on the

1    chairs once you pull that page out, and distributed.  And then

2    we will go right after closing arguments to the jury

3    instructions.  And we will provide lunch to the jurors.

4              MR. FELLER:  And us?

5              THE COURT:  Only the jury.  The order will say

6    lunch for the jury.  And if he's here, he will probably get

7    one.

8              MR. FELLER:  Thank you, Your Honor.

9              What time should we be back?

10             THE COURT:  In 15 minutes now.

11             MR. FELLER:  15 minutes.  Thank you, Judge.

12             *(Recess taken.)*

13             THE COURT:  All rise for the jury, please.

14             *(Jury enters the courtroom at 11:16 a.m.).*

15             THE COURT:  Everybody is in their place.  You

16   may be seated.

17             The prosecution has rested.  The Defense has

18   rested.  And we are ready for closing arguments.

19             Remember what I told you before.  This is not

20   evidence.  This is the attorneys' view of what the evidence

21   shows.  The ultimate decision as to what the evidence shows is

22   collective yours as jurors.

23             There is no time limit on the closing arguments,

24   but this being a short case, it would probably be two or three

25   days.

```
 1                    Is that about right, counsel?
 2                    MR. FELLER:  I'm hoping for two or three
 3       minutes, Judge, but . . .
 4                    THE COURT:  All right.  You may begin.
 5                    MR. BURGESS:  I would ask that those comments be
 6       stricken.
 7                    MR. FELLER:  Are we going to be okay if I stand
 8       now?
 9                    (Mr. Feller is addressing the jury.)
10                    THE COURT:  You are not suggesting you are going
11       to sit down?
12                    Can you see?
13                    MR. FELLER:  No.  They want to see the . . .
14                    JUROR NO. 7:  It's fine.
15                    THE COURT:  Okay.  She said it's fine.
16                    MR. FELLER:  Okay.  Sorry.  I'll try to move
17       around a little bit.
18                    On your chairs when you came in are copies of
19       jury instructions.  When Mr. Burgess and I are through, the
20       Judge is going to go all through I think 53 pages of those
21       with you.  I want to highlight just a couple that I think are
22       the most significant or might be the most significant in your
23       deliberations.
24                    If we could have 16, page 18.  And it will be up
25       on the screen, but hopefully your page numbers should
```

1   correspond.  And if we could highlight (2) (A) and (B).

2             There you go.

3             All right.  So, you will remember when we

4   started out, we talked about what the elements of the offense

5   are, what the recipe is, or if you decide to acquit, what that

6   would involve.  And there are only two, and they are very

7   straightforward.

8             First, that two or more persons conspired, or

9   agreed, to commit the crime of possessing with intent to

10  distribute controlled substances.

11            So, there was an agreement among two or more

12  people to commit that crime.  And the Government submits that

13  agreement was to do that through a robbery.

14            Now, what's an agreement?  Again, you will have

15  another instruction in there.  The Government doesn't have to

16  prove that it's formal or that it's written or that it's even

17  spoken.  It's just simple common sense; did this group of

18  individuals agree to get together to do something illegal.

19            And here, of course, they did.  And how do you

20  know that?  Well, you know that because you have it on video.

21            If we could have Exhibit 5, 2, please.  This is

22  already at the coney island right before they are supposed to

23  go to the robbery.  This is going to be Agent Nether

24  describing again how much the quantity of cocaine is that they

25  are supposed to steal.

1          And on the left there you see Mr. McGee standing

2    right there as Agent Nether is speaking.

3              (Exhibit 5, Clip 2 played in open court.)

4          MR. FELLER:  Again, we heard a lot about how

5    Mr. McGee was walking around at the coney island.

6          Well, he really wasn't walking around very much.

7    First, when we start at the coney island, he is at a table on

8    the right side of the image.  And the remainder, he walks

9    over, gets a cup of water and stands to Agent Nether's left.

10         So, was there an agreement?  Of course, these

11   folks knew exactly what they were doing.  You have Mr. McGee

12   on video listening to Agent Nether talking about how he's the

13   courier.  He's picking up six kilograms of bricks, or whatever

14   the other euphemisms are, of cocaine.  There should be 30 left

15   at the stash house when the robbery takes place.

16         Let's go back to the jury instructions, page 18.

17         And, second, that the Defendant knowingly and

18   voluntarily joined the conspiracy.  That's your second.

19         So, one, that you have an agreement among a

20   group of people -- again, it doesn't need to be written; it

21   doesn't need to be spoken; just an understanding -- and,

22   second, that the Defendant voluntarily chose to participate.

23   And, again, that too you will have on video from the coney

24   island.

25         Could we have Exhibit 5, Clip 1.

1          Again, this is near the beginning.  We'll see

2   Mr. McGee at a table on the right side.

3              *(Exhibit 5, Clip 1 played in open court.)*

4              MR. FELLER:  And again later, Exhibit 5, Clip 3.

5              *(Exhibit 5, Clip 3 played in open court.)*

6              MR. FELLER:  In this clip you have evidence both

7   of the agreement, "when we come in with choppers, with masks,"

8   and obviously of Mr. McGee's participation in it.

9              Now, you're all here today and we heard three

10  witnesses.  We heard about a whole lot of stuff that happened

11  after the coney island.  They split up.  Mr. Barkley and McGee

12  go to McGee's house.  Mr. McGee picks up a gun.  They go to

13  the cousin's house.  Mr. Barkley comes back with Mr. Porter to

14  the liquor store.  Mr. McGee and his cousin go to get more

15  guns.  Mr. Barkley and Mr. Porter's people get into the

16  storage lot.  Mr. McGee and his cousin don't.  They end up

17  fleeing on foot.

18             The Judge in the beginning gave you an example

19  of direct versus circumstantial evidence.  You remember that.

20  Circumstantial evidence is if somebody comes in in a raincoat

21  and they're all wet.  Right?  What does that mean?  Well, it's

22  raining outside.

23             Circumstantial evidence, if it's snowing outside

24  and you see a vehicle that you have been following and there's

25  nobody in it and there's footprints in the snow leading from

1    it, it probably tells you somebody got away.

2                    There's a chase by the marshals, by ATF over a

3    couple weeks.  Not a chase.  They track -- they identify

4    Mr. McGee and they track him down to the home of a man named

5    Errol Shaw.  McGee isn't at his house.  He's not at his sister

6    house's.  He's not at his mother's house.  He is hiding out in

7    a guy's basement with a firearm, Exhibit 6.

8                    But my point is if we --

9                    You know what, can we get Exhibit 16, page 38.

10                    One of the instructions you will hear is about

11   flight; that when a Defendant -- this is page 38 -- that when

12   a Defendant flees the scene of a crime, that is something that

13   you can consider as indicative of guilt for the offense.

14                    But my point in all of that is the charge here

15   is conspiracy; that there's an agreement and that the

16   Defendant voluntarily joined it.

17                    Everything that happened after that, I think

18   going to your house and picking up a gun, fleeing from the

19   scene, all of that is indicative of guilt certainly.  And

20   that's why we went through all of the testimony here today.

21   But none of it really mattered, because the crime is completed

22   if you have an agreement and if somebody voluntarily joins it.

23   And, again, all of the clips -- and you have the entire

24   video -- from what happened at the coney island at that point,

25   the crime was completed.

1          Now, I don't like to predict what a jury is

2     going to hear from a Defense lawyer.  But my guess is, based

3     on the couple days we've sat through, you are going to hear

4     that Mr. Porter, Denny Moe, is the one who set this up.

5          And you know what.  That's probably absolutely

6     right.  If we could have Exhibit 1 Clip 1.

7          *(Exhibit 1, Clip 1 played in open court.)*

8          MR. FELLER:  Mr. Porter was also the one who was

9     responsible for arranging to get these drugs sold.  Exhibit 1,

10    Clip 2, please.

11          *(Exhibit 1, Clip 2 played in open court.)*

12          MR. FELLER:  Can we go back to page 22 of the

13    instructions.

14          As you will hear from Judge Tarnow when he goes

15    through the complete instructions, the fact that there were

16    other people involved, the fact that other some of those

17    people may have been more or less involved, the fact that this

18    particular Defendant wasn't at that first meeting with the

19    undercover agent, none of that makes any difference

20    whatsoever.

21          There is no question that Dennis Porter, Denny

22    Moe, is a really bad guy.  And he will be dealt with in a

23    separate proceeding.

24          For your purposes, the question is whether this

25    Defendant, Alistair McGee, whether there was an agreement to

1    participate in a robbery and whether this Defendant

2    voluntarily joined in it.  And based on the video that you saw

3    from the coney island, I don't think there can be any doubt,

4    reasonable, possible or otherwise, as to that.

5              Now, if you believe Mr. Barkley, who testified

6    here today -- and I would urge you -- you will get this book

7    back with you.  And it wasn't up on the screen.  Exhibit 17 in

8    that book is the statement that Mr. Barkley gave to law

9    enforcement on the day he was arrested.  Right?  He is

10   arrested at the storage facility.  Goes to law enforcement.

11   He says you've got me.  Here's what happened.

12             There were no prosecutors.  There was no deals.

13   There was no anything.  There was a guy confessing to the

14   offense.

15             Exhibit 18, again, February 22nd -- if you look

16   at his plea agreement, there was no deal for almost another

17   month -- there is a full description of Mr. Barkley, of how he

18   was recruited to commit this offense by Mr. McGee, of the gun

19   robbery that took place the day before.

20             All of this is -- again, you have the reports.

21   You will also have the actual recordings, if you want to hear

22   them, of Mr. Barkley's interviews that took place on those

23   dates.

24             But if you believe Mr. Barkley, this Defendant's

25   role was actually, very, very substantial.  Mr. Porter may be

1    the kingpin, but it was Mr. McGee who arranged to have

2    Mr. Barkley participate in the robbery, who picked up a gun

3    from his own house, and who in fact set up the robbery of his

4    neighbor to steal the guns the day before.

5            Speaking of firearms, we have again -- if we can

6    go to Exhibit 6.

7            Mr. McGee several weeks later, after this

8    robbery goes bad, after his co-conspirators are arrested, he's

9    not living in his house.  He's not staying with family.  He's

10   staying with some guy, Errol Shaw, in his basement.  Agents

11   have to track him down using a cellular telephone.  He's

12   living in the basement, and in the basement is a firearm.

13           Now, Mr. Barkley tells you that this is the

14   firearm that he had seen previously with Mr. McGee.  We know

15   from the agents that there are other firearms from the robbery

16   the day before.

17           If we can have Exhibit 7.

18           And we can just go through them.  These are

19   found at Mr. Porter's house.  These are consistent with the

20   report of the robbery.  This is consistent with Mr. Barkley's

21   testimony of being told about the robbery -- and if we could

22   have Exhibit 8 -- and of being asked by Mr. McGee to put up

23   one of those guns.

24           Now, if we could have Exhibit 16, page 52.

25           You are going to have a two-page verdict form in

1    this case.  Page one is as to the single-count charge,

2    conspiracy to possess with intent to distribute controlled

3    substance; guilty or not guilty.

4            And then if we can go to page two.  If you

5    determine that Mr. McGee is guilty of that offense, you are

6    also asked to determine the quantity involved.

7            So, the quantity here is the quantity that this

8    Defendant and his co-conspirators believed was going to be at

9    the stash house.

10           Again, I think the evidence is undisputed that,

11   at the very least, that's six kilograms that the agent said he

12   was going to be taking out himself, but again you have the

13   recordings.  He time and time again says it's going to be 30

14   kilograms that is expected to be left at the stash house.

15           Ladies and gentlemen, I will have an opportunity

16   to address you again in a minute or when Mr. Burgess is

17   through.

18           I can tell you that there is absolutely no

19   federal criminal trial that is ever easy, but there are some

20   that are straightforward.

21           And I think based on the recordings you have

22   here, based on Mr. Barkley's testimony that is entirely

23   consistent with the statements he has given to law enforcement

24   for nearly a year now, there is no dispute that there was an

25   agreement to commit an armed robbery, that the object of that

```
 1   robbery was 30 kilograms of powder cocaine, and that Mr. McGee
 2   voluntarily joined in that conspiracy.
 3               I'll ask you to return a verdict of guilty.
 4               THE COURT:  Mr. Burgess.
 5               MR. BURGESS:  Thank you, Your Honor.
 6               Good morning.
 7               JURORS:  Good morning.
 8               MR. BURGESS:  This is, unfortunately, the one
 9   and only time -- I do like to have the last word, but,
10   unfortunately, this is the only time that I do get to talk to
11   you before you get the case as jurors.
12               As jurors, I would like to thank you in advance
13   for sitting here, paying attention.  Everybody has been very
14   attentive.
15               I know it wasn't a long trial, and I'm sure all
16   of you are most likely relieved that it wasn't a long trial.
17   I'm sure you have heard of federal trials taking weeks and
18   months.  I'm sure you are relieved it was two days.  But
19   myself and Mr. Feller tried to keep you at least awake.  So, I
20   appreciate everybody's attention in this case.
21               I always find it quite interesting when the
22   Government says it's straightforward.  Because when they say
23   it's straightforward, to me that's code for don't look at it
24   very closely, don't read between the lines, don't look at the
25   case under a microscope, which is what you are supposed to do
```

1      as jurors, but just go ahead and broad stroke it.

2                  Because if you look at the case the way it was

3      created -- and as I said in my opening statement, I say

4      created because the Government chose and picked what they

5      would show you in this case.  Okay?

6                  And, again, as I told you before in my opening

7      statement, a reasonable doubt is a doubt based on reason and

8      common sense growing out of the evidence or lack of evidence.

9                  Now, I will just touch on a couple of things,

10     because -- again, and if I say something that is not

11     consistent with what the Judge says, please follow his

12     instructions.

13                 But in this particular case, you heard from four

14     witnesses.  You also heard that there were several other

15     witnesses, witnesses that were present at the coney island,

16     witnesses that were present when Mr. McGee was arrested, a

17     number of other witnesses that could have been called in this

18     case that were not.  I will touch on that a little bit later.

19                 The other thing too is the Government appears in

20     this case to have the ability to video tape pretty much at

21     will.  They have a hidden video camera on their undercover

22     agent.  They video taped the whole coney island situation.

23     And, yet, the stuff that would be a little more telling and be

24     helpful to you is not video taped.

25                 They have this surveillance, this take-down spot

1   set up at the storage facility, and, yet, there's really no

2   video of the outside of it, where the SUV is or what happens

3   with the SUV.  You don't get to see that.  They have the

4   opportunity to do that.  You don't get to see the SUV drive

5   away in this case because I submit to you that Mr. McGee in

6   this case --

7                First of all, Mr. McGee is -- even though the

8   Government would like to think otherwise, Mr. McGee is only

9   mentioned first on February 2nd, but only appears in this

10  case -- excuse me -- first on February 1st, but only appears

11  in this case on February 2nd.

12               Now, the Government showed you recordings from

13  January 18th, January 28th, other recordings that Mr. Porter

14  talked about a crew.  But he also referenced a crew that

15  didn't have anything to do with Mr. McGee.  He referenced a

16  crew that was partly Nop and partly Nop's cousin.

17               Now, you saw Nop on the video.  Nop was not

18  called to testify.  I assume he's available to the Government.

19  They (sic) chose not to testify.  That is some lack of

20  evidence that you can consider in this case.

21               Mr. Porter is obviously -- and Mr. Feller is

22  absolutely correct.  Mr. Porter is the ringleader in this

23  case.  I don't think that's disputed.  Mr. Porter is setting

24  this up.  I mean, according to the agent, he had no problem

25  getting him to talk.  Mr. Porter brags.  I mean the video --

1    you weren't shown, but they are in evidence if you want to see

2    them.   Mr. Porter brags further about his exploits, about what

3    a dangerous guy he is, what a tough guy he is, what he does to

4    people, how he's known.

5              Two witnesses at least in this case

6    testified that -- at least the agent testified that he

7    wouldn't want to meet him in an alley, and the other,

8    Mr. Barkley, testified that Mr. Porter is a tough guy and he's

9    scary.

10             So, Mr. Porter I think it's pretty clear is

11   running this whole situation.   Mr. Porter, for whatever

12   reason -- and, unfortunately, if you had it all video taped

13   for you, I guess we probably would have less to talk about

14   here.   But unfortunately you don't.   You don't have

15   everything.   And you never do as jurors.   It would be nice,

16   but you don't.   So, you have to kind of rely on your

17   collective memories, your collective common sense and think

18   about this situation, and you can use circumstantial evidence

19   to make your own conclusions.

20             Because this has to be found beyond all

21   reasonable doubt.   And I say "all reasonable doubt."   It is "a

22   reasonable doubt" in the jury instructions, but I say all

23   reasonable down because each one of you does not have to have

24   the same reasonable doubt.   Each one of you can have different

25   doubts in this case.

1          We all picked you because you are reasonable.

2     So, any doubt any of you are going to have is a reasonable

3     one, first of all.

4          Secondly, you don't have to agree on the same

5     reasonable doubt when you go back and deliberate.  That's not

6     required.  If you all have hesitation in your mind, if you

7     think about this case and go, hmm, as reasonable people you

8     now have a reasonable doubt.

9          So, with that in mind, think about a logical

10    conclusion in this case.  Mr. McGee is not mentioned until

11    February 1st.

12         Now, again, the Government wants to put all this

13    extraneous stuff in here and wants you to keep your eyes off

14    the prize, because they figure if they throw enough junk at

15    the wall something will stick for you.

16         They want to throw in all these guns found in

17    Mr. Porter's house in Mr. McGee's case.  These guns have

18    nothing to do with Mr. McGee.  The Government would probably

19    argue otherwise and say it was part of the whole conspiracy.

20    But what they are really trying to do in this case is just

21    paint Mr. McGee in a bad light.

22         The one gun they claim is found in the

23    basement -- and, again, they called one witness to testify in

24    this case.  Nine or ten people in this house that did this

25    raid?  Not even the first one on the scene in the basement?

1    And you are supposed to believe one witness, that Mr. McGee is

2    down there in the basement with the gun?

3              By the way, the gun is behind the couch.  The

4    gun is not printed.  There is no physical evidence to suggest

5    that Mr. McGee has any connection to this gun unless you want

6    to believe Mr. Barkley.  And I'll get to him in a minute.

7              When it comes down to it, what you have here is

8    you have Mr. McGee in one setting bragging, talking about a

9    bunch of crap, trying to get himself pumped up at that point

10   in front of Mr. Porter.  Then they leave this situation --

11             And if you want to believe Mr. Barkley, that's

12   up to you.  But think about Mr. Barkley's testimony in a

13   certain light here.  Mr. Barkley is a snitch, first of all.

14   And by itself, I'm not saying that you have to discount his

15   testimony only because he's a snitch, but let's think further

16   about what Mr. Barkley is.

17             Mr. Barkley since he has been an adult, and

18   probably earlier than that, has been a drug dealer his whole

19   life.  Since he has been an adult, since the mid 90's, he has

20   been a drug dealer.  He's also a home invader.  And he also

21   has admitted to at least two home invasions in front of the

22   jury, in front of you all, where he went in and went to home

23   invade some place, to get drugs and to sell them; very

24   consistent with what we have here.

25             But Mr. Barkley would have you believe that he

1    was called in the last second.  You know, even though he did

2    this in November of 2009, he was called in at the last second

3    here because it was Mr. McGee here that recruited Mr. Barkley.

4    And that's what he would have you believe.

5              However, there is no evidence to suggest

6    Mr. McGee was involved in a home invasion in November of 2009.

7    The Government would say, yeah, but he was involved in a

8    robbery the day before.

9              Really?  Where's the charge?  Where's the

10   evidence?

11             There is no charge against Mr. McGee for a

12   robbery that occurred on February 1st, because they couldn't

13   even have, as the officer testified today, probable cause to

14   even get a warrant for that case.  They don't even have enough

15   evidence to charge, much less convict, Mr. McGee of anything.

16             Apparently, whatever agency is handling that

17   matter -- I believe it's Detroit -- doesn't have a lot of

18   faith in just Mr. Barkley's testimony, which is the only thing

19   that really gets you as far as -- gets you to Mr. McGee being

20   involved in the February 1st supposedly robbery in this case.

21             So, Mr. McGee is brought in at the last minute

22   by Mr. Porter, a man that two witnesses say is a scary guy.

23   And Mr. McGee talks on the tape, admittedly, a bunch of crap

24   in this case about doing this or doing that or whatever,

25   leaves the scene -- and if you want to believe Mr. Barkley

that these guns were picked up or dropped off here and there,
that's up to you.  There's, again, no physical evidence, no
guns found in the SUV after it's searched by the police, no
guns ever verified at the scene by the undercover officer.  He
didn't look in the SUV.  There's no guns other than
Mr. Barkley saying that Mr. McGee handled some guns.  There's
no evidence.

So, you have Mr. McGee -- who, by the way, if
Mr. McGee is so tight with Mr. Porter, why is he driving in
another vehicle -- he makes the effort to go to his cousin's
house, gets in another vehicle with his cousin.  No one to do
with any of this whole plan, by the way.  His cousin, who was
not involved in this plan -- there's nothing about the cousin
being met at this coney island.  He gets in the car with
someone completely uninvolved in this case, in an SUV, someone
who he is a relative of according to the testimony, someone
who has nothing to do with this case and someone who is not
affiliated at all with any of this situation and was still
unknown at this point.

He gets in this car, this SUV with his cousin,
and they follow Mr. Porter.  They get over to this liquor
store and then they drive to this other area.  The SUV goes by
the place.

And, again, the Government will say, well, they
didn't have the code.  You heard the thing talking about the

 1    code.

 2                    We only heard one side of the conversation,

 3    first of all.  They don't have the other side of it.  I don't

 4    know whose phone that was, but they pretty much recorded

 5    everything they chose to record in this case.

 6                    But be that as it may, that car does not go in,

 7    does not try to go into this area.  Leaves the area.

 8                    Now, the Government will probably argue in its

 9    rebuttal that, well, he left the area because he knew

10    something was up.

11                    Really?  Where's the evidence of that?  Please,

12    show me the evidence of that.

13                    Other than the fact that Mr. McGee in this case,

14    even though he talked a lot, never intended to -- throughout

15    this whole situation, never intended to be involved in this.

16                    And the Judge will instruct you on this, and I

17    will just point it out to you, that in one of the instructions

18    in this case, to convict a Defendant, the Government must

19    prove that he knew the conspiracy's main purpose and that he

20    voluntarily joined it intending to help advance or achieve its

21    goals.

22                    Mr. McGee never ever joined this conspiracy

23    intending to help, advance or achieve its goals.

24                    However, whatever influence Mr. Porter has, you

25    can reasonably conclude from circumstantial evidence.  What

1    you do know about Mr. Porter is he's a scary, violent guy.

2                    Whatever interaction came between Mr. Porter and

3    Mr. McGee, I don't know.  But we all know.  We all know the

4    old adage actions speak louder than words.

5                    When Mr. McGee is in Mr. Porter's sight, in his

6    presence, he talks a good game.  When he's away from

7    Mr. Porter, he leaves the scene.  Because Mr. McGee never ever

8    joined this conspiracy.  He never ever intended to help

9    advance or achieve the goals here.  As soon as he was away

10   from Mr. Porter, he left.  He's gone.

11                   Now, again, the Government will probably say,

12   well, he left because he knew this.

13                   Well, these flash bangs went off after this car

14   had already parked.

15                   And, by the way, think about this as well.

16   After February 2nd, Mr. McGee is in constant contact with --

17   according to the Government -- with Mr. Porter during this

18   thing that's going on, calling him about the numbers, all this

19   other stuff.

20                   Not one piece of evidence to suggest that

21   Mr. McGee made any effort to contact Mr. Porter or anybody

22   else once he drove away from the scene in this particular

23   situation.  Not asked these guys what happened, what was the

24   deal, are we going to do another one.  Nothing.  No evidence.

25                   Mr. McGee cut ties from this whole situation

1   when he drove away from that scene because he never intended

2   to help advance or achieve the goals of this conspiracy.

3            Now, as far as the Government saying -- and they

4   do pick and choose what they choose to tell you.  And it's

5   your job to really look at everything -- not pick and choose,

6   but look at everything before making a decision.

7            They say, well, he took off.  He took off.  It's

8   flight.  He must be guilty.

9            Well, he took off because he didn't want to be

10  involved anymore.  And the flight instruction also indicates

11  that there's all kinds of innocent reasons to leave.  I think

12  that it's reasonable to conclude and as reasonable people, you

13  can also conclude that Mr. McGee left the scene because

14  actions speak louder than words.

15           Mr. McGee never had any intent to be involved in

16  this conspiracy.  Whatever influence Mr. Porter had over him

17  was gone when Mr. McGee jumped in the car with his cousin, not

18  involved with this case, in a different vehicle, drove near

19  the area and drove away.  And he never looked back.

20           Now, as far as -- one other thing I mentioned in

21  my opening.  As far as Mr. Barkley's testimony goes, take it

22  for whatever it's worth.  There's a special jury instruction

23  on snitch witnesses.  I believe it's referred to as

24  cooperating witnesses.  I apologize.  But there's a special

25  instruction on that because you are supposed to give them

 1     special consideration.

 2              When these officers -- when these agents go to

 3     talk to him with this case in their mind, with their goals in

 4     this case in mind, and when they go to talk to him, I

 5     guarantee to you -- please listen to the tapes if you'd

 6     like -- the answers are either intentionally or

 7     unintentionally suggestive to Mr. Barkley.

 8              And Mr. Barkley knows that if he's not helping

 9     the Government in this case, if he's not offering some

10     assistance in order to attempt to convict Mr. McGee, he's not

11     getting a deal.  Cooperation is not like, oh, let me get that

12     gum off the bottom of your shoe.  No.  They want some kind of

13     substantial assistance that is right in the cooperation

14     agreement or they have the discretion not to help out

15     Mr. Barkley at all.

16              Mr. Barkley I think downplays -- and I think

17     that's human nature.  Mr. Barkley downplays his role in this

18     whole situation.  I think Mr. Barkley is much more involved in

19     this case.  I think he was probably involved a lot earlier

20     than he let's on.  And I think that's consistent with what

21     Mr. Barkley has done in the past, admittedly.

22              Now, again, I ask you to keep your eyes on the

23     prize.  The rest of this, the guns found in Mr. Porter's

24     house, the mention of an uncharged, unproved robbery, all this

25     other stuff, to the elements in this particular case are

1    meaningless.  The Government will argue probably in the

2    rebuttal otherwise, but all this other stuff is extraneous --

3    excuse my language -- crap for purposes of trying to elicit a

4    desired response by the Government.

5            What I propose to you, again, through the

6    evidence -- not through me manufacturing anything or creating

7    anything, but just from the evidence that has been presented

8    by the Government, what I propose to you -- is reasonable and

9    is what happened in this case -- is that Mr. McGee, for

10   whatever reason, even though he talked a good game in front of

11   Mr. Porter, never had any intent to advance or achieve the

12   goals of this conspiracy.

13           And because that's the case, because that

14   scenario is so likely in this case, because it's a reasonable

15   one, as jurors, if you do your jobs and look past the

16   extraneous evidence in this case, if you look past that and do

17   your job as jurors, there's only one verdict you can conclude;

18   in that it's reasonable that Mr. McGee did not intend to

19   advance or achieve the goals of this conspiracy; and as a

20   result of that, there's only one verdict, and it's not guilty.

21           Thank you.

22           THE COURT:  Thank you.

23           The Government has rebuttal?

24           MR. FELLER:  Yeah.  Let me get page four and

25   five of the jury instructions.

1          This is the instruction, it is at page four.

2          Mr. Burgess talked about reasonable doubt and

3     sort of gave you a definition of what a reasonable doubt is.

4     Let's look at what the actual definition is, and it's in

5     paragraphs four and five on the next page.

6          Nope.  Next page.

7          "Proof beyond a reasonable doubt does not mean

8     proof beyond all possible doubt.  Possible doubts based purely

9     on speculation are not reasonable doubts.  A reasonable doubt

10    is a doubt based on reason and common sense.  It may arise

11    from the evidence, the lack of evidence, or the nature of the

12    evidence.

13          "Proof beyond a reasonable doubt means proof

14    which is so convincing that you would not hesitate to rely and

15    act on it in making the most important decisions in your own

16    lives."

17          Now, ladies and gentlemen, one of two things

18    must be true.  Either Mr. McGee is guilty or literally every

19    witness you heard from, in Mr. Burgess' version of events,

20    must be lying.  Agent Nether must be lying to you about the

21    fact that he was on the phone with Mr. McGee as he was trying

22    to get into the storage facility.  Agent Pacholski -- I don't

23    know what he did wrong -- he's lying about the fact that he

24    arrested Mr. McGee or was involved in the arrest and found

25    Mr. McGee in the basement where a firearm was also involved.

1    Mr. Barkley is lying --

2              And if we can have Exhibit 10, page two, and if

3    we can highlight that top.

4              Mr. Barkley is lying even though he has told the

5    exact same version of events -- and you have it in his report

6    on February 2nd, seven, eight months ago, and on February

7    22nd -- and even though Mr. Barkley knows -- and this is one

8    of the first things I covered with him -- that the only way he

9    gets any recommendation from the Government is if he tells the

10   truth.

11             So, all of those folks -- I guess Agent Jury is

12   okay.  But all of those folks have to be lying to you for that

13   version of events to be true.

14             Now, you heard from Agent Nether.  You heard

15   from Mr. Barkley.  You heard from Agent Jury.  You heard from

16   Mr. Pacholski.  But you heard from somebody else as well.

17             You heard from Dennis Porter talking to the

18   undercover informant the day this robbery is supposed to have

19   occurred.  He doesn't have any reason to brag to the

20   informant.  He doesn't have any reason to lie to him.  He

21   doesn't have any reason to do anything but tell him the

22   complete truth, because the very next day he's going to be

23   risking his life in a robbery -- it's not just a robbery.

24   It's a robbery of a Mexican Drug Cartel -- with the undercover

25   informant.

1          Dennis Porter doesn't have a deal.  Dennis

2    Porter didn't appear in front of you with some incentive to

3    lie.  You heard from Dennis Porter in a candid conversation

4    the day before the robbery was to take place.  And what does

5    Dennis Porter have to say?

6          Can we have Clip 1.

7          *(Exhibit 1, Clip 1 played in open court.)*

8          MR. FELLER:  Can I have that one more time,

9    please.

10         *(Exhibit 1, Clip 1 played in open court.)*

11         MR. FELLER:  This is the robbery that was going

12   to take place the next day.  And Mr. Porter says, "Yeah, it's

13   me, you, Stir, and Country."

14         And who shows up the next day at the coney

15   island?

16         Stir, Mr. McGee.

17         Now, we saw the video of what's going on at the

18   coney island.  And Mr. Burgess says, well, you know what.

19   What's really happening here is Mr. McGee, he's just somebody

20   who boasts.  He's somebody who brags.  He's scared of Mr.

21   Porter; so, he's telling Mr. Porter he's going to be involved,

22   but he didn't really mean it.

23         Again, as a matter of law, the Judge will

24   instruct you none of that makes any difference.  The crime is

25   completed when the agreement is made, when Mr. McGee agrees to

1    participate.  That happened at the coney island.  Everything

2    else after that doesn't matter.

3              But you know what.  Mr. Burgess is just plain

4    wrong.

5              Let's say Mr. McGee is afraid of Mr. Porter.

6    Let's say Mr. McGee just -- you know, he wants to show up at

7    the coney island.  He wants to tell Mr. Porter he's going to

8    participate and then he wants to hightail it out of there.

9    That's all he wants.  And Barkley is lying about going to get

10   the gun.  Okay?  Let's say all of that is true.

11             Then what possible explanation is there for

12   Mr. McGee, in a red Mercury Mariner, that Mr. Porter is not

13   in -- he's with his cousin.  Why on earth, after leaving the

14   coney island, does he then come back after going to get his

15   gun, come back and meet up with everybody at that liquor

16   store?

17             Let me have Clip 2.

18             *(Clip 2 played in open court.)*

19             MR. FELLER:  Mr. McGee to the undercover agent.

20   He comes to the liquor store and says, "What do you want me to

21   do?"

22             And, again, even after the liquor store, he's in

23   the red Mercury Mariner with his cousin.  Not with Mr. Porter.

24   He doesn't have anything to be scared of.  Mr. Porter is in a

25   separate car with Mr. Barkley.  And you know what.  He gets

1    into the storage facility, and he's behind a locked gate, that

2    Mr. McGee is having trouble getting through.

3              And so what does Mr. McGee, this man who is

4    terrified of Mr. Porter, who is just bragging, who just can't

5    wait to get the heck out of there, what does he do?  He gets

6    on the phone with Agent Nether for instructions on how to open

7    the gate.

8              Clip C 3.

9              *(Clip C3 played in open court.)*

10             MR. FELLER:  Does that sound like somebody who

11   is terrified and is trying to get away from Mr. Porter?

12             And then what happens?  Then what happens?

13             Let's go with Mr. Burgess as far as, well, six

14   flash bang grenades all wired together.

15             Yeah, that's pretty scary.  I would be scared

16   too.

17             So, Mr. McGee he takes off and, you know, he's

18   scared of that and he drives away.  Okay.  Let's go with him

19   as far as that.

20             But then he abandons the car and runs off in the

21   snow on foot.  Is that what you do if you're innocent, if you

22   haven't done anything wrong, if you weren't planning a

23   robbery?  You would take off and start running on foot?

24             And then for weeks, for weeks the search was

25   going on.  You don't go home.  You don't go to family members.

1    You hide out in some guy's basement with, by the way, a gun

2    that Mr. Barkley told you about.

3              It's not that Mr. Barkley is up here testifying

4    and just making things up.  That's not how you evaluate him;

5    well, did he seem like he was telling the truth or not.  It's

6    the things he told you, the details he told you, were those

7    consistent with the other evidence.  Was it consistent with

8    the fact that some guys from the robbery of the day before

9    were found in Mr. Porter's house, as both Mr. Barkley and

10   Agent Jury testified about.

11             Is it consistent that a gun is found with -- is

12   this a coincidence that this guns who happens to go to coney

13   island and happens to agree to participate in a robbery,

14   happens to meet em' at a liquor store, happens to try to get

15   into the storage facility and punch in the code, happens to

16   run away in the snow, happens to then be hiding out in some

17   guy's basement and then there just happens to be a gun behind

18   the couch?

19             And this is what we call physical evidence.

20             Ladies and gentlemen, there's a fair amount of

21   video in this case.  There's a fair amount of testimony.  But

22   I submit to you that this one clip -- it is impossible to

23   reconcile this clip with anything other than the existence of

24   an agreement and Mr. McGee's participation in it.

25             5, 3, please.

1                    *(Exhibit 5, Clip 3 played in open court.)*

2              MR. FELLER:  We're going to come in with

3      choppers.  We're going to come in with masks.  It should go

4      smooth."

5              Ladies and gentlemen, on behalf of the United

6      States, I ask you to return a verdict of guilty.

7              Thank you.

8              THE COURT:  Thank you.

9              Now, we have to eliminate two of the jurors, and

10     Ms. Ware will do that with our famous box of numbers.

11                  *(Case Manager Ware pulls two jurors' names from*

12                  *the box.)*

13              THE COURT:  Juror No. 1 and Juror No. 5.  Thank

14     you very much.

15              Please take whatever you have in the jury room

16     and bring it out here, because we have some certificates for

17     you.  And thank you.

18              How many lunches did we get, Ms. Ware?

19              CASE MANAGER WARE:  14.

20              THE COURT:  You can't sit in on deliberations,

21     but you are more than welcome to take the lunch.  I guess I

22     should apologize that it's not coney islands.

23              Just leave those in the jury room.

24                  *(Juror Nos. 1 and 5 leave the courtroom at 12:05*

25                  *p.m.)*

1          THE COURT:  Okay.  For the rest of you, now it's

2     time that you can talk about it after I give you the

3     instructions.

4          So, you have a copy of the instructions in your

5     hand.  There are three ways to use it and one way that I ask

6     that you not use it.

7          The good ways are -- and it's your choice --

8     read along with me, not read along with me, or read along with

9     me part of the time and not read along part of the time.

10         What I would ask that you not do is to be

11    reading page ten when I'm reading page five, because while we

12    have two ears and two eyes, we only have one brain, and it can

13    only be focusing on one or the other.

14         So, please focus on what I'm reading either by

15    reading along with me or not reading along with me, but don't

16    read a different page.

17         And as I indicated, these are yours.  You can go

18    into the jury room with them.  If you want to make notes on

19    them --

20         If you'll just wait in the back for a minute.

21              *(Off the record.)*

22         THE COURT:  And I may misread something.  If I

23    find something here that's wrong, even though it has all been

24    proofread several times, I will tell you I'm saying something

25    different than is printed.  If I misread it and there's any

1  difference in what I'm saying, it's the pages that control.

2  But I haven't made a mistake since about seven o'clock this

3  morning.  So, hopefully I won't misread anything.

4             *(The Court read the jury instructions to the*

5             *jury.  The jury instructions were not*

6             *transcribed.)*

7                          *   *   *

8             MR. FELLER:  Your Honor, I know Ms. Oliver is

9  working on getting a computer ready.  She has not yet

10 returned.  So, I don't know whether we want to break or --

11            THE COURT:  All right.  We are working on

12 getting a computer.

13            Is it agreeable to both counsel that she should

14 be allowed to go in the jury room just to show how the

15 computer works?

16            MR. FELLER:  Absolutely, Your Honor.

17            MR. BURGESS:  I have no problem with that.

18            THE COURT:  Okay.  You can start your

19 deliberations.

20            The first thing, as I said, is to select a

21 foreperson.  Maybe the second thing is to eat your lunch or

22 you can do both at the same time.  But hopefully your lunch is

23 here.

24            So, all rise for the jury.

25            You may now begin -- I have to swear in the

```
 1    court officer.

 2                    (Bailiff sworn.)

 3                    THE COURT:  Hang on a second.  All of you have a

 4    verdict form.  But the only one that counts is the

 5    foreperson's, and that will be given to me when you reach a

 6    verdict in open court.  I will look at it and then give it

 7    back to the foreperson.

 8                    The rest of you have the verdict form for a

 9    reference point.  Okay?

10                    (Jury leaves the courtroom at 12:47 p.m.)

11                    THE COURT:  You have not been forgotten in the

12    back.

13                    Do you have any objections to the instructions?

14                    MR. FELLER:  No, Your Honor.

15                    MR. BURGESS:  No, Your Honor.

16                    (Recess held at 12:48 p.m.)

17                    (Jury enters the courtroom at 2:15 p.m.)

18                    THE COURT:  Everyone please be seated.

19                    The jurors are present and in their place, and I

20    have a note that indicates there's a verdict.

21                    If the foreperson would hand it to Ms. Ware,

22    please.

23                    (The verdict form is handed to the Court.)

24                    THE COURT:  Ms. Ware, if you would return it.

25                    If the foreperson would stand and please read
```

```
 1    the verdict, please.
 2                    JUROR NO. 9:  "Count 1, conspiracy to possess
 3    with intent to distribute controlled substances.
 4                    "As to Count 1 of the First Superseding
 5    Indictment, conspiracy to possess with intent to distribute
 6    controlled substances, we, the Jury, after full consideration
 7    and due deliberation, unanimously find the Defendant, Alistair
 8    Rufus McGee, guilty.
 9                    "If you find the Defendant, Alistair Rufus
10    McGee, guilty as charged in Count 1, please proceed" -- okay.
11                    "We, The jury, having found the Defendant,
12    Alistair Rufus McGee, guilty of the offense charged in Count
13    1, we, the Jury, find the following amount of cocaine was
14    involved in the offense:
15                    "More than 5 kilograms."
16                    THE COURT:  Thank you.
17                    And you signed that?
18                    JUROR NO. 9:  Yes, I did.
19                    THE COURT:  All right.  You may sit down.
20                    Please return the verdict to Ms. Ware, please.
21                    I'm going to ask each and every one of you --
22    and, again, I'm going to refer to you by number out of my own
23    laziness rather than rudeness.
24                    Juror No. 3, is that your verdict?
25                    JUROR NO. 3:  Yes, it is.
```

```
 1                    THE COURT:  Juror No. 4.

 2                    JUROR NO. 4:  Yes, it is.

 3                    THE COURT:  Juror No. 6.

 4                    JUROR NO. 6:  Yes, it is.

 5                    THE COURT:  Juror No. 7.

 6                    JUROR NO. 7:  Yes, it is.

 7                    THE COURT:  Please hand it straight back.

 8                    And you are Juror No. 2, right?

 9                    JUROR NO. 2:  Yes.  That is my verdict.

10                    THE COURT:  Juror No. 14.

11                    JUROR NO. 14:  Yes, it is.

12                    THE COURT:  Juror No. 13.

13                    JUROR NO. 13:  Yes, it is.

14                    THE COURT:  Juror No. 12.

15                    JUROR NO. 12:  Yes, it is.

16                    THE COURT:  Juror No. 11?

17                    JUROR NO. 11:  Yes, it is.

18                    THE COURT:  Juror No. 10?

19                    JUROR NO. 10:  Yes, it is.

20                    THE COURT:  Juror No, 9, you have already told

21   us, but tell us again.

22                    JUROR NO. 9:  Yes, it is.

23                    THE COURT:  Juror No. 8.

24                    JUROR NO. 8:  Yes, it is.

25                    THE COURT:  Okay.  Anyone have any questions
```

 1    before I discharge the jury?

 2              MR. FELLER:  No, Your Honor.  Thank you.

 3              MR. BURGESS:  No, Your Honor.

 4              THE COURT:  Okay.  You are discharged with

 5    thanks.

 6              Please wait in the jury room.  I have some

 7    certificates.

 8              Rise for the jury, please.

 9              Leave those jury pins too, please, because they

10    are hard to get.

11              *(Jury leaves the courtroom at 2:28 p.m.)*

12              THE COURT:  Anything anyone wants to put on the

13    record?

14              MR. FELLER:  Yes, Your Honor.

15              Pursuant to 3143(b)(2), the Government seeks

16    remand of this Defendant.  Pursuant to that statute remand is

17    mandatory in any drug case punishable by more than 10 years

18    imprisonment.

19              The mandatory minimum here is 10 years, barring

20    exceptional circumstances.

21              Here, we have a Defendant who is unemployed,

22    unmarried, no children, involving a violent offense.  We

23    have -- we were here just last week on a -- because he had

24    been arrested for drunk driving, had violated his tether on

25    five occasions.  We also have a civilian witness, cooperating

```
 1   Defendant who had testified that if this Defendant is out,
 2   presents a risk there.
 3               So, for all of those reasons, Your Honor, and
 4   given what is a 10-year mandatory minimum sentence and
 5   possibly significantly more, the Government would ask for
 6   remand.
 7               THE COURT:  Mr. Burgess?
 8               MR. BURGESS:  Your Honor, pursuant to 18 USC
 9   3145(c), the Court has discretion under certain circumstances
10   to allow my client to remain out on bond.
11               My client has always appeared.  His pretrial
12   officer is in constant contact with him.  Obviously last week
13   at the pretrial he made efforts immediately, when he found
14   out, to contact me, myself, as well as the pretrial.  He has
15   always appeared in court with family and girlfriend.
16               I think that he has community ties, as well as
17   his appearance at his court dates in this case and his
18   pretrial, allow him to remain out on bond at presentencing.
19               THE COURT:  Are you working?
20               MR. McGEE:  No, sir.
21               THE COURT:  Pardon?
22               MR. McGEE:  No, sir.
23               THE COURT:  What do you do all day?
24               MR. McGEE:  For the last couple of weeks I done
25   had my kids.  I been just with my kids.
```

1              THE COURT:  How old are your kids?

2              MR. McGEE:  I have one daughter 14.  I have a

3     daughter 11.  I have a son that will be three on October 19th.

4              THE COURT:  I'm going to ask for a new report

5     even though he was here a week or two ago.

6              What has happened with the drunk driving?

7              MR. McGEE:  I go on October 15th.

8              THE COURT:  I am going to ask pretrial for a new

9     report.

10             Bond will be continued until we get that report,

11     and a hearing date will be set.

12             MR. BURGESS:  Thank you, Your Honor.

13             MR. McGEE:  Thank you, Your Honor.

14             THE COURT:  You are free to go, but you have a

15     lot of responsibility to show up.

16             MR. McGEE:  Yes, sir.

17             THE COURT:  Okay.  Because that 10 years is

18     going to look like a small amount of time when they add on for

19     whatever they can add on for not showing up.

20             MR. McGEE:  I'll be here.

21             THE COURT:  All right.  Thank you.

22             MR. McGEE:  Thank you.

23             MR. BURGESS:  Thank you, Your Honor.

24             THE COURT:  Let's have a sentencing date,

25     please, Ms. Ware.

```
1              CASE MANAGER WARE:  February the 10th, 2:30.

2              THE COURT:  Wait a minute.  90 days sometime.

3              CASE MANAGER WARE:  January the 10th.

4              THE COURT:  January the 10th.  What time?

5              CASE MANAGER WARE:  2:30.

6              THE COURT:  Okay.  Are you available?

7              MR. FELLER:  I will be here, Your Honor.

8              MR. BURGESS:  I am available, Your Honor.

9              THE COURT:  Okay.

10             MR. BURGESS:  Thank you, Your Honor.

11             THE COURT:  And you are available?

12             MR. McGEE:  Yes, indeed.

13             THE COURT:  Okay.

14             MR. McGEE:  Thank you again.

15             THE COURT:  You are welcome.

16             MR. FELLER:  Your Honor, I'm sorry.  I don't

17   know what your policy is with regard to speaking to the jurors

18   afterwards.

19             THE COURT:  I go and talk to them.  And --

20             Do you want to talk to them?

21             MR. FELLER:  If I could, sure.

22             THE COURT:  I ask them if they want to stick

23   around, and then I will come and invite you.

24             What about you, Mr. Burgess?

25             MR. BURGESS:  That's up to them.  If they
```

1    want to --

2                    THE COURT:  No, no.  Do you want to?

3                    MR. BURGESS:  I don't have any interest in

4    talking to the jury, Your Honor, unless they want to speak to

5    me for some reason.

6                    *(Proceedings adjourned at 2:34 p.m.)*

7                              —      —      —

8

9

10

11

12

13

14   STATE OF MICHIGAN )
                       ) ss.
15   COUNTY OF WAYNE   )

16

17   I, Denise A. Mosby, Federal Official Court Reporter, do
     certify that the foregoing is a correct transcript from the
     record of proceedings in the above matter.

18

19                              s/ Denise A. Mosby

20                              _____
                                DENISE A. MOSBY, CSR, RMR, CRR
                                United States Court Reporter
21                              124 Theodore Levin U.S. Courthouse
                                231 W. Lafayette Boulevard
22                              Detroit, MI 48226
                                313.961.6230
23                              Denise_Mosby@mied.uscourts.gov

24   Dated:   MARCH 22, 2011

25